IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

TYLER LEE CANARIS,

    Plaintiff,

v.

MICHAEL MCMASTER, in his
Individual Capacity as a
former Deputy of the Paulding
County Sheriff's Office, and
GARY GULLEDGE, in his Individual
and Official Capacity as Sheriff
of Paulding County,

    Defendants.

_____/

- - -

VIDEOTAPED DEPOSITION OF JOHN DALE
MAY 23, 2025
10:04 A.M. - 1:29 P.M.

- - -

110 S.E. 6TH STREET
SUITE 1980
FORT LAUDERDALE, FLORIDA 33301

- - -

Reported by:

Keith Rabinowitz, Court Reporter

Notary Public, State of Florida



Page 2

APPEARANCES:

On behalf of the Plaintiff:
THE COCHRAN FIRM ATLANTA
BY: SAMUEL L. STARK, ESQUIRE
   100 Peachtree Street N.W.
   Suite 2600
   Atlanta, Georgia 30303
   (404) 222-9922
   sstarks@cochranfirmatl.com

On behalf of the Defendant:
BUCKLEY, CHRISTOPER, HANSEL
BY: TIM BUCKLEY, ESQUIRE
   â€‹2970 Clairmont Road NE
   Suite 650
   Atlanta, Georgia 30329
   (404) 633-9230
   tbuckley@bchlawpc.com

ALSO PRESENT:
JASON WAYMIRE (via telephone)
ERIC WILLIAMS, VIDEOGRAPHER

Page 3

- - -
INDEX
- - -

Testimony of: JOHN DALE                     PAGE
     BY MR. STARK............................... 04

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION                PAGE
EXHIBIT-1     CV................................... 06
EXHIBIT-2     TESTIMONY LIST...................... 47
EXHIBIT-3     REPORT.............................. 20
EXHIBIT-4     ORDER MOTION TO DISMISS............. 23
EXHIBIT-5     OFFICER-INVOLVED SHOOTING POLICY.... 79
EXHIBIT-6     EARLY IDENTIFICATION SYSTEMS 5/2020. 80
EXHIBIT-7     REPORTING USE OF FORCE.............. 83
EXHIBIT-8     NATIONAL CONSENSUS POLICY AND
              DISCUSSION PAPER ON USE OF FORCE.... 87
EXHIBIT-9     USE OF FORCE REPORTS           90
EXHIBIT-10    POST PROFILE....................... 116
EXHIBIT-11    TERMINATION REPORT................. 117
EXHIBIT-12    GRAND JURY DOCUMENT.................117
EXHIBIT-13    PAULDING COUNTY SHERRIF'S
              PROCEDURES......................... 124
EXHIBIT-14    DOCUMENT ATTACHED TO COMPLAINT
              80 OF 80...........................
130
EXHIBIT-15    DOCUMENT ATTACHED TO COMPLAINT
              79 of 80........................... 132

Page 4

P R O C E E D I N G S:

THE VIDEOGRAPHER:  We are now on the record. This begins Videotape Number 1 in the deposition of John Dale in the matter of Tyler Lee Canaris versus Michael McMaster and George Gulledge.

Today is Friday, May 23rd, 2025 and the time is 10:04 a.m.  This deposition is being taken at 110 Southeast 6th Street, Suite 1970, Fort Lauderdale, Florida.

The videographer is Eric Williams of Magna Legal Services and the court reporter is Keith Rabinowitz of Magna Legal Services.

Will counsel and all parties present state their appearance and whom they represent, after which the court reporter will swear in the witness.

MR. STARK:  Sam Stark for the Plaintiff.

MR. BUCKLEY:  Tim Buckley on behalf of the Sheriff.

MR. WAYMAYER:  Jason Waymire on behalf of Michael McMaster.

MR. BUCKLEY:  Gary Gulledge.  Sorry.

THE REPORTER:  Okay.  You can -- will the witness raise their right hand, please?

(JOHN DALE, after having been duly sworn, was examined and testified as follows:)

Page 5

THE WITNESS:  I do.

THE REPORTER:  You may proceed.

MR. STARK:  Okay.  Great.  For the record, this is the deposition of John Dale taken pursuant to subpoena, notice, and agreement among the parties for all purposes allowed under the Federal Rules of Civil Procedure.

Subject to at least what I would propose to be the standard stipulation, reserving objections except as to the form of the questions and responsiveness of the answers until first use of the deposition and or time of trial, if that is agreeable.

MR. BUCKLEY:  That is agreeable on behalf of the Sheriff.

MR. WAYMAYER:  Agree.

- - -
EXAMINATION
- - -

BY MR. STARK:

Q.   Okay.  Good morning, sir.

A.   Good morning.

MR. STARK:  Let's start a little bit here with your qualifications and credentials.  And I'm going to hand you what I've marked as Plaintiff's





LEGAL SERVICES

Page 6

Exhibit-1.

- - -

(EXHIBIT-1, CV, was marked for identification.)

- - -

BY MR. STARK:

Q.    That I believe is a copy of your CV, right, or your current resume.  Am I correct?

A.    Correct.

Q.    Are you employed currently as a police officer?

A.    I'm an assistant chief with the city of Boynton Beach, Florida.

Q.    Okay.  And how long have you served in that capacity?  Since 2022?

A.    Yes.  Little -- little over three years.

Q.    Is that a part-time position?

A.    No.  It's full-time.

Q.    And I take it there's nothing about you serving in that position that prevents you from doing outside work as an expert consultant?

A.    They -- we -- our policy is to submit, like, an off-duty employment authorization.  And I'm fully authorized to do this type of work.

Q.    Okay.  So within your department, you have submitted a request for approval to do off-duty work

Page 7

specific to this case or just in general as a police practices expert?

A.    In general, as a police practice expert, I don't submit a request for every case.

Q.    Okay.  Now, my guess is that if you were an expert in a Florida case on either side, you might have some problems, right?

A.    I typically don't take cases in adjoining -- like anywhere where we would maybe request mutual assistance, the tri-county area.  I usually don't, just to avoid any -- any problem unless it's for the municipality or the agency.

Q.    Okay.  Well, let me ask the question this way.  Do you believe that you would have the discretion pursuant to the approval you have to be a police practices expert outside of your Boynton Beach Police Department employment to serve as an expert for a Plaintiff in a case against a Florida police officer?

A.    I have.  I'd say about -- right now, about 50 percent of my cases are plaintiff and about the other 50 percent are defendant.

Q.    Okay.  So 50 percent plaintiff, 50 percent defendant, and you are currently involved in some cases on behalf of the plaintiff that involve Florida police officers?

Page 8

A.    Yes.

Q.    Okay.  And your department does not have any issue with that as far as you know?

A.    They're very supportive of it.

Q.    All right.  But I take it you -- you haven't gone to them for any pre-approval for specific cases?

A.    No.

Q.    Okay.  You just have a blanket approval to do expert work?

A.    Yes.

Q.    What is your 9:00 to 5:00, so to speak, as it relates to the police department job?

A.    I typically -- right now I work Monday to Thursday for 10-hour days.  It's flexible.  I'm an assistant chief, so if I need to change my schedule to come in at night, I can do that.

Q.    Okay.  What are your duties and responsibilities as an assistant chief?

A.    I've had different roles as assistant chief, but currently I'm in charge of all uniformed personnel.

Q.    So you're in charge of all uniformed personnel with the department?

A.    Yes.  Anything related to operations.

Q.    Okay.  And I take it that would include those assigned to patrol?

Page 9

A.    Yes.

Q.    And so on Fridays and Saturdays and Sundays, is there no assistant chief?

A.    Oh, I'm always an assistant chief.

Q.    Okay.

A.    I'm always on call.  They -- they -- if there's anything they need to call me on, they will.  They're obviously -- there's a chain of command below me, they handle these things.  It's a 24/7 operation.  So, I'm notified by text and email of anything that happens over the weekend.  I get phone calls.

Q.    Okay.  And -- and I would -- I take it from what you said here is that you believe that serving in the dual capacity of being a full-time assistant chief and a police practices expert, in your view, there is no conflict with that?

A.    I wouldn't take a case if there was a conflict.

Q.    Right.  But there is no conflict of interest by virtue of you being a full-time assistant police chief and then also simultaneously offering your services up as a police practices expert?

A.    No.  None at all.  I -- I spend -- like I said, more than -- at least half, sometimes more than half of my cases are plaintiff cases.  So I have no



MAGNA
LEGAL SERVICES

Page 10

problem looking objectively at a case. And if the law enforcement acted inappropriately I'm -- I'm not afraid to say it.

Q. Okay. Do you have a retainer agreement?

A. I do.

Q. Okay. Is that in the Dropbox link with your file?

A. Yes.

Q. Okay. And that retainer agreement, I take it for this case is with the Buckley Christopher firm; is that right?

A. Yes.

Q. And how many hours do you think you've billed so far?

A. I know that I tabulated, I don't know about the total number of hours, but the invoice so far was a little over $15,000.

Q. $15,000. What is your hourly rate?

A. $350 an hour for standard casework and then $450 an hour for testimony, deposition, trial.

Q. Okay. And have you received a check from The Cochran Firm for your deposition today?

A. I have not.

Q. During the break, I will check on that. Tell me -- what is -- you have a standard flat rate, as I

Page 11

understand it, for depositions?

A. No. For deposition, it's $450 an hour with a minimum of three hours.

Q. Minimum of three hours. Maybe that's where I get my three hours from.

A. Yeah.

Q. All right. 450 an hour. Minimum of three hours. Okay. And are -- are you -- are you current on -- when you say 15k, I take it that would not include your preparation for the deposition today?

A. Correct.

Q. About how many hours do you think you put in to prepare?

A. I think total preparation and the review of deposition from the other expert, I think, it was 8.8 hours.

Q. Okay. And that will be added to your roughly 15k, is your recollection?

A. Yes.

Q. 8.8 hours at 350 an hour.

A. Correct.

Q. Okay. Have you ever done any work before with the Buckley Christopher firm?

A. I have not.

Q. Okay. You have other Georgia cases pending;

Page 12

is that right?

A. I have one. I think it's headed to a mediated settlement.

Q. Who was the attorney that hired you?

A. It's a firm out of Chicago, Winston & Strawn, I think.

Q. Okay. And which side are you on?

A. I'm on the defense for Hertz rent-a-car.

Q. Okay. And that's your only pending Georgia case?

A. Correct.

Q. You've done other cases in Georgia?

A. No.

Q. Okay. So this is your second case in Georgia?

A. Yes.

Q. Okay. No previous cases with this firm?

A. No.

Q. Okay. I take it from what I understand and what you've said, you do both cases on the plaintiff and on the defense side and the police practices contexts, right?

A. Yes.

Q. So my guess is that you probably had some cases where you were the plaintiff's expert and the

Page 13

officer alleged to have used excessive force, never got charged?

A. I've only had as the plaintiff not charged. I think pretty much that's all of them.

Q. All right. So roughly how many plaintiffs' civil rights side cases, you -- you -- you've been involved in?

A. On the plaintiffs' side, I would say that almost all of them are federal civil rights.

Q. Yeah, how -- how many though?

A. I think that I have a -- I've been retained as of today, I think 19 cases. I could -- I could look right at my -- I have it in my CV.

Q. Sure, take a look.

A. Yeah. It's -- the CV may not have, like, the most recent one I was retained in.

Q. Okay. Well, let's do it this way, of the cases on your CV, and I'll get a pen for you. Why don't you just mark -- put a P by everyone --

A. I actually have it.

Q. It's designated?

A. Yeah.

Q. Okay. All right. Show me the first one. Okay. I see the first one there retained by a plaintiff. This Teriano case.



Page 14

A.   Yes.
Q.   Right.  That's in district court in Florida, right?
A.   Correct.
Q.   Is that a death case?
A.   It is not.  It's a use of force case involving a canine.
Q.   Involving a canine.  Were any officers charged?
A.   No criminal charges on officers.
Q.   Okay.  No criminal charges.  Did it go to the grand jury?
A.   It had.  I think they just did depositions on the officers involved.  And I'm about to check in with the attorneys to see where we're at in terms of a report.
Q.   So it's under review by the district attorney's office?
A.   I don't believe so.
Q.   Okay.  So, in other words, for this Teriano Cleveland v. Michael Pendergast case, you're -- you're representing the -- the plaintiff in that case as the police practices expert, correct?
A.   Correct.
Q.   The officer or the -- the officers involved, no -- no criminal charges were brought against them,

Page 15

correct?
A.   Not -- not that I know of.
Q.   Okay.  Were -- were there any findings by internal affairs that they did anything wrong?
A.   They haven't -- they have me in a holding pattern until the depositions are done, and I haven't had a -- a -- a full receipt of all the reliance materials at this point.
Q.   All right.  Let me go back here; so...  It sounds like you know though that no criminal charges have been brought; is that right?  In this Pendergast case?  Do you know?
A.   I don't -- I don't -- none that I know of.  Yeah, not that I believe.
Q.   Okay.  All right.  Let me try this a different way.  So, would you agree that whether or not an officer is charged criminally is not dispositive of whether they violated the use of force policies and procedures of their department?
A.   Yeah.  Of course.  So criminal, administrative, civil, I understand the difference.
Q.   Okay.  And would you agree then that whether or not an officer is indicted by a grand jury would not be dispositive of whether they violated the use of force policy of their department?

Page 16

A.   It would be unlikely that they violated a civil rights action and not found guilty of policy violation.
Q.   Okay.  So do you disagree?
A.   I would.  I mean, every policy that I've ever read pretty much says you have to follow the Constitution.  So if they were charged in an excessive use of force case, if they weren't administratively charged before that, I'm pretty sure they would be administratively charged after that.
Q.   Okay.  So, in the cases where you represent the plaintiff, if I'm understanding you, for any case where you represent the plaintiff, if that officer was not indicted by a grand jury, does that mean you -- you -- you withdraw from the case?
A.   No.  I -- I would take the case on a plaintiff.  If I -- I -- I have my opinion, I'm asked to look at it.  If I -- I don't take all cases, but if I looked at the case and -- and this was my opinion, it wouldn't be affected.  I mean, it would be evidence that I would look at in terms of what their finding was.
Q.   Okay.
A.   But.  I would make my -- I'm a police practice expert.  That's what I look at.
Q.   Right.  You're not a lawyer?

Page 17

A.   No.
Q.   You're not a judge?
A.   Correct.
Q.   Right.  And the fact that a grand jury may indict or not indict an officer, that may or may not be dispositive of your independent review?
A.   It -- it may influence my review and the fact that I've had a body, look at evidence, and rule that it met a certain threshold, you know, like a -- beyond a reasonable doubt or a preponderance of the evidence if there's a grand jury indictment and their findings of that investigation.  It -- it would be a neutral and detached investigation.  I would -- I would consider that in my opinion.
Q.   I'm not asking you what you would consider.  I guess here's what I'm asking you.  In your role as a police practices expert, if someone came to you to hire you for the plaintiff where a case against an officer had been presented to a grand jury, but no indictment was returned.  Does that in and of itself mean that you won't get involved in that case because the grand jury has said, we don't think the officer did anything wrong?
A.   No, no, no.  I would take the case.  I've rarely seen the case where -- I would take the case regardless of what a grand jury --



Page 18

Q.  You can elaborate as much as you want on what I'm asking you, but all I'm essentially asking you is this.  Not being a lawyer, not being a judge, am I correct that when you review a case, regardless of what the court has decided, you're doing an independent review as a police practices expert?

A.  I would agree with that.

Q.  If you're not doing a review as a judge or as a juror.

A.  No.  Absolutely, not.

Q.  Okay.  And you're not doing the review as a lawyer because you're not a lawyer?

A.  That's correct.

Q.  Okay.  So in other words, the extent to which -- let's just go to this case.  Whether or not the grand jury returned an indictment?  That is not dispositive of your review, is it?

A.  My review is purely not -- not force-related, it's regarding the -- the policies and practices of the agency.

Q.  Okay.  Well, let's try it this way.  The extent to which you make any reference in your report to what the grand jury did or didn't do.  That has no direct bearing on your opinions; is that fair?

A.  If a grand jury -- because a grand jury can

Page 19

make recommendations, and if in their recommendations they had something that spoke to the practices of the agency, and that was their finding after hearing all the testimony, it would be something I would consider.

Q.  You're answering a different question than what I'm asking.

A.  Okay.  You're going to have to rephrase.

Q.  Here's what I'm asking you.  For your review in this case, as I understand it, you did not conduct a review of the use of force incident, correct?

A.  That's correct.

Q.  Okay.  And you state that in your report, right?

A.  I did.

Q.  So you did no analysis or evaluation of whether or not Deputy McMaster's use of force was in violation of the Paulding County Sheriff's Office's policy, correct?

A.  I -- I didn't.  And now -- I did -- I -- well, I've looked at his use of force.  I didn't analyze it with the purposes of rendering an opinion on his use of force.

MR. STARK:  Okay.  Let's go to -- let's do it this way.

THE WITNESS:  Sure.

Page 20

MR. STARK:  Because I -- I feel like you're not directly answering my question and --

THE WITNESS:  Okay.

MR. STARK:  -- we can try it a few different ways.  I mean, there's your report, Claimant's Exhibit Number 3, right?  So --

MR. BUCKLEY:  This is 3.  I didn't --

MR. STARK:  Yes.  It's 3.  I skipped 2.

MR. BUCKLEY:  Okay.

MR. STARK:  But I'll come back.

MR. BUCKLEY:  That's fine.

MR. STARK:  That's just by virtue of the way that, like, the conversation is going.

MR. BUCKLEY:  All right.

                    - - -

(EXHIBIT-3, REPORT, was marked for identification.)

                    - - -

BY MR. STARK:

Q.  All right.  So, on page 1 of your report.

A.  Yes.

Q.  The last sentence is, "My analysis will not examine the actual use of force by former Deputy Michael McMaster in this matter."  Is that true or not true?

A.  Yeah.  For the purposes of rendering an

Page 21

opinion of whether it was justified or not justified.

Q.  Okay.  So as it relates to your opinions in this case as set forth in your report, none of your opinions are based on an evaluation or an analysis of the actual use of force by Deputy Michael McMaster; is that correct?

A.  I agree with that.

Q.  Okay.  All right.  So that being the case, the extent to which the grand jury did or did not indict him for whether his use of force was in violation of the law.  That would have no bearing on your opinions, because you didn't look at his use of force, right?

A.  If -- if the -- yeah, it would have a -- it would have an impact in that if the grand jury returned a finding that the force was excessive and if during the investigation -- the administrative investigation, they found that no excessive force was revealed, then that wouldn't be consistent with standard police practices.

Q.  That's -- so there's an indirect -- you're still answering a -- here's my question.  Did the grand jury's decision on whether or not to indict Officer McMaster for use of excessive force, just that aspect of their decision, does that have a bearing on your opinions when you didn't evaluate his use of force?

A.  No.  But I can -- they did evaluate it, and



Page 22

they rendered that decision. And that decision is mirrored by the internal affairs investigation conducted by Paulding County.

So, in -- in some way, I feel that it -- it validates. It supports their decision that they didn't find excessive force.

Q. I understand that you may feel that, and that may be the inference you draw from that. But what I'm saying to you is, if I read correctly what you wrote in your report, "My analysis will not examine the actual use of force by former Deputy Michael McMaster in this matter." Why does it matter from a use of force standpoint? Not training, not supervision. Why does it matter what the grand jury decided?

A. Because if they found that he used excessive force, it would be a violation of policy, and the policy intersects with any administrative matter.

Q. Why does that matter to you and the scope of what you were asked to do?

A. Because I looked at their administrative investigation. And their investigation was -- happened before the grand jury.

Q. Okay.

A. And the grand jury comes back with a finding of no excessive force, and that's the same finding that

Page 23

they came up with.

Q. Okay. So in other words, a court's decision about Mr. McMaster's conduct, grand jury, court of law, that would be relevant to you.

A. I think so.

MR. STARK: Okay. All right. That being so. Let me show you this. Well, tell me if this is part of your file. Something that you review. And tell me if it's consistent with what you're saying. Is it relevant to your analysis?

I think I'll find it in here somewhere. If not, we'll make a copy, but...

Why don't we do this? Let me hand you this copy. Plaintiff's Exhibit Number 4. This is the order granting Defendants' Motion To Dismiss.

- - -

(EXHIBIT-4, ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, was marked for identification.)

- - -

MR. STARK: I do have some extra copies here somewhere that I'll find momentarily.

MR. BUCKLEY: In the criminal proceeding.

MR. STARK: Correct.

MR. BUCKLEY: Okay. All right.

MR. STARK: Okay.

Page 24

MR. BUCKLEY: I haven't reviewed it in full, but I'm --

MR. STARK: Sure.

MR. BUCKLEY: Yeah.

BY MR. STARK:

Q. Have you ever seen Plaintiff's Exhibit-4? Was that produced to you?

A. I don't know if it was or not. I think your expert may have referenced it or --

Q. Okay.

A. -- quote parts of it.

Q. Here's my question. Was it produced to you as part of your file? And if not -- if we take a break, can you go on a computer and tell me?

A. I can look at my --

Q. Absolutely.

A. I -- I don't see it in the reliance materials.

Q. Okay. All right. So based on your current review of your file, which I assume Plaintiff's Exhibit-3 delineates every single document and all the material that you reviewed as part of this case, correct?

A. But as I mentioned, your expert, which is in my analysis, includes quotations from an order. And if that's the same order, then I have reviewed parts of this document which is exhibited number 4.

Page 25

Q. Not my question.

A. But you're asking me if I reviewed number 4, and I'm telling you that I may have reviewed parts of number 4.

Q. Not my question. My question is, have you reviewed the entire contents of Plaintiff's Exhibit-4?

A. I have not.

Q. Okay. Was the entire contents of Plaintiff's Exhibit-4 ever presented to you before you rendered an opinion in this case?

A. It was not.

Q. Okay. All right. So the extent to which court rulings, grand jury decisions, internal affairs decisions, you say are relevant to your analysis in this case. I take it if this is a legal ruling from a court regarding the circumstances of this case, it too would be relevant, correct?

A. It -- it could be.

Q. It could be. All right. You can't say because you've never read it?

A. Well, I can't say because I read it. And I don't know. I'm not an attorney. So I don't know the -- the context of the order and -- and what it was deciding.

Q. I understand. You're not an attorney as it relates to understanding grand jury proceedings either,



MAGNA LEGAL SERVICES

Page 26

right?

A. Well, a grand jury proceeding is -- is fairly straightforward. It's almost, like, a verdict from a jury, you know, guilty or not guilty, it's -- it's saying true bill or no true bill. I -- I understand that it -- if it levied these criminal charges or not, and I can -- the -- the recommendations are written by jurors who are plain people and they write plainly.

Q. I understand. But the extent to which there is an order from a court of law that addresses factual and legal findings concerning this incident that's reflected in -- reflected in Plaintiff's Exhibit Number 4, which is a 13-page report. Just so the record is clear, you have never read the full contents of this report, correct?

A. Correct.

Q. All right.

MR. BUCKLEY: Just for clarity. It -- it's an order. Not a report.

MR. STARK: Your objection is noted.

BY MR. STARK:

Q. Let me clarify for the record. The extent to which there is an order from a court of law dealing with the facts and circumstances of this incident as reflected in Plaintiff's Exhibit Number 4, this 13-page report --

Page 27

order I should say, correct me. You've never read the order, is that correct?

A. I have not read Exhibit Number 4.

Q. Okay. And it is not part of your file?

A. It's not part of my file.

Q. It was not given to you when you were retained?

A. Not to my knowledge.

Q. Well, to your knowledge, did you accurately document everything you were given in Plaintiff's Exhibit-3, your report?

A. I believe I have.

Q. Okay. And previously you looked, and you didn't see the order granting Defendants' motion to dismiss accusation reflected in your report, right?

A. Correct.

Q. Okay. Do you think there's still some possibility that you omitted it? That you got it, but you omitted it?

A. It's, you know, it's computers, it's always a possibility that -- that I received it and -- and didn't put it in the file.

Q. Right. And the possibility that you had it and you forgot to put it in your report.

A. It's always a possibility.

Page 28

Q. Right.

A. I don't know what the number is on that, but...

Q. Okay. But as you sit here right now, you can look at it. Does it look like something you think you ever read?

A. Well, I remember the title.

Q. Okay.

A. I believe I remember the title.

Q. Okay.

A. And I believe this title was listed in your expert's report, and I believe that I've reviewed parts of this document.

Q. Okay.

A. But not the document in its entirety.

Q. Okay. But just so the record is clear. The extent to which you're referring to Scott Defoe's deposition and what he may have referenced or what he may have wrote in his report. Those are things that occur after you were retained, right?

A. Correct.

Q. Those are things that you've only -- at least the deposition you've only recently had the benefit of reviewing, correct?

A. I had his report prior to issuing my report.

Page 29

Q. The deposition. The deposition. Not the report.

A. But you actually referenced his report as well.

Q. No. The deposition. The extent to which you read things in his deposition. You only did that recently because his deposition was only recently taken?

A. Yes. Yes.

Q. Okay. All right. So, you -- you have made a number of references here to -- well, strike that. Let me ask you this question. What were you hired to do? What -- what was the scope of what you were asked to review?

A. I was given documents and materials related to the case and asked to render opinion.

Q. About what?

A. Concerning the policies and practices of the Paulding County Sheriff's Office.

Q. Okay. Anything else?

A. To look at -- I looked at the reviews from the context that were there, mechanisms for accountability, consistent with general law enforcement practices.

Q. Right. But that falls within your review of the policies and practices, right?

A. Yes.



Page 30

Q. So I'm saying, what was your scope of work to review the policies and practices of the Paulding County Sheriff's office, right?

A. Yes.

Q. Anything else?

A. I'll review the training records for the deputy involved.

Q. Okay. As part of your review of the policies and practices, right?

A. Yes.

Q. Okay. Any -- any -- any other subject matter area that doesn't fall under policy and practices review?

A. Outside of my report, no.

Q. Okay. So your report, as you sit here today and what you just described. It -- does it fairly and accurately set forth the opinions that you have regarding this matter?

A. I believe so.

Q. Okay. Does it fairly and accurately set forth the scope of the matters you were asked to review?

A. I -- yes. I believe so.

Q. Okay. All right. Is there something outstanding, some review that's outstanding still that might require you to supplement your report?

A. It's -- I don't know what comes out of this

Page 31

deposition. If you're asking me to give more opinions, but that may cause me to revise.

Q. No. I'm asking you that as you sit here right now, do you have an assignment currently, not whether you might get one in the future, because we don't know that. As you sit here right now, do you have any open or outstanding assignments regarding this matter?

A. As of this moment right now, I have no additions to make to my report.

Q. Okay. All right. So, and as you sit here right now, as far as you know, your work in this matter is done.

A. As far as I know, yes.

Q. Okay.

MR. BUCKLEY: Object to form. He's a trial expert. That would work.

MR. STARK: Your objection is noted.

BY MR. STARK:

Q. Subject to you maybe being called at trial, I suppose, right? Yes?

A. Yes.

Q. Or if they decide -- you don't know whether they're going to give you something else to look at or not?

A. That's correct.

Page 32

Q. Okay. But as of today, you're not still working on anything relating to this case, other than being here today to do your deposition?

A. Not at this moment.

Q. Okay. All right. So, let's go back. I think we were sort of doing your -- well, I want a couple -- couple more things here, just -- the -- so the report on pages 6 and 7.

A. You can look at my CV.

Q. I'm sorry.

A. Yeah.

Q. Let me get my nomenclature right. Your CV, which is Plaintiff's Exhibit what?

A. 1.

Q. Plaintiff's Exhibit-1. I'll get it right. P1, Plaintiffs Exhibit-1, your CV on pages 6 and 7. Are these all of the cases you have ever been retained in as a police practices expert?

A. No. They were the ones at the time that I provided the CV. I -- I have a -- I have at least one other one that I haven't received the check, but I believe I'm retained.

Q. Okay. Retained by which side?

A. By the defense.

Q. Okay. And what is the entity or police

Page 33

officer involved?

A. I -- I -- I don't have the information on the officer yet. They haven't given me the complete file. But it's a -- an employment-law type case.

Q. An employment law. Not the use of force.

A. Yeah.

Q. Okay. All right. So if we go back to page 6 here, first case retained by the plaintiff, you said no criminal charges as of yet.

I didn't quite understand what your answer was about whether there could be criminal charges.

A. Yeah. At this point they've given me a video tape, and maybe a police report. So from that, I -- I can't really tell you much else about the case.

Q. Okay. Do you think there should be criminal charges?

A. That's not for me to say. I'm not a prosecutor.

Q. I understand. Do you have opinions about whether the officer violated the law?

A. I -- I have an opinion that -- not regarding the law, but an opinion regarding his use of force and it being unreasonable.

Q. Okay. So your opinion is that in this Michael Pendergast case, that particular officer involved used



Page 34

unreasonable force?

A. I can't tell you without reviewing the whole file and all the evidence, but my impression is that it's possible.

Q. You said it was your opinion. Do you want to -- all I'm asking you is, forget -- have you reached an opinion yet?

A. No.

Q. Okay.

A. I -- look I haven't -- not one I'm willing to take him to court. I -- I just got the case.

Q. I understand. So as of right now -- whatever, just say what the answer is. As of right now, you have not reached a final decision for that matter, it's still under review.

A. That's what I'm saying.

Q. Is that good? Okay. All right.

A. I think you want me to say --

Q. No, no, no. That's fine. I -- I don't want you to say anything that -- that you don't feel comfortable saying. What about the Joshua Scarborough case? Have you rendered an opinion already in that case?

A. I have, and I've been deposed in it as well.

Q. Okay. All right. And is your opinion one

Page 35

where you determine that the officer or officers involved used unreasonable or excessive force?

A. Yes.

Q. Okay. And is that opinion in a Rule 26 report?

A. Yes.

Q. Okay. Was the officer indicted?

A. No.

Q. Did it go to a grand jury?

A. Not to my knowledge.

Q. Do you know if it's going to a grand jury?

A. It -- it wasn't at the time I wrote my opinion.

Q. Okay. And if I understood you correctly, tell me if I have this right. If that case does go to a grand jury, depending on the grand jury's findings, it may affect the opinion you've rendered.

A. In this case, no.

Q. No, not in that case? Why not?

A. My -- my finding is that he used unreasonable force in a -- in accordance to what is generally accepted law enforcement practices. What they're looking at is a criminal matter, and -- and it's separate.

Q. Right. And -- and whether or not a jury or a trial judge views it differently, it doesn't change your

Page 36

view as a police practices expert based on your evaluation of the incident?

A. Well, they -- they also look at a different burden of proof, you know. So they -- there's -- there are times where people violate the law -- do not violate the law criminally, but do violate the law administratively. If that makes sense to you.

Q. Okay. But you're not a lawyer, right?

A. No. But I have gone to arbitration on employment law. And I have had people who I've terminated for a criminal offense to which they were found not guilty for. And -- and in arbitration ruled that he, in fact, did commit the offense.

Q. Okay. All right. Let's go to the Saeed Akhtar Khan case, that's you retained for the plaintiff in that one also, right?

A. Yes.

Q. Have you rendered an opinion?

A. Let me think about it. Yes, I have.

Q. Okay. Is it a use of force case?

A. No. It's a investigation's -- a case where I rendered decision regarding investigative practices against Mr. Khan.

Q. Is it a case that involves allegations that an officer violated someone's Fourth Amendment rights?

Page 37

A. No use of force.

Q. No Fourth Amendment rights.

A. You'll have to explain to me all their --

Q. Search Fourth Amendment right, not seizure. Arrest, use of force.

A. No. No Fourth Amendment.

Q. No Fourth Amendment issues?

A. No.

Q. Okay. You've rendered an opinion?

A. Yes.

Q. Was the officer charged?

A. No.

Q. Was it submitted to a grand jury?

A. No.

Q. Did -- did internal affairs review the conduct of the officer?

A. No.

Q. State of Charles Townsend versus Marion County Sheriff's Office, have you rendered an opinion in that case?

A. Yes.

Q. Is it a use of force case?

A. Yes.

Q. Is it a death case?

A. Yes.



MAGNA
LEGAL SERVICES

Page 38

Q.   Was the officer charged?
A.   No.
Q.   Was it submitted to a grand jury?
A.   Not to my knowledge.
Q.   Did internal affairs sustain any rule violations against the officer?
A.   He -- he resigned prior to any administrative review.
Q.   Okay.  I take it though, your conclusion is that the officer violated the Fourth Amendment standards regarding reasonable force; is that correct?
A.   Correct
Q.   We got Luigi -- what is it?  Maosia versus Town of Bay Harbor Islands.  You're retained by the Plaintiff.
A.   Yes.
Q.   Is that a death case?
A.   No.
Q.   Is it an excessive force case?
A.   A false arrest in what is -- in the investigation.
Q.   False arrest.  Okay.  All right.  You've rendered an opinion?
A.   Yes.
Q.   Have you been deposed?

Page 39

A.   No.  Case has been resolved.
Q.   Did the officer make false allegations?
A.   He made allegations that were unsupported by testimony and evidence.
Q.   Okay.  Was the officer charged?
A.   No.
Q.   Did it go to a grand jury?
A.   Not to my knowledge.
Q.   Did internal affairs make a decision about the officer violating policy?
A.   No.
Q.   No, they didn't?
A.   They -- I don't know that they investigated it.
Q.   Okay.  Would that matter to you, the -- the -- if they did and the results of their investigation?
A.   It would -- it would matter to me and that if they reviewed it and failed to conduct the proper investigation in accordance with, you know, accepted practices, then that would -- may render another opinion that they are not engaged in practices that would ensure that these types of events don't occur.
Q.   Sure.  But if internal affairs investigated this incident and reached a different conclusion than you -- would that change your opinion?

Page 40

A.   No.
Q.   Okay.  Why not?
A.   My opinion is based on -- no, it wouldn't be because my opinion is independent of theirs.
Q.   Okay.  All right.  Your opinion in this case then is independent of anyone else that has rendered an opinion, correct?
A.   Absent any other information, that's my opinion based on the facts that I had at the time of the report that I'm not -- I'm not -- okay.
     I'm trying to answer your question.
Q.   No.  That's okay.
A.   I feel like you're tap dancing around it.
Q.   No.  No.  That's okay.  Let me just -- I'm -- maybe I'm inartful this morning.
     Whenever you review a case as a police practices expert, you're doing an independent review, correct?
A.   That's correct.
Q.   You're doing a review that is intended to be objective, right?
A.   Yes.
Q.   You're doing a review that's based on your education, training, and experience, right?
A.   Correct.

Page 41

Q.   It's not based on the lawyer's perspective who sends you the case, right?
A.   Correct.
Q.   Right.  It's not based on the prosecutor's perspective who may or may not have charged the case, right?
A.   Yes.
Q.   It's not based on the grand jury that decides did the officer commit a violation, right?
A.   Correct.
Q.   It's based on your own professional education, experience, and training, right?
A.   Yes.
Q.   Now, I take it there may be sometimes -- you tell me when you may say, oh, let me talk to maybe a ballistics expert or some other type of expert, but when you render these Rule 26 reports, you're saying that you, John Dale, you alone have looked at all the evidence, objectively evaluated it, and the opinion is your opinion, right?
A.   That's correct.
Q.   Okay.  All right.  So if we go to this Anthony Melchiorre case.  That's from Florida.
A.   Yes.
Q.   Death case?

11 (Pages 38 to 41)



Page 42

A.  Use of force, non-death.
Q.  Have you rendered an opinion?
A.  I did.
Q.  Rule 26 report.
A.  No.  No testimony.
Q.  Report -- written report.  It's in federal court, right?
A.  Yes.
Q.  Okay.  Have you given them that Rule 26 report?
A.  Yes.
Q.  Okay.  Was the officer charged?
A.  No.
Q.  Did it go to a grand jury?
A.  No.
Q.  Do you know if it will go to a grand jury?
A.  I -- I don't believe so.
Q.  Okay.  Did internal affairs review the decision by the -- or the actions of the officer?
A.  Not that I recall.
Q.  Was the officer fired?
A.  Not that I know of.
Q.  Okay.  All right.  We got this George Girardi. You've rendered an opinion?
A.  Yes.

Page 43

Q.  Is that a use of force?
A.  Yes.
Q.  Death case?
A.  No.
Q.  Was the officer charged?
A.  No.
Q.  Was it submitted to a grand jury?
A.  It went to trial testimony.  Oh, no, no.  I'm sorry.  There was no grand jury.
Q.  No grand jury.  Okay.  You -- you -- so this case went to trial?
A.  Yes.
Q.  What was the outcome?
A.  They ruled for the defense.
Q.  Ruled for the defense.  You were on the side of the Plaintiff.
A.  I was retained by the Plaintiff's attorney.
Q.  Right.  So they ruled, kind of, against the side you were on.
A.  Yeah.  I don't -- I don't know that I'm on -- I -- they ruled against the attorneys that retained me.
Q.  Okay.  They ruled against the attorneys that retained you.  And did you testify as a witness?
A.  I did.
Q.  On behalf of the plaintiff?

Page 44

A.  Yes.
Q.  Okay.  All right.  You understand that at a trial, there are two sides, and each side presents evidence, right?
A.  Yeah.  And I -- you understand that I'm not on anybody's side.  I'm there to render an independent opinion.
Q.  Sure.  You were retained by the Plaintiff, right?
A.  Yes.
Q.  To be an expert witness on behalf of the Plaintiff, right?
A.  Correct.
Q.  To render an objective opinion with respect to the Plaintiff's case?
A.  Yes.
Q.  Okay.  All right.  Now, did the fact that the jury ruled against the Plaintiff, did that change your view about the police practices opinion that you gave?
A.  No.
Q.  Did it make you think you -- you -- you'd gotten it wrong?
A.  No.
Q.  Okay.  All right.  Carmen Reincon and Carlos Reincon.  That -- you were retained by -- that's a U.S.

Page 45

attorney's case, right?  Well, hold on.  Sorry, you were retained by the plaintiff.
A.  Yes.
Q.  Death case?
A.  Yes.
Q.  Was the officer charged?
A.  No.
Q.  Did it go to a grand jury?
A.  Not to my knowledge.
Q.  Was the officer disciplined or fired?
A.  Not to my knowledge.
Q.  Did internal affairs find any violations in the officer's conduct?
A.  Not to my knowledge.
Q.  Okay.  Have you done your Rule 26 report?
A.  Yes.
Q.  Hasn't gone to trial?
A.  I -- I don't know if the case is still active.
Q.  Okay.  Have you been deposed?
A.  Yes, I was deposed.
Q.  Okay.  Then we got Ulai Perez.  The State of Leicester, Jesus Machado.  That's U.S. District Court in Florida.  Is that a death case?
A.  No.
Q.  Was the officer fired?



Page 46

A. No.

Q. Was he charged criminally?

A. No.

Q. Did internal affairs find any violation in the officer's conduct?

A. No.

Q. You rendered an opinion? I take it that the officer violated the standard regarding use of force.

A. Yes.

Q. And then we got this John Sosinovich. Anthony Carmichael versus the City of Camden. That's in New Jersey, that's in federal court, right?

A. Yes.

Q. Is that case over?

A. I believe so. A while ago.

MR. BUCKLEY: It was older or over.

THE WITNESS: Over. It -- it --

It's -- I don't know that it's over. Yeah, I -- I believe so. It's an employment-law case.

MR. STARK: Employment law. Okay. All right. So let's -- while we're -- since we kind of just did that, we have this -- oh, sorry.

MR. BUCKLEY: Did you ask -- did you ask him about the one at the bottom of page 6 that says retained plaintiff Scarborough? I -- I didn't hear

Page 47

you ask about that.

MR. STARK: I thought I did.

MR. BUCKLEY: You did. Did you -- okay.

MR. STARK: Right. So that's -- so -- so that's from Plaintiff's Exhibit-1. Oh, sorry. Plaintiff's Exhibit-2, which I skipped earlier.

--

(EXHIBIT-2, TESTIMONY LIST, was marked for identification.)

--

BY MR. STARK:

Q. This is -- this is -- you tell me what it is. We'll do it that way.

A. My disclosure of any testimony for the last four years.

Q. Okay. All right. And the first one here is this Scarborough case that I think we were just talking about, right?

A. Correct. It's a use of force involving a taser.

Q. Okay. Now, of the -- any of these cases on this list, Plaintiff's Exhibit-2, do any of these cases involve claims against a supervisor or a department for failing to train or discipline?

A. The first one is a failure to discipline.

Page 48

Q. Scarborough?

A. Yes. I -- I'd say more like a -- a failure to conduct a legitimate, meaningful internal review.

Q. Okay. And in your Rule 26 written opinion, you address that?

A. Yes.

Q. And you determined that the review of that particular matter was not adequately conducted, for lack of a better way of putting it?

A. Yes.

Q. Do any of the others involve a -- a -- a review by you, relating to a supervisor or a city police department or county sheriff's office, not having adequate policies and procedures regarding training, use of force, etc.?

A. The others, no.

Q. Okay. So, of all the cases you've done, are there any others that you would consider like this one from the standpoint of you're not looking so much at the underlying incident, but you're looking at the department's response or the adequacy of their policies and procedures, any other cases like that you've been involved in?

A. As an expert for court, no.

Q. Okay.

Page 49

A. But as a consultant for -- under a consent decree, yes.

Q. Okay. You -- you've been a consultant for a police department that's under a consent decree?

A. As a part of the -- the check comes from the police department, but I don't know that the police department retained us.

The Department of Justice had a consent decree on the city of Albuquerque, it ended this past year.

And as a part of that review, they found that they had a backlog of almost 700 use of force incidents, and they hired a team of us to conduct reviews of these outstanding force encounters.

Q. Uh-huh.

A. And so over a two-year period, I reviewed 62 cases as a part of that consent decree, and they encompass the use of force policy, if there were training needs, if there were policy gaps. So it -- it was kind of the full practices review.

Q. Right. So you were like one of the monitors being paid by the -- the -- the DOJ to -- to -- assist with monitoring or compliance?

A. The monitors will be someone else. DOJ has a -- they call it CASA, it's a stipulated agreement between DOJ and the city, and the terms of that agreement are

13 (Pages 46 to 49)


MAGNA
LEGAL SERVICES

Page 50

monitored by the monitors, and there are benchmarks they have to meet. And the monitors basically said that, hey, Albuquerque, you didn't investigate this backlog, so we're going to make you, you can't -- you don't have the resources internally to do it. So we're going to bring in a team, and they put out an RFP, I guess, and the firm that -- that brought me in won the RFP, and they paid me to -- to look at these cases.

Q. What's the name of that firm?

A. DLG.

Q. Where are they based at?

A. I don't know where they're physically located.

Q. Okay. So, let's do a little bit more, and then we'll -- we'll take a break. Going back to P1, your resume.

A. Yes.

Q. So we got this Boynton Beach Police Department from 2020 through the present as the Assistant Chief, right?

A. Correct.

Q. And it looks like part of that job involves transforming the department's internal affairs force review and pursuit review process, right?

A. Correct, yes.

Q. Okay. Currently, does there exist within that

Page 51

department an early warning or early intervention policy?

A. It -- it's -- it may be in policy, I'm not sure if it's in policy or not, but it's part of the program that manages all the force complaints and early intervention program.

Q. What's that program called?

A. IAPro.

Q. Okay.

A. It's used in about half the police departments in the country.

Q. Right. So Boynton Beach Police Department uses IAPro.

A. Correct.

Q. Okay.

A. And a -- and a module of it called Blue Team.

Q. Blue Team. All right. Is there any written policy or procedure with the Boynton Beach Police Department in writing that sets forth a -- a guideline or information regarding an early warning system?

A. There is to the degree that what a supervisor is expected to do if they get an EIP alert.

Q. Okay. What's the policy called?

A. I'm not sure what policy it's under. If it -- if it's under its own policy, if it's under the use of force policy, but an early intervention type alert, it

Page 52

doesn't necessarily mean use of force. It can mean absenteeism, it can mean a lot of things.

Q. I understand.

A. Yeah. So, I -- I could tell you this, there -- there is, we -- we have these programs in place. And I've worked for three large police departments. And in one of them to try and nail what the criteria should be, we actually did a study, we hired the RAND Institute and we -- the best that we could do was when we came up with a system that gave about 60 percent to 70 percent false positives.

Q. I understand.

A. So it's not -- it -- all it is is, here have a look and see if there's anything there. But --

Q. Not my question.

A. Okay. It is --

MR. BUCKLEY: But he gets to finish his answer.

MR. STARK: Sure. He can -- he can finish his answer, but he's got to answer my question.

MR. BUCKLEY: Why? And when he's finished, you can --

MR. STARK: That's fine. That's fine.

MR. BUCKLEY: No. Hold on a minute. When he's finished, you can then clarify.

Page 53

MR. STARK: That's fine. That's fine.

MR. BUCKLEY: You don't get to interrupt.

MR. STARK: That's fine. I -- if he --

THE WITNESS: You asked me about EIP and --

MR. STARK: It's not what I asked.

THE WITNESS: Well, you asked me if we had a system for it.

MR. STARK: That's not what I asked.

THE WITNESS: Well, then go ahead. Ask me --

BY MR. STARK:

Q. I asked you whether at your current police department, do you have a written procedure that addresses the early warning system? That's my question.

A. Yes.

Q. Okay. What is that policy called?

A. That -- that I don't know.

Q. Okay. So you don't know the name of the policy?

A. No, I don't.

MR. STARK: Okay. All right. Let's take a break. And let me say this, I had said three hours. That's fine.

THE VIDEOGRAPHER: 11:02. Off the record.

- - -

(A recess was taken.)

14 (Pages 50 to 53)


MAGNA
LEGAL SERVICES

Page 54

                      - - -
          THE VIDEOGRAPHER:  11:16 on the record.
BY MR. STARK:
     Q.    Okay.  I'm on Plaintiff's Exhibit-1, your CV,
Mr. Dale.  I'm under the Boynton Beach Police Department
Assistant Chief Areas of Responsibility.  And I'm at
bullet point number one where it says, and correct me if
I'm misreading this, that in this position you have
worked to transform the department's internal affairs.
     A.    Correct.
     Q.    Is that correct?
     A.    Yes.
     Q.    Okay.  Did that work involve creating any new
written policies or procedures?
     A.    Written policies, no.  Procedures, yes.
     Q.    Okay.  So written procedures but no written
policies?
     A.    No.  Nothing that I can recall that's on
paper.  It's just the -- the way that we set up to
investigate and review.
          In the -- in the past, a majority of it was
done by just a couple of people, but having -- first of
all, they had officers investigating other officers, we
changed to -- they're all sergeants.
          So the -- we had people of a higher rank doing

Page 55

the investigations.  They were purely fact finders rather
than rendering opinions, then it went to a captain of
internal affairs who then would render a finding.  And
then we involved command staff to make recommendations on
discipline. It wasn't really formalized in any kind of
way.
     Q.    Okay.
     A.    So, I'd just say that it -- it became a --
a -- a more structured process, and we've made full use
of IAPro, Blue Team for -- and to include all, not just
pursuits, but failures to stop, where they initiate a
pursuit and/or they initiate a stop and the person
flees.  And we review all uses of force.
     Q.    Okay.
     A.    So I know that you -- you mentioned about EIP.
     Q.    Right.
     A.    Now, it's usually meant to go back and look at
other uses of force.  We review all of them --
     Q.    Okay.
     A.    -- including body cam and incarceration.
     Q.    Okay.  And let me just put my own objection
just beyond the scope of my question.
          My question specifically is, as it relates to
working to transform the department's internal affairs,
and let me add to that force review.  Were any new

Page 56

written policies and procedures prepared?  Not how it
works, was anything new in writing on paper generated?
          MR. BUCKLEY:  So let me understand your
objection to as testimony that if he -- if you ask
if something's written, and he answers and explains
that there were procedures changed, but they weren't
written.  That's not responsive in your opinion?
          MR. STARK:  That's correct.  That's beyond the
scope of my question.
          MR. BUCKLEY:  Wow.
          MR. STARK:  Your "wow" is noted.
BY MR. STARK:
     Q.    That's beyond the scope of my question.  My
question is limited to whether or not that work under
bullet point number one regarding internal affairs and
force review.  Did it generate any new written policies
and procedures?
     A.    I -- I don't know if they changed the policies
to match the procedures.
     Q.    Okay.  All right.  If we go to -- well,
staying with the 2022 through present in your assistant
police chief position, I'm assuming that does not involve
doing any patrol.  You personally, is that correct?
     A.    If -- if I'm out on the road, and I'm in a --
I'm always in a uniform.  I turned my radio on.  I -- I'm

Page 57

technically I'm -- if I see a crime, I'm going to stop
and intervene.
     Q.    Okay.
     A.    So I -- I am an active -- I'm a -- I'm a
police officer.  And if I see something, I'll respond.
Do I get calls assigned to me from dispatch?  No, I
don't.
     Q.    Okay.  Other than exigent circumstances, you
witnessing a crime in process, is any part of your duties
and responsibilities as the assistant police chief --
does any part of it involve you being assigned to do
patrol?
     A.    There's a lot of -- a lot of information
packed in that one.  If I'm out grabbing a cup of coffee
and I see something, it doesn't have to be egregious like
you said, but it could be a traffic violation.  It could
be people arguing, and I could pull one of them over and
say, "Hey, what are you doing?"  I can do that.
          I'm not required to do it in every
circumstance.  There's a large amount of discretion in
police work.  But if I see something that I think some
action needs to be taken, I can take it.
     Q.    Okay.  When was the last time you made an
arrest?
     A.    The last time I made an arrest was probably

15 (Pages 54 to 57)



Page 58

around 2012 or '13.

Q. Okay. Not since you've been with the Boynton Beach Police Department.

A. Not since Boynton and not with the Broward Sheriff's Office.

Q. Okay. When was the last time you prepared a -- an incident report, a -- a basic police incident report?

A. I would say around the same time.

Q. Okay. All right. So, it sounds to me that at least from 2022 through the present, we'll go through your other positions. You've been functioning in a supervisory capacity, mainly?

A. Yes.

Q. Okay. But with some duties and responsibilities for patrol, it sounds like?

A. As needed.

Q. As needed. Okay. All right. So, Broward Sheriff's Office 2013 through 2019, you were part of the command?

A. I was, like, a Number 2 in command.

Q. Okay.

A. That helps you -- I know a lot of people don't know what a colonel is. So I was a colonel at Broward Sheriff's Office. It goes to the sheriff, and the

Page 59

sheriff had two direct reports -- three direct reports: General counsel, the undersheriff, and me.

Q. Okay.

A. And I reported directly to the Sheriff.

Q. Right. Have you ever served in the military?

A. No.

Q. Okay. All right.

A. Well, I would -- I did serve in the military. I was on a Navy scholarship at -- in college; so...

Q. Okay. But you were never enlisted in the armed forces?

A. No.

Q. Okay. All right. Have you ever in -- in your career as a police officer ever discharged your firearm?

A. No.

Q. Never shot or killed a suspect?

A. No.

Q. Okay. Have you ever been involved in the arrest of a suspect where you had to use physical force that required hospital treatment for the suspect?

A. Yes.

Q. Okay. Tell me about that.

A. Well, I mean, it wasn't one incident. I mean, I -- I worked in a street narcotics unit for two years that -- this is now Fort Lauderdale PD --

Page 60

Q. Uh-huh.

A. -- where I think the unit made between 1500 and 1800 arrests a year regarding crack cocaine. And they involved alot of foot pursuits. It wasn't uncommon for people to sustain injuries, scratches, bruises, whatever during their arrest. And someone has to sit with them at the hospital so they can be medically cleared at the jail. So I -- I couldn't give you a number.

Q. Okay. All right. So, from 1990 through 2013, is that when you were with Fort Lauderdale PD?

A. Yes.

Q. And starting on the bottom of page 2 going over through, I guess really maybe the very top of page 4, these the different positions that you held when you were with Fort Lauderdale PD?

A. Yes.

Q. Okay. When you were with Fort Lauderdale PD, did they have a written policy regarding early warning or early intervention?

A. Written, I can't answer.

Q. Okay. You -- you don't recall?

A. I -- I know they had a -- an EIP program. I just don't know if it was written.

Q. But you just can't recall is what I mean.

Page 61

Maybe there was, maybe there wasn't, you just don't remember.

A. Well, I -- I don't know. It's different than I don't recall.

Q. Okay.

A. At least I would have known it at one point. I know, I -- I don't.

Q. You just don't know period.

A. Correct.

Q. Okay. All right. I take it, they had a written use of force policy. You would know that, right?

A. Yes.

Q. No doubt about that?

A. Correct.

Q. Okay. And for your current department, there's a written use of force policy, right?

A. Yes.

Q. No doubt about that?

A. Correct.

Q. Okay. All right. Let's go to -- I'm sorry, hold on. Yeah. Let's go to -- let's go to your report here, which is Plaintiff's Exhibit-3.

And before I do that, let me just ask you this, have you ever been sued before?



Page 62

A.   Well, as a supervisor on the scene, I was once sued, and the case was dropped at some point.  You want me to explain the circumstances?

Q.   Which department?

A.   Fort Lauderdale.

Q.   Okay.  And was it a -- I take it, it was a civil suit?

A.   I don't know if it was actually -- if it was a suit or an intent to sue.  I don't -- I was a sergeant at the time, so I can't tell you where it was.

Q.   Okay.

A.   As -- as when I worked at the Broward Sheriff's Office, I was named in a suit along with other members of the department on an employment law case.

Q.   Okay.

A.   I served as the agency witness for the Broward Sheriff's Office during that time.  I can't tell you if I was named in any of those suits.  It would have just -- I would have been encompassed, maybe not from my direct role in any use of force, but for administrative issues.

Q.   Okay.  All right.  Did -- did you -- and I guess in coming here today, did you get a chance to review your report before you came?

A.   I read it, yeah.

Q.   Anything else you reviewed specifically to

Page 63

prepare for today?

A.   I just -- I -- I skimmed through the reliance materials, some of them, and I reviewed the deposition for your expert.

Q.   Okay.  Let's go to you -- let's go to Plaintiff's Exhibit-3 here.  This was written on February 4th, or at least submitted on February 4th, 2025; is that right?

A.   Yes.

Q.   So I take it as of that date you were done with your review and, essentially, you -- you have written your analysis, your opinions, everything in the report is that --

A.   Yes.

Q.   Okay.  Do you remember when you were hired?

A.   I don't.

Q.   Okay.  You -- you have -- let's just take it sort of paragraph at a time.  "Since I've been retained by Buckley Christopher & Hensel, Attorneys at Law, in my capacity as an expert on police practices and procedures in the reference case."  You see that?

A.   Yes.

Q.   And then you have a footnote there that refers to your CV, your qualifications, publications, authored, etc.  Am I reading that right?

Page 64

A.   Yes.

Q.   And then it says, "I was tasked to analyze this case and to offer opinions and conclusions as to whether the Paulding County Sheriff's Office and its employees acted reasonably and in accordance with professional standards, widely accepted practices, and customs as it relates to its training, policies, procedures, and practices."  Do I have that right?

A.   Yes.

Q.   That is the scope of what you were tasked or hired to do.  Is that right?

A.   Yes.

Q.   Okay.  All right.  Now, when it says as to whether the Paulding County Sheriff's Office and its employees, which employees are -- are we referring to the sheriff, the -- the -- the main, I mean, who -- who -- what employees are we talking about here?

A.   Any -- any employee that would have been involved with the incident or its review.

Q.   Any employees involved with the incident or its review?

A.   Or -- yeah.  Or any of its -- in the review of any of its policies and practices.

Q.   Okay.  And can you name those employees for me?

Page 65

A.   I mean, it's -- it's -- it's all their employees that are related, I mean.

Q.   Yeah.  I'm just asking, can you name them?

A.   There's the sergeant that reviewed the case. I mean, I would review his review of the incident.

Q.   What -- sorry.  What's his name?

A.   I don't recall his name.

Q.   Okay.  Can you look in your report and maybe that'll help you?

A.   Brent Miller.

Q.   Brent Miller.  Okay.  All right.  Anybody else?

A.   McMaster.

Q.   McMaster.  Okay.  Anybody else?

A.   The -- I think Ogden was -- that's another one.

Q.   Ogden you're saying?

A.   Yes.

Q.   Okay.  Anybody else?

A.   I reviewed the depositions for Gulledge.

Q.   Okay.  Anybody else?

A.   Hunten (ph).

Q.   Okay.

A.   Ritch.

Q.   Okay.



MAGNA
LEGAL SERVICES

Page 66

A.  Buckner.  I mean, they're -- they're all listed in my reliance materials if you want me to keep going.

Q.  "They" mean who?

A.  Those employees.

Q.  Yeah.  Just name them all for me.

A.  I can't tell you, every employee -- I mean, how many do you want?  I'd have to go through and open each one of these documents.  Some of them are a little lengthy, and if they had a role in this case, I would consider the way that they acted and if it was consistent with law enforcement practices as it relates to this case.

Q.  Okay.  So the ones that are listed in the depositions you reviewed and others whose name you -- you -- you don't know unless you go into the file.

A.  Yeah.  I mean, do you have a specific -- you want -- I mean, you want me to answer your questions, but -- and you don't want me to run on, but you won't -- you don't want to ask me a specific question.

Q.  Listen.  My question to you is this: Which employees are the subject of the review here that you said you were asked to do?

If you're unable to completely answer that without going into your file, that's an acceptable

Page 67

answer.  I'll just move to the next question.

A.  That's my answer.

Q.  Okay.  All right.  So it -- it also says, "I will also examine the opinions of the Plaintiff's consultant concerning these areas," and I take it there, you're referring to Scott Defoe; is that right?

A.  Yes.

Q.  Okay.  Have you ever been on any other cases where Scott Defoe was an expert or involved?

A.  Not to my knowledge.

Q.  Okay.  Did you know who he was before his name came up in this case?

A.  No.

Q.  Okay.  So, and then you have a summary of the incident, right?  You have page 2, 3, and then a little bit of page 4 is a summary of the incident.  Where does that summary come from?  What is the source of the factual summary that you provided?

A.  It comes from the -- the reports --

Q.  Which reports?

A.  -- in the documents that come through reliance materials.

Q.  The reliance materials?

A.  Yes.  That are listed under my methodologies.

Q.  Okay.  Can you tell me which report?  If

Page 68

you're able to?  If you can't, that's an acceptable answer.  Are you able to tell me the -- the narrative summary of the incident that you've provided here?  Is there a police report, a grand jury report, an internal affairs report?  Where does that narrative come from?

A.  Some of it comes from maybe the CAD report.

Q.  Okay.

A.  The police report, the -- the video itself.

Q.  Okay.

A.  Radio transmissions.  The investigations that are included in the reliance materials.  Testimony -- testimony evidence in the case.

Q.  Okay.  So this is something that you prepared based on all of the different things you referenced, your -- your summary of the incident, is that fair?

A.  Yes.

Q.  Okay.  Just so we're clear here, and we touched on this earlier, you are not offering any opinions about whether there was reasonable articulable suspicion or probable cause for the stop, are you?

A.  Well, yeah.  Yes, I am.

Q.  Where is that in your report?

A.  Well, not -- not an official opinion, but from the standpoint of that I am reviewing a police report and in order to have -- which looks at its use of force and

Page 69

in order for use of force to be valid, there has to be a legal objective, and there can be no use of force without a legal objective.

So to the context was there reasonable suspicion, I -- I would have to look at that as part of their use of force review.  If they -- if they didn't -- if they weren't able to determine that he had a reason to stop Mr. Canaris, then, and if they didn't point that out, then the investigation would be flawed.

Q.  Is -- is there an opinion that you have set forth in your report, which I thought had your opinions on the back that says what you just said, because I didn't think you were rendering an opinion regarding the incident itself, are you?

A.  Well, I didn't -- I didn't say that.  I said in my -- my analysis will not examine the actual use of force by former Deputy Michael McMaster.

Q.  Okay.  Okay.  Very well.  What is your opinion regarding whether there was reasonable articulable suspicion or probable cause for the stop?  And where can I find that opinion in the report?

A.  I offered no opinion on whether there was a reasonable suspicion to stop Canaris.

Q.  Okay.  And earlier, I thought you were saying something different.  Am I right then that you're not



Page 70

offering any opinions in this case on whether there was reasonable articulable suspicion or probable cause for the stop?

A. My -- my review is that of the internal review. I reviewed the review, if that makes sense. And that review would encompass whether there was reasonable suspicion to stop. I see -- I don't -- I don't see any fault in their conclusion that there was reasonable suspicion.

Q. Okay. So are you -- is that -- is that set forth in your report? Is there -- is there -- this is all I had, let me -- let me -- let me ask the question.

A. It is in the -- in the regard that I believe that they adequately reviewed the use of force as required by their policy.

Q. I'm -- I'm asking a different question. My question is, is there any opinion set forth in your report where you address your independent review of whether there was reasonable articulable suspicion or probable cause for the stop? Is it in your report?

A. In the form of an opinion, no.

Q. Okay. All right. So, we better just leave it at that. Let me do this. Go to page 3 of 22 of your report. I take it from what you said, you did watch some video footage of the actual use of force incident,

Page 71

right?

A. Yes.

Q. In part for -- for I guess background purposes, right?

A. Background. And if I'm going to review the investigation of the use of force, I have to make sure that it doesn't say something that is plainly not there.

Q. Okay. All right. Do you have any opinions or views about whether the video that you saw is a fair and accurate depiction of what transpired?

A. I didn't analyze the -- the video in its entirety to make -- to render that decision.

Q. Okay. All right. Because -- and here's why I asked that. I -- I guess on page 3 of 22 in that first paragraph, you -- you -- you say here, sort of, I think, second sentence from the end, "It should be noted that while the incident was recorded on dash camera video, it was not from the vantage point of Deputy McMaster and may have recorded movements not seen by him during the encounter." Do you see that statement?

A. Yes.

Q. Am I correct that by that you don't mean to say that there may be missing video or is -- that the video doesn't sort of fairly and accurately show what it shows, do you?

Page 72

A. No. I -- I don't say that it's not accurate, it just has limitations.

Q. Right. And would it be equally true that it doesn't show, I guess, all of the incident from Canaris's vantage point?

A. From neither of the vantage points.

Q. Okay. All right. Then there's the third paragraph says, "Upon reviewing security camera footage, it was determined that Mr. Canaris was not the individual reported to have attempted to unlawfully enter vehicles in the immediate vicinity." Who -- who reviewed video footage that determined that?

A. I believe it's in a report where the officers went to the callers, reviewed their home video. I -- I don't know if it was a ring camera or an outdoor camera, but based on that review, they were able to determine that Mr. Canaris was not the person that they saw prowling or --

Q. Okay.

A. -- doing burglaries in front of their homes.

Q. Okay. Let me ask you this question. Would it be fair to say that the summary of the incident that we're sort of reading through. This is your attempt at setting forth what the Paulding County Sheriff's Office documentation shows?

Page 73

A. The -- the -- the facts as I believe them.

Q. The facts as you believe.

A. Or that have been presented to me.

Q. Okay. All right. Because you didn't do any independent review of the facts, right?

A. I did not speak to any people in this case. I did not go to the scene. I didn't talk to the officers. I didn't look at the video from the homes myself.

Q. So they are the facts as presented to you in the file that you were given by the attorneys that retained you?

A. Yes.

Q. Right. Which did not include, remember, Plaintiff's Exhibit-4, correct?

A. Correct.

Q. Okay.

A. Not to my knowledge, number 4.

Q. Okay. All right. So then we go to page 4 of 22, Paulding County Sheriff's Office, you have this budget information. Is that from the internet?

A. Yeah. I -- I cited it. One is their US Census Bureau. One is their actual budget they publish.

Q. Okay. And you pulled that from the internet?

A. Yes.

Q. Did you print it and put it in your file?

19 (Pages 70 to 73)



Page 74

A.   I did not.

Q.   Okay.  All right.  How and why is that relevant to your analysis?

A.   Well, I mean, it sets the background to the reader as to where the location is, Paulding County.  It tells what its population is, the size of its agency, what its resources are.  I included it as background information.  Sometimes we'll add if they're accredited or if they have body cameras, things like that.

Q.   Does -- does its budget and location, this information from the county budget and the Census Bureau, does that have any direct bearing on the opinions you reached in this case?

A.   No.

Q.   Okay.  And so if we go from page 4 of 22, you have under methodology, essentially all of the things that you reviewed, correct?

A.   Correct.

Q.   Okay.  And that's not really methodology, that's just the content of the material that you received.

A.   Under the methodology, it has -- these are the materials that were used and the -- the way that they were analyzed.

Q.   Okay.  All right.  The first part is just the

Page 75

listing of the material that was used.  Now, I -- I think somewhere in here, you refer to, is it IACP?

A.   Yes.

Q.   And that is what?

A.   The International Association of Chiefs of Police.

Q.   And that is a body that, I take it from the way you described them.  You believe they have model policies and procedures that are best practices for police departments?

A.   Yes.  They -- they play, they put forth exactly that -- model policy that's given to agencies.  You know, there's 17,000 police departments independently working on the same project of putting together policy for the department.  They set up committees with subject-matter experts who sit down from agencies across the country.  I sat on one of them for body-worn cameras, and they come up with some basic policies that are good to include in your, for your agency.

Q.   Okay.  And did you specifically use or rely on any of them in particular?

A.   I did.

Q.   Which ones?

A.   They're all cited everywhere that I use them, they're cited --

Page 76

Q.   Can you -- let's -- can you take me through the different places where you reference the ones that you used or relied on?

A.   I relied on Opinion Number 2.

Q.   What page is that?

A.   Right now, I'm on page 11.

Q.   Okay.  You -- you mean where you have Issue Number 2 here, is that what you're referring to?

A.   Yes.

Q.   Okay.

A.   And on page 11, second to the last paragraph is the standards of conduct model policy for IACP.  That was reviewed and compared.

Q.   PCO policy and procedure manual.  So -- I'm sorry, hold on.  So when you say the Paulding County Sheriff's Office provides employees with a policy and procedures manual, then it says these -- where -- where are the -- where do you reference the IACP policies?  That's what I'm asking you.  What IACP policies?

A.   On page 11.

Q.   Okay.  This "Standards for Conduct?"

A.   Yes.

Q.   Okay.  And does that -- okay.  So that's one "Standards for Conduct."  Any -- any, tell me where the others are?

Page 77

A.   On a -- 12.

Q.   Okay.

A.   IACP.  The policy -- model policy for reporting use of force.

Q.   Okay.  Page 12.  Reporting Use of Force?

A.   Right.

Q.   Okay.

A.   On page 13.

Q.   Page 13.

A.   It has IACP involvement.  It's not a product of IACP, but it's done in concert with them and other agencies, is the National Consensus Policy and Discussion Paper on Use of Force.

Q.   Okay.  All right.

A.   Also on page 13 is the IACP model policy for arrest and investigatory stops.

Q.   Okay.  All right.

A.   Also on 13, there's the IACP model policy for investigations of allegations of employee misconduct.

Q.   Which paragraph is it?  Where is that?

A.   Last, the last paragraph.

Q.   Okay.  All right.  See that.  Anywhere else?

A.   Page 18.  Again, the same IACP model policy for investigations of allegations of employee misconduct.

Q.   Okay.  All right.  That's the one we just



Page 78

talked about, right?

A.    Yes.

Q.    Okay.

A.    That's all I have.

Q.    Okay.

A.    I may have missed -- if I missed one, I apologize. But that's all.

Q.    Okay. Sure. That's fine. And as I understand it, and in a -- in a few places here, you say this. The extent to which you -- you did any analysis regarding the written policies or procedures of the Paulding County Sheriff's Office, one of the ways you did that analysis was by sort of looking at their written policy and procedure and sort of comparing it to IACP's model?

A.    Yes.

Q.    Okay. All right. And you've set forth the -- the times you've sort of done that, right?

A.    Yes.

Q.    Okay. Let's -- let's do this. And did you print these things out -- when I get your Dropbox link, is it gonna have these things?

A.    I can put them in for you, if you want.

Q.    Well --

A.    I have copies.

Page 79

Q.    I mean, let me show you the one --

A.    And they are publically available.

Q.    I understand. Let me show you the ones I have, maybe the ones I'm missing, you can add them in.

A.    Yeah.

MR. STARK: So Plaintiff's Exhibit Number 5. Tell me, is -- hold on, let me make sure I got that one. Okay. So Plaintiff's Exhibit Number 5. I want to make sure this is a clean copy.

MR. BUCKLEY: Thank you.

- - -

(EXHIBIT-5, IACP OFFICER-INVOLVED SHOOTING POLICY, was marked for identification.)

- - -

BY MR. STARK:

Q.    Thank you. And this is IACP Law Enforcement Policy Center Document Investigation of officer-involved shootings and other serious incidents from April 2019. Is that one of the policies and procedures from IACP that you looked at?

A.    No.

Q.    Why not that one?

A.    Well, it wasn't an officer-involved shooting, and this says other serious incidents. It's really -- it -- the way that it's titled, I would refer that to be the

Page 80

criminal investigation.

Q.    Okay. So you did not deem this to be relevant?

A.    I -- no, I looked at the other one, the one for employee misconduct.

Q.    Okay. Did you even look at that one and determine it really doesn't fit? Is that what you're saying?

A.    Yeah. I didn't feel that the -- the -- it wasn't a question of whether the officer should have been criminally charged. I didn't -- I -- I didn't -- that wasn't something that I was tasked to review.

Q.    Okay. So the extent to which it is in other serious incidents, you didn't view the Canaris matter as falling within that category?

A.    Correct.

MR. STARK: Okay. All right. We can put that one aside. Let me show you Plaintiff's Exhibit Number 6. This is early identification systems from May 2020.

- - -

(EXHIBIT-6, EARLY IDENTIFICATION SYSTEMS 5/2020, was marked for identification.)

- - -

BY MR. STARK:

Page 81

Q.    Did -- did you -- did you look at that one at all?

A.    No.

Q.    Why not?

A.    I didn't know it existed.

Q.    You didn't know that exists?

A.    No. I didn't know they had a moral policy for it.

Q.    Okay. Because as I understand it, and I think you reference -- I think Major Ritch's testimony, you have given opinions or -- or you have set forth statements in your report which indicate that you believe that the Paulding County Sheriff's Office had in place, essentially, an early identification system, right?

A.    Yes.

Q.    Okay. But the extent to which you've done that analysis, it would not have been inclusive of Plaintiff's Exhibit Number 6?

MR. BUCKLEY: Object to form of question.

THE WITNESS: I haven't reviewed it. So no, it hasn't.

BY MR. STARK:

Q.    Okay. And it also would not have included any written policy and procedure from the Paulding County Sheriff's Office regarding an early identification


MAGNA LEGAL SERVICES

Page 82

system, correct?

A.    Correct.

Q.    Because they don't have one, right?

A.    I don't know if they have one.  I just used the testimony from Major Ritch.

Q.    Were you ever provided one?

A.    No.

Q.    Okay.  Did you ask if there was one?

A.    No.

Q.    If there were one in writing, wouldn't you have wanted to see it?

A.    If -- if there is one available, I'll review it, and I can change my opinion or add to my opinion if -- would I want to see it?  I saw no evidence that there was one, but it -- I would look at it; I would review it and consider it.

Q.    Okay.  All right.  Do you want to look at that some now?

A.    If you want me to.

MR. STARK:  No.  I don't.  I just -- it's fine.  Let's just -- let's keep going while we're doing good.  Let's just keep going.  All right.  So that is Plaintiff's Exhibit Number 6, early identification systems.  Let me show you Plaintiff's Exhibit Number 7, reporting use of force incident.

Page 83

- - -

(EXHIBIT-7, REPORTING USE OF FORCE, was marked for identification.)

- - -

BY MR. STARK:

Q.    Is that one that you would have used and relied on?

A.    I believe -- I believe I provided it to you in the --

Q.    You mean you believe you referenced it?

A.    Yes.

Q.    Okay.  All right.  Can we go back to the page where -- if you don't mind, where -- where you would have referenced that one?

MR. BUCKLEY:  I think he said 12.  Page 12.

THE WITNESS:  Page 12.  Yes.

BY MR. STARK:

Q.    Okay.  All right.  Page 12.  Okay.  And the extent to which you did any analysis that involved looking at IACP's policy of model policy and Paulding County Sheriff's Office policy or what they said they were doing, you've kind of -- you've set that forth in your report, right?

A.    Yes.  I compared the IACP model policy to the policies of Paulding County.

Page 84

MR. STARK:  Okay.  All right.  Let's see, I -- I -- I may.  There were more, right?  There's Plaintiff's Exhibit Number 8.

- - -

(EXHIBIT-8, NATIONAL CONSENSUS POLICY AND DISCUSSION PAPER ON USE OF FORCE, was marked for identification.)

- - -

BY MR. STARK:

Q.    And I think this is called the National Consensus Policy on Discussion Paper on Use of Force, right?  And I think this is one you referenced also, right?

A.    Yes.

Q.    Okay.  All right.  So, the methodology, the analysis is what we -- we just talked about a moment ago, right?

A.    Yes.

Q.    Okay.  So the other ones that I am missing, you, kind of, at least identified them, and you add them to the file or we can --

A.    Sure, I'll.

Q.    -- make them part of the record, right?

A.    Yes.

Q.    Okay.

Page 85

A.    I'll make sure you have.

Q.    So in other cases you've done, I -- I take it you -- you likewise relied on IACP?

A.    I relied on IACP, somewhat, on PERF, Police Executive Research Forum.  Sometimes I'll rely on academy-type training guides in the case of Georgia Post.

Q.    What about CALEA?  Do you -- do you ever rely on CALEA?

A.    I -- I -- accreditation.  A lot of states have their own individual accreditations.  Florida has, to give you an example, they call CFA.  And a lot of agencies feel like it better addresses the accreditation of their state.  So they choose not to do CALEA.  CALEA is -- and it is very expensive and encompasses more than most agencies have; so... But an accreditation doesn't necessarily look at the content of the policy, only that there's a standard that says you have to have a policy that addresses a particular topic.

Q.    Right.  So for instance, and correct me if I'm wrong, in order to be accredited by CALEA, CALEA has modeled policies that essentially say to have our accreditation, you have to have a policy that generally conforms with our model policy.

A.    I'm not aware of CALEA having any model policy.



Page 86

Q. You're not?

A. I'm only aware of CALEA and CFA having standards, and those standards say something to the effect of every police department will have a use of force policy, and it will include these topics. It doesn't tell them what the content of their policy needs to be.

Q. Okay. So your recollection of CALEA is that if we were to go into CALEA and -- and look at whatever their standards are for internal affairs operations, your understanding is that CALEA does not set forth, essentially, policy guidelines for what should be in that standard?

A. I -- I've never seen a -- if they exist, I'm -- I have no knowledge of them.

Q. Okay. All right. Have you ever belonged to a police department that was accredited by CALEA?

A. Broward Sheriff's Office had the CALEA accreditation and it -- I believe it eventually dropped it due to the cost.

Q. Okay. So if we go to page 5 of 22 and -- and let me ask you this, I want to -- I see here, the depositions you reviewed, Michael McMaster, do you see that?

A. Yes.

Page 87

Q. Sheriff Gary Gulledge?
A. Yes.
Q. Chad Hunton?
A. Yes.
Q. Karen Ritch?
A. Yes.
Q. James Buckner?
A. Yes.
Q. Tyler Canaris?
A. Yes.
Q. Thomas Ogden?
A. Yes.
Q. And Brent Miller?
A. Yes.
Q. Okay. There was a GBI investigator who was deposed. His name, I -- I pronounce it G. G-H-E-E -- I think it's G. Wilson. Does that name sound familiar?
A. It doesn't -- yeah, it doesn't ring a bell.
Q. Okay. All right. Do you -- do you in a couple of places though, in your report, you -- you refer to the -- the -- the GBI. And -- and here's why I asked that because I -- I want to -- before I ask you this next question, I want to make sure. It's a question that -- that's -- that you're capable of answering based on what you have reviewed here.

Page 88

You -- I take it you don't recall ever reading a deposition of someone from the GBI, The Georgia Bureau of Investigation.

A. It -- I don't -- I don't recall it at this time.

Q. Okay. All right. Well, just for the record, there is a -- a deposition of someone named G. Wilson from the Georgia Bureau of Investigation. I think it was taken on November 12th, 2024. But here's really what I want to ask you. I want to do this carefully just to -- can you show me where -- where in your report you refer to the GBI. You -- you refer to them a few places. Can you take me to one of those and then I have a question about that?

A. In -- in the summary.

Q. Which page is that?

A. Page 3.

Q. Okay. So page 3 says at the request of Sheriff Gulledge, investigators with the Georgia Bureau of Investigations were asked to conduct an independent investigation, right? And so here's my question. Is it your understanding that the Georgia Bureau of Investigation investigated this incident to determine whether McMaster's use of force was reasonable?

A. I -- I don't know what the -- within the

Page 89

context they had them conduct. I don't know if it's just purely fact-finding --

Q. Okay.

A. -- or if it was for the purpose -- some other purpose.

Q. Okay. All right. So the extent to which you reference the GBI investigating the incident, you're not suggesting or relying on any understanding that the GBI looked at this incident and cleared Deputy McMaster?

A. No. My -- the only role in -- in my experience in -- in referring cases to other agencies is to show in complete transparency that we're going to have a separate set of eyes look at this, and collect the facts so that nobody can accuse us of having massaged the facts in any kind of way. And then that agency, if they -- it -- it's my understanding when -- when this occurs, that if they find something they deem to be criminal, they would present that to a prosecutor to make a determination.

MR. STARK: Okay. So if we go back, if we go to page 5 of 22. Starting at paragraph 41 through paragraph 54. Tell me -- and -- and let's do it this way. I'm going to mark something that -- I only have one copy. It may or may not be helpful to us. The Plaintiff's Exhibit Number 9, which are



Page 90

documents, use of force incident reports Bates numbered Gulledge 000378, and it goes through to 000733.

I only have this one copy and I -- and I -- my questions about it are limited to some extent.

MR. BUCKLEY: Since you only have the one copy, can you tell me what your understanding of what it is as you hand it to me?

MR. STARK: Yeah. My understanding is that these are documents that relate to use of force reports, perhaps not all of them that pertain to Deputy McMaster, that also correspond with items 41 through 54 from Mr. Dale's report and in fairness to you, when you look through these, if -- if you're able to say whether it does or doesn't, that's fine if you can't, that's fine also because here's really what I'm trying to get to.

- - -

(EXHIBIT-9, USE OF FORCE REPORTS, was marked for identification.)

- - -

BY MR. STARK:

Q.   The extent to which you have referenced use of force reports, and how many pages there are. All of that is within your file within the Dropbox?

Page 91

A.   Yes.

Q.   Okay. All right. I believe it's what I'm showing to you as Plaintiff's Exhibit Number 9, you -- you -- you -- maybe you're able to tell us if it is or isn't, if not, that's no problem.

A.   Yes. And -- and if this helps you when you get my Dropbox. I get them electronically. That's what -- I try to summarize them as to what they are. It may not be the exact name of the file, and that's why I include the pages so that when you look at it, there's some other reference point, but...

Q.   Right. Although, what I noticed here, at least on yours, and again, there's a lot of -- you don't have that Bates, there's this number in the bottom right. And do you recall whether your reports had that Bates number we referred to in the bottom right? Can you recall?

A.   I -- I don't know that I have anything Bates stamped.

Q.   Okay.

A.   If -- if -- if I do, it might have been for -- for -- within the individual depositions. I try not to use those because sometimes they change or I don't -- I -- that's lawyer stuff.

Q.   That's correct. They do change and are

Page 92

sometimes mixed up. Here's my question for you. And we'll have this Exhibit Number 9 on the record. I'll make, uh, your file as a Dropbox file or -- in some -- or thumb drive part of the record. But per this -- per -- per -- per your report, am I correct that, not counting this incident, did you identify use of force incidents involving McMaster that you have numbered starting on page 5, 41 through 54. Is that what that is?

A.   Yeah. From what I recall, kind of, like your file here, they're given to me in one big PDF.

Q.   Okay.

A.   And they were all the reports for each year. I, I, I believe that's how they were presented to me. And if -- they'll be exactly that way and in the Dropbox I give you.

Q.   Fair enough.

A.   So --

Q.   And -- and -- and there's some context for this that I'll ask you about later. Because I guess what I see here is 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, I see 14 use of force reports referencing McMaster as you have identified them in your report. And my question to you is this. Did your file not contain many more use of force reports regarding McMaster?

A.   So I -- I believe that when you open it,

Page 93

you'll see the reports from 2021, which include all the use of force incidents for that year, and the same for each of the other years. So it's more than just -- these are just the files as they were presented.

Q.   I understand. Okay.

A.   I -- I apologize. Sometimes I get these things, and they're in one massive PDF. And I want to be transparent in the materials that I reviewed, but sometimes just putting a file name doesn't really --

Q.   Understood.

A.   Yeah.

Q.   I -- I understand. So the extent to which you have paragraphs number 41 through 54. You have grouped these use of force reports relating to McMaster by year?

A.   I -- I believe that's how they were presented to me.

Q.   Okay. And you have 28 pages for 2021. 26 pages for 2020, etc., as you've set forth, right?

A.   Yes.

Q.   Okay. So do you recall, I know there was some issue you took with Scott Defoe's use and reliance or reference to McMaster's use of force reports, do you recall how many he had leading up to the time of this incident?

A.   I believe he cited 70 something and I found 55



Page 94

only.

Q. Okay.

A. Because I'm looking at the use of force that he had as a police officer.

Q. Okay.

A. Actually, I'll make that -- use of force that he had as a -- from the time period that he was assigned to the law enforcement side of the house.

Q. Okay. So is Scott Defoe's 70 inclusive of both at the jail and on patrol?

A. I -- I can't -- I can't determine where he got the -- the 70 from.

Q. Okay. So your number maxes out at 55.

A. Correct.

Q. Okay. So if Scott Defoe is saying -- if -- if Scott Defoe is saying 70, your file did not reflect 70 is what you're saying?

A. Correct. I -- you know, actually in one of the citations, I actually list how many per year, I think in the report.

Q. Yeah, yeah. Show me where that is.

A. So, like, on page 16 in the -- the bottom footnote.

Q. Okay.

A. By -- by year, those are the number of use of

Page 95

force incidents that I had in those files.

Q. Okay. 1 for 2022.

A. Yes.

Q. 11 for 2021.

A. Yes.

Q. 8 for 2020.

A. Correct.

Q. 17 for 2019.

A. Yes.

Q. 7 for 2018.

A. Yes.

Q. 9 for 2017.

A. Yes.

Q. And 2 from 2016.

A. Yes.

Q. And none of those are from his years at the jail; is that right? You separated that.

A. I'd have to -- I'd have to look to see his time. Unless, if you tell it to me, I believe you, but I -- his hire date when he cut over.

Q. I don't remember, but I thought that part of what you were saying is the only ones you deemed relevant were from when he was in the patrol division.

A. I -- I -- I may have misspoke on that. I'm trying to remember exactly the years. And I'd have to --

Page 96

I don't know if there's a report to reference when he -- I -- you know, it's probably in a training section. Let me look at my report.

Q. Well, let's -- let's -- if you go to page 16 of 22. I think here's what you say, the first paragraph. It's that -- that corresponds with your Footnote 12. It says a review was conducted of reports provided by PCSO concerning the use of force incidents involving Deputy McMaster as a patrol deputy, right?

A. Yes.

Q. From September 24th, 2016, through March 4th, 2022.

MR. BUCKLEY: Can you tell me what page you're on?

MR. STARK: Page 16 of 22.

MR. BUCKLEY: Thank you, sir.

BY MR. STARK:

Q. First paragraph, third sentence there; so... And then -- and then it says, a total of 55 force incidents. Footnote 12, right?

A. Yes.

Q. So your analysis focused on 55 incidents only from the time he was within the patrol division?

A. That's correct. So I was right in -- (crosstalk.)

Page 97

Q. Okay. All right. And -- and they are numbered here by year under Footnote 12?

A. Yes.

Q. Okay. So the extent to which Scott Defoe says 70 if he's including the ones from the detention center. Wouldn't you expect his number to be higher than 55?

A. I -- I -- I don't -- I can't say how he got his number.

Q. Okay. That's fine.

A. And I -- and I looked in his report, in his deposition and I didn't see where he said how he got that number.

Q. Let me ask you this. Did you see any use of force reports from the detention center?

A. I don't -- I'm not sure if I was provided them or if I -- or if I didn't include them. I -- I can't say one way or the other.

Q. Okay. All right. So, we know when you send your file, unless something is added to it, if you send your file as it is today, it's going to show us whether you even got --

A. Yes.

Q. -- the use of force reports from the time at the jail?

A. Yes.



MAGNA
LEGAL SERVICES

Page 98

Q. And you understand that he spent some time at the jail before he was assigned to the patrol division, right?

A. Yeah. Yeah. And I can answer the question. In my materials it has use of force reports from 14 and 15.

Q. Okay. And what page are you on there?

A. Page 6.

Q. All right.

A. Number 51 and 52.

Q. Okay. Page 6, number 51 and 52. All right. So I take it we know from this that you did receive use of force incidents involving McMaster from his time at the jail.

A. Yes.

Q. You don't know how many?

A. I -- I know that I read all of the -- these -- these reports. I just didn't include them in my analysis because, having worked in a correctional facility in the jail, they're vastly different, and they're different environments. So I wanted to keep my methodology just to the --

Q. I understand. We're gonna talk about that. But what I'm suggesting to you is you have questioned where Scott Defoe gets 70 from. And -- and my question

Page 99

to you is. You got 55, but you haven't counted the ones from the jail. If you count the ones from the jail, does it give you 70?

A. I don't know.

Q. Okay. But does it give you more than 55?

A. I would assume so.

Q. All right. But you would assume so because we got 22 pages of something relating to use of force reports for 2015 and we got 23 from -- from -- well, roughly 20 or so pages from 2014 and 2015, right?

A. Yes.

Q. And if I'm hearing you correctly. Your analysis, your methodology did not involve reviewing those use of force reports; is that right?

A. They were reviewed, but I just didn't feel that they were pertinent to my analysis.

Q. Okay. They were deemed not relevant?

A. They would be relevant if they were extraordinary or if there were, if -- if I looked at those use of force reports and found that they were -- they resulted in discipline or excessive force rulings, then -- then, yeah, they would. But the -- the number -- the number of use of force incidents for a person is very relative to their assignment. And in the jail, depending on even where he worked in the jail, can mean a vast

Page 100

difference in numbers.

Q. Where did he work in the jail?

A. I don't know.

Q. Okay. All right. So all I'm asking you is this because --

A. Let me backtrack that. I -- I said -- I said I don't know, but I do know that he was on a special response team.

Q. Okay.

A. And in my experience, special response teams are typically called to do cell extractions when -- say an inmate doesn't want to leave his cell and they -- there's a very regimented process by which a team is called, a special response team, and there's a supervisor, they issue warnings and at some point in time this response team may be called upon to enter the cell, and take the person in custody.

So in that context, it's not really a, a, a force that's initiated by the deputy, it's -- it's at the direction of a supervisor.

Q. Okay. Can you refer me to any document that says what you just said as it relates to Deputy McMaster at the jail?

A. I know that he was in that unit because he was -- there was an incident involving him not attending

Page 101

or leaving early, a training for the special response.

Q. Okay. All right. As it relates to 51 and 52 on page 6 of 22 of your report. Tell me if I have this right. Do you know whether any of those use of force reports deal with Deputy McMaster being on the special response team?

A. I do not.

Q. Right. Okay. You don't know how many there are, right?

A. I -- I don't recall, no.

Q. And it sounds like you did not find them to be materially relevant to your analysis; is that fair?

A. That's fair.

Q. Okay. All right. So that would be one area where you and Scott Defoe have a difference of opinion, right?

A. Yes. I -- I do so with having worked in a correctional setting and having supervised correctional assets.

Q. I understand. Well, let me ask you this. Does the Paulding County Sheriff's Office in its policies and procedures have a different use of force policy for the people at the jail than they do for their patrol?

A. Well, in a custodial environment there is a different standard, as I'm sure you know, for working in

26 (Pages 98 to 101)


MAGNA
LEGAL SERVICES

Page 102

the jail because they have the security aspect that they have to consider.

Q. Not my question.

A. Okay.

Q. Does the Paulding County Sheriff's Office use of force policy, which you've reviewed, right? Yes?

A. Yes.

Q. Okay. Does it apply differently if you're at the detention center than if you're out on patrol?

MR. BUCKLEY: Objection. Asked and answered.

THE WITNESS: There -- there are nuances to the detention setting that are different than that of the road deputy. I didn't review the policies for the detention center.

BY MR. STARK:

Q. Okay. Because I'm just trying to figure out what is your basis? Not, not your experience, not anecdotally from what you've experienced. What is your basis for saying a distinction should be made between a use of force incident with the deputy at the jail versus the use of force incident with the deputy on patrol?

A. Because in the use of force in the jail, it also encompasses the -- the security aspects of the facility.

Q. I understand. Can you point me to any

Page 103

testimony documents or policy that you've read from the Paulding County Sheriff's Office that supports what you just said?

A. I'm using case law. I'm using --

Q. You can take anything from the Paulding County Sheriff's Office.

A. I have -- I have not reviewed the detention policies. I do not know if they have a separate policy or if they have any provisions that are separate from the road-patrol deputy.

Q. Okay. All right. So you're -- you're -- the extent to which you hold that opinion, you're not basing it on something somebody said from the Paulding County Sheriff's Office or something in their written policy; is that fair?

A. Yes.

Q. Okay. All right. You're not a lawyer, right?

A. Correct.

Q. What cases are you basing your opinion on?

A. I don't remember. I see all of our training or a lot of law enforcement training is based on cases like Graham versus Connor. And I -- I don't remember the name of the specific case that involves force in the jail. But I -- I've -- I'm not as fluent in it because I

Page 104

-- I encounter it less often.

Q. Do you think that Graham v. Connor applies differently to the use of force in a jail versus the use of force on the street?

A. I -- that I don't know.

Q. Okay. All right. You said it was somehow based on cases. So that's why I asked you that. So, you and Scott Defoe have this difference of opinion about that --

A. About the number of.

Q. About the number, and I think I read where you said Scott Defoe also does not appear to take into account whether other officers were involved in the use of force incidents that likewise involve McMaster? Do you remember that?

A. Yes.

Q. Okay. But can we talk about that?

A. Sure.

Q. Okay. So --

A. Can I address the other thing you said that we -- we differed on opinion. But I think in his deposition, he -- he actually took my 55 and said, okay, let's -- I don't know whether it's 78 or 55, but I still believe even with my number, he -- he -- he accepted my number, I guess in some way.

Page 105

Q. Sure. But he didn't say the ones at the jail, they don't matter because he was at the jail.

A. He said that he had no experience in that area, I believe. And they -- I -- I think he refrained from commenting on jail force.

Q. Okay. Whatever he said is what's going to be in the transcript. Let -- let me ask you this. How many years have you worked in a jail cell?

A. I worked in a jail cell or as a detention officer for one year.

Q. One year.

A. Yes. And -- but at the Broward Sheriff's Office, I was also in charge of professional standards that included all the jail accreditation. I also had all the jail internal affairs. So all the use of force and IA cases from the jail would come to me. So I was responsible for reviewing their policy. And then their practices as a result to --

Q. Which -- which office is this?

A. Broward's Sheriff's Office.

Q. Okay. When you were at the Broward Sheriff's Office, did they make a distinction in writing between the standard for use of force if you're at the jail versus if you're out on the street?

A. They made the distinction that there -- there

27 (Pages 102 to 105)



Page 106

were allowances for force as it -- as it related to the security of the facility.

Q. I'm not sure I understand your answer. Did they have a different use of force standard for jailers than deputies on patrol? That's really my question. Was there a different standard?

A. I don't know about -- I don't know if I'm understanding in terms of the standard. It sounds like you're trying to make a legal distinction. I -- I'm just saying that the policies in -- in a jail or there are some acceptable applications of force that would not be acceptable outside of the jail.

Q. Okay. Let -- let's go back to just the Paulding County Sheriff's Office. Just for a moment. You're aware that the Paulding County Sheriff's Office has written policies and procedures, right?

A. Yes.

Q. And that their written policies and procedures, at least in theory, are designed to cover all operations and functions of the Sheriff's office, right?

A. Yes.

Q. Okay. All right. So you might have some people assigned to internal affairs. They're going to, at least in some respects, bound by that internal affairs policy, but also any other policies, right?

Page 107

A. Yes.

Q. And if you're at the jail or you're out on patrol, my understanding is that when it comes to use of force, when it comes to code of conduct, when it comes to internal affairs, the written policies and procedures are not different for the -- for the officers assigned to the jail versus the ones on patrol. Do you think they're different?

A. There's -- there are entirely different -- different policy book for --

Q. Okay.

A. Yeah.

Q. So your belief is that the Paulding County Sheriff's Office has a different policy and procedure for use of force at the jail versus on patrol?

A. I don't know that.

Q. Okay. All right. So --

MR. BUCKLEY: Can we go off the record?

MR. STARK: Yes.

THE VIDEOGRAPHER: 12:29 off the record

- - -

(A recess was taken.)

- - -

THE VIDEOGRAPHER: 12:50. On the record.

BY MR. STARK:

Page 108

Q. Okay. Mr. Dale, let me ask you this question. Given the experience that you have doing police practices evaluation and consultation, have you ever been involved in a case where you determined that an officer was not adequately trained as it relates to use of force?

A. I don't believe so.

Q. Okay. And -- and -- and here's why I'm asking this question. Is it your belief, just as a general proposition given your background, training, and experience, that if an officer is post-certified and legally -- and from their department standards of whatever certification is required, they're allowed to be on the street, does that, in and of itself, mean the officer is adequately trained for all the circumstances they may encounter?

A. If they're post-certified and then when they get out, they become field trained.

Q. Right.

A. At that point they're deemed to be trained to a sufficient level to conduct basic investigations to respond to calls for service. And then as they're there, because skills are perishable, there's an ongoing burden of training.

Q. Okay. And -- and let me try to ask it a

Page 109

different way and make it more specific. I got the impression from reading your report that because Deputy McMaster was post-certified, that -- that, in and of itself, as far as you're concerned, means that he was adequately trained as it relates to use of force period.

A. He's -- at the moment that he comes off of his, well, post training in itself means that he's certified and he has enough training deemed by the state to go out and be a police officer.

Police departments, though, recognize that there's a field-training program. Paulding County has a field-training program, and they have field-training officers.

And they continue to train them to show them how to connect the dots between the policies that they learned in the academy and the tactics they learned into real-life scenarios.

Then, once they get off, they're still -- most officers sit on a probationary status and they're supervised, their stuff, their work is reviewed. But never ends, it -- it continues past post.

Q. Okay. I'm -- I'm -- let me try it, yet in another way. Do you believe or can you think of a scenario where an officer is currently post-certified,

28 (Pages 106 to 109)

MAGNA
LEGAL SERVICES

Page 110

they've long gone through the FTO process.

A. Right.

Q. They're not on probation. They're -- they're like Deputy McMaster. They -- they are some years into being on the force. Their -- they're current in their post certification. The impression I get and -- and -- and from your report is that if that is the case, an argument cannot be made that that officer is not adequately trained. Is that -- is that what you're saying?

A. No. That's not what I'm saying.

Q. Okay. And -- and -- and let me -- let me ask a different question. So one of the things that an early warning system might do, for example, hypothetically speaking, is identify an officer who perhaps needs some retraining, theoretically, just in general, correct?

A. It's -- it's a possible outcome, yes.

Q. Right. There are some departments that have early warning systems where part of the goal, it's not about discipline, it's about identifying officers that may need retraining in a certain area, right?

A. One of -- yeah, one of several different topics, yeah.

Q. Right. Okay. Part of an early warning system may also be about identifying an officer, not who has

Page 111

done something wrong, but who may need some counseling so that they don't cross over and do something wrong, right?

A. Yes.

Q. Okay. So an early warning system could very well be set up. For example, if an officer has a certain number of use of force incidents, even if they're all justifiable, we still want to flag that officer, because we may want to make sure as a department that that officer is using all the tools to make sure that their use of force, even if justifiable, maybe it could have -- maybe less lethal force could have been used or maybe some sort of de-escalation. Those are things that could be part of an early warning system, right?

A. Yeah. I -- I think what you're trying to say is, yes, the early warning system, when you look at the force individually, may not indicate a problem, but when you look at them from an overall pattern that perhaps there's a deficiency that could be addressed through training, that's just one thing.

Q. Okay. So without going into the substance of Major Ritch's testimony. As I recall, what Major Ritch said, and you sort of referred to it, and we have the transcript that's part of the record. But as I recall, she could not see at her deposition what criteria or parameters were being used by the Paulding County

Page 112

Sheriff's Office to flag any officer's conduct. Is that your recollection?

A. My recollection is she knew that there was an EIP system program and that through their iTrack there are parameters entered. She just didn't know what the exact parameters were.

Q. Okay. Which, in essence, means if you don't know what the parameters are, how would you know what the intervention criteria is?

A. She -- yeah, she doesn't know -- you know, you have a program, she doesn't know what is in the box that says alert us when there's X number of use of force or whatever it is.

Q. Okay. Let me ask the question this way. Did you read anywhere or see anywhere where anybody testified to or you saw in writing a statement that said Deputy McMaster was identified through IAPro as someone who should be in the early warning system?

A. I didn't see any alerts generated for McMaster.

Q. Okay. Did you see or read anywhere any criteria defining how the Paulding County Sheriff's Office's early warning system functions?

A. No.

Q. Okay. Because, as I recall, although Major

Page 113

Ritch sort of talked about an early intervention system and the capability of IAPro, she was not, at least in my conversation with her, able to define how does this work for Paulding County.

A. From her deposition, I couldn't tell. She indicated that she didn't know how the -- what the criteria that were entered into the program to initiate an alert.

Q. Do you know how it works?

A. I -- how theirs?

Q. For Paulding county.

A. I don't.

Q. Okay. Because again, the way the system -- the system APD in Atlanta may set up their system different than the Paulding County Sheriff's Office in terms of, here's the criteria we want to alert us for early intervention. That is a department-specific criteria, right?

A. It -- yeah, it would depend. If that's a larger department, it's easier for people to get lost; a small department less. So there may be more criteria, and it's -- it becomes an IT function too, like what silos of data can you bring in that will help feed the triggers to your EIP.

Q. Okay. All right. I'm going to stay with them

29 (Pages 110 to 113)

MAGNA ◆
LEGAL SERVICES

Page 114

by two hours.

A.   All right.  Okay.

Q.   I just made that decision.  So I'm going to -- this makes me more efficient, I think.  So the extent to which you refer to all the different post-training that McMaster had.  I think you do that on page 8 of 22, then you do that on page 9 of 22.

The training that is relevant for purposes of the incident that forms the basis, in general, for your review is one that involves use of force and more specifically physical force, right?

A.   Use of force, and then I included ethics and professionalism.  I included legal updates.  Things that I felt, kind of, like touch the core of use of force and communication.

Q.   Correct.  But firearms training doesn't relate to this matter, does it?

A.   Yeah.  Every time that you have firearms training and there's a decision as to whether you use deadly force or not, which encompasses a -- a -- a Graham test, basically.

Q.   Okay.  So you're saying firearm training, taser training, all of that factors into Deputy McMaster's use of force on that day.

A.   Yeah.  The -- the -- the principles still

Page 115

apply.  I mean, no matter what tool you're using, it's still a test of whether the force is objectively reasonable given the totality of the circumstances.

Q.   Okay.  All right.  You -- you know that they fired Deputy McMaster, right?

A.   I do.

Q.   Okay.  Did you read the reports regarding his termination?

A.   I believe I did.

Q.   Okay.  Do you think his termination was justified?

A.   It -- it's a -- that's an agency decision.

Q.   Do you have an opinion regarding -- as a police practices expert --

A.   From a -- for the core purposes, I don't have an opinion.

Q.   For the who purposes?

A.   For the purposes of this, I do not have an --

Q.   Okay.

A.   -- official opinion as to whether he should have been fired or not.  I didn't look at -- I looked at -- I saw that the reasoning for it -- I didn't look at those individual cases.

Q.   Okay.

A.   I saw that they were for -- it seemed like

Page 116

repeated incidents of unprofessionalism or discourtesy.

Q.   Okay.

A.   And -- but I don't know that they were force-related.

MR. STARK:  Okay.  All right.  Well, let's see what you saw and talk about what you think, or if it's part of what your scope of opinions are.

First, let me show you this.  And let me -- this is his post profile.  This is Plaintiff's Exhibit-10.

- - -

(EXHIBIT-10, POST PROFILE, was marked for identification.)

- - -

MR. BUCKLEY:  Thank you, sir.

MR. STARK:  Is that two or one?

MR. BUCKLEY:  It says 13.

MR. STARK:  No.  I mean two -- I gave you one, just one copy.  It felt like two, but --

MR. BUCKLEY:  You did.  And you're calling this Plaintiff's 10 for today?

MR. STARK:  Oh, did I?  Yes.  Yeah, it's Plaintiff's 10.  I -- I -- I put it over that we used it for something else.  Yes, I'm sorry.

MR. BUCKLEY:  That's all right.

Page 117

MR. STARK:  All right.  And then -- wait a second here.  All right.  So -- 10, where is 11?

MR. BUCKLEY:  You've got something with a blue sticker on it underneath that on -- on the other part.  That part.

MR. STARK:  Here's 11.  Okay.  Plaintiff's Exhibit-11.  Hold on to that one too.  All right.  That's for -- all right.  So, you got 11 and 10.  I'm also going to go ahead and give you 12, right.  There's 12.  There's 12.  And let me see if I can get my numbers in order here.

- - -

(EXHIBIT-11, TERMINATION REPORT, was marked for identification.)

(EXHIBIT-12, GRAND JURY DOCUMENTS, was marked for identification.)

- - -

BY MR. STARK:

Q.   All right.  So, let -- let's start with the grand jury one, that's number 12, right?  Let's start with that document.  Was this document -- thumb through it.  It's only about four or five pages.  Was it part of your review?

A.   Yeah.  I don't know that the front cover page --


MAGNA
LEGAL SERVICES

Page 118

Q.    Okay.

A.    -- was part of my review, but -- the general presentment report...

Q.    You -- you read this report?

A.    Yes.

Q.    Did you consider it in your analysis and methodology?

A.    I considered it to the degree that -- their findings.

Q.    Their findings?

A.    Yeah. They -- at the end, their recommendations. I read the whole report. I mean, to what degree it influenced me, but I read the recommendations. And the fact is that they -- they ruled independently that the force was justified.

Q.    Okay. Now, let me -- let's do it this way. Go to the third page, third page of the document.

MR. BUCKLEY: You're on number 12, right?

MR. STARK: Yes, I'm on 12. It's the second page of the grand jury report in general present.

BY MR. STARK:

Q.    You've read it, it's part of your file. It sounds like in some manner you have used and relied on it. Is that fair?

A.    I've reviewed it. I -- I -- I -- yes, I guess

Page 119

I could say I relied upon it.

Q.    Okay. All right. And I'll tell you in the context I want to specifically know, did you rely on this or not? On page two, which is at the bottom, "The Office of Professional Standards did find, however, that McMaster violated the Sheriff's Office's policy in the way in which he spoke to Mr. Canaris during the incident. McMaster was written up and required to take classes involving de-escalation and communications." Did you use and rely on that in any way in reaching your opinions?

A.    Well, yeah, I mean, in -- in the case of it doesn't come from the grand jury, it comes from the fact that the Paulding Police Department or Sheriff's office reviewed the incident, and while they found no excessive force, they did find other violations, and they identified them. They -- they were taking corrective action.

So, that fact, well, not just in the report, is also in the IE files for -- for the review files for Paulding County. To that degree, it shows that there's an attempt to identify violations and take corrective action.

Q.    Okay. So you -- you used it, and you make the inference from this that this shows that the Paulding

Page 120

County Sheriff's Office, they are responding appropriately to this incident because they're requiring him to take de-escalation and communication classes. Is that what you're saying?

A.    What I'm reading is that the Paulding County Sheriff's Office, in their review, determined that Deputy McMaster would benefit from additional de-escalation and communication training.

Q.    Okay. And if that's so, do you infer from that if he had this training, maybe the incident would not have occurred?

A.    But he did have the training. I mean --

Q.    No, no. The additional training.

A.    No. I -- I don't -- I don't think that it's a -- it says that it wouldn't have occurred if he had the training. It just says that. Apparently, in -- in their eyes, he's had this violation and that we want to attempt to address it in -- and correct the problem through additional training.

Q.    Right. So you're reading it to say, Deputy McMaster, as determined by the Paulding County Sheriff's Office, needed additional de-escalation training and communications training. Do -- do you -- do you read it that way?

A.    That's their -- their solution for the

Page 121

violation is to try and remedy it, to improve his performance in future calls.

Q.    Right. So that he won't do the same thing again, right?

A.    Well, I don't know what "do the same thing" means.

Q.    Whatever it says, you read it.

A.    But that when it comes to this specific policy, that he's -- he acts within policy.

Q.    Correct. Let me back up, because it says, "The Office of Professional Standards did find, however, that McMaster violated the Sheriff's Office policy in the way in which he spoke to Mr. Canaris during the incident. McMaster was written up and required to take classes involving de-escalation and communications." That's what it reads, correct?

A.    Yes.

Q.    Okay. And would you agree that at least based on the way this reads, the Paulding County Sheriff's Office is saying, by virtue of this incident, you violated this policy and we want you to take some additional classes, right?

A.    Yes.

Q.    To prevent you from violating this policy in the future, right?



Page 122

A.   I mean, that would be one of the goals, I guess.  And the other part is that you can't say that he wasn't -- that he wasn't given this training.  Usually, that's a step in progressively dealing with the problem is, you tend to change behavior.  First, can it -- can it be done by training?  If not, then by discipline.

So they're also setting the stage that he's on notice, he's been given enhanced training in this area because he violated the policy.  And in the future, training probably won't be, I mean, the inference is that training won't be an option in the future that he'd be disciplined.

Q.   Yeah.  Because he had already had de-escalation training, right?

A.   He had, yeah.

Q.   Okay.  All right.  So -- but it sounds like you did some analysis of the fact that the department said, enhanced, as you use the term, de-escalation and communications training, right?

A.   Yeah.  They weren't very -- they weren't specific on it.  They said -- I think verbal judo was one term they used, de-escalation.  But they recognize that communication, and I don't know if that is pre-force communication or post-force, where, you know, he -- he says some things that are derogatory toward Mr. Canaris.

Page 123

Q.   Well, let me ask you this.  Would you agree though that the extent to which de-escalation is used by law enforcement agencies, as it relates to police practices, that's pretty well-defined within the industry?  Would you agree?  Like IACP defines it, right?

A.   I don't know that it is.  It is -- there's some nuances to it, I mean, people will view a show of force as a de-escalation tool.  Telling someone what the consequences to not complying with an order is, by many considered de-escalation.

Q.   Okay.

A.   So, pointing your taser and putting the lasers from the taser is an inference that if you do not comply, I'll use this taser and it's meant to elicit a lower resistance level.

Q.   Okay.  But you like IACP in terms of its model guidelines, right?

A.   I do.

Q.   Okay.  So if IACP defines it a certain way, you -- you -- you, kind of go with IACP.  Is that fair?

A.   I don't know that.  I mean, I could just tell you that in working with policies that are under a DOJ consent decree, I know that they -- that in policies where a show of force, say, is considered de-escalation that DOJ has accepted that policy.

Page 124

Q.   Okay.  Have you ever looked at what IACP says about de-escalation, its purpose, its intent?

A.   I don't -- I don't recall it.

Q.   Okay.  All right.  I think we have it here. That was a part of your analysis, right?

A.   Yes.

Q.   Okay.  But de-escalation, now -- and you reference it a number of different times from his post-profile.  You never looked at any curriculums or course outlines for what was taught during those programs, right?

A.   No.  I just know that they're post -- post-approved curriculums.

Q.   Right.  But you don't know how they defined de-escalation?

A.   I don't.

Q.   Okay.  All right.  And I take it other than what we now have on the record through IEP, does Paulding County's use of force policy define de-escalation?

A.   I can look at it.

MR. STARK:  Yeah.  Let me give you one.  Let's make one part of the record here.  And we'll call this Plaintiff's Exhibit Number 13.  You can ignore that four.

- - -

Page 125

(EXHIBIT-13, PAULDING COUNTY SHERIFF'S PROCEDURES, was marked for identification.)

- - -

BY MR. STARK:

Q.   Do you think you have it in your report, Mr. Dale?

A.   No.  I don't -- don't.  I don't have...

Q.   But you have the report too; so...

A.   Yeah.

MR. STARK:  And for the record, that copy has highlights on it from a previous use as an exhibit that are not Mr. Dale's highlights or mine.  But I got an orange marker here that if we find something in there on de-escalation, we will highlight it.

THE WITNESS:  Under force options.

MR. STARK:  Would you highlight --

THE WITNESS:  Sure.

MR. STARK:  -- anything in there that you think relates to de-escalation?

THE WITNESS:  Sure.  So for the record, it's on page 2.  Roman numeral III A4, it says that once force is utilized by the deputy must be escalated and de-escalated.

MR. STARK:  Okay.

MR. BUCKLEY:  What page?  I'm sorry.



Page 126

THE WITNESS:  It's on page 2 of 13.

MR. BUCKLEY:  Thank you.

THE WITNESS:  And in section B, it gives various options to overcome control, which -- over -- overcome and control a resisting subject is verbal commands, verbal skills used to control --

MR. STARK:  Okay.

THE WITNESS:  -- or de-escalate the situation.

MR. STARK:  Okay.

BY MR. STARK:

Q.   Okay.  You've highlighted everything in there that relates to de-escalation?

A.   In this -- in the Paulding County, Chapter 8.  Yeah.

Q.   Okay.  All right.  But part of what -- what relates to de-escalation is communication.  The way an officer communicates with a citizen or a suspect, right?

A.   It -- it's one of the facets, yes.

Q.   Okay.  All right.  Let's go to this second to last page of the grand jury report, which is -- it ends -- the page ends with this, the 20th day of December 2023, The Grand Jury Recommendations.  That first paragraph, "The grand jury recommends that the Paulding County Sheriff's Office review their policies and

Page 127

procedures regarding use of force."  Do you see that sentence?

A.   Yes.

Q.   Did you consider that in your analysis and methodology for this case?

A.   I did.

Q.   Okay.  And it says, "We recommend that the Sheriff's Office continue to implement the changes that have been put into place following this incident, including the creation of a Use of Force Review Board and advanced use of force tactics training for deputies."  Do you see that?

A.   Yes.

Q.   Okay.  How did you use and rely on what's in that paragraph in any way?

A.   Well, I mean, they -- they asked them to continually review.  They recommended that they review their policies and procedures for use of force.  But that is something that in -- in any agency should regularly occur as it pertains to use of force.

Their policy, I think, was enacted a very short time before this incident.  They cited no -- no deficiencies in the current policy.

Q.   They being who?

A.   The grand jury.  There was -- there was

Page 128

nothing cited that would show that the current policy that was in place was deficient in any way.  They -- it seemed to me that they're recommending mechanisms to -- to add to the existing policy in terms of oversight from a -- a citizen board to make it more transparent and open.

Q.   That's your interpretation of this?

A.   Yes.

Q.   Do you think the grand jury would have been qualified to point out deficiencies in the Paulding County Sheriff's Office use of force report?

A.   If they had a witness that came forward, and they brought him and -- and it was an expert who said that -- and pointed to them -- it pointed to the parts of the policy that were deficient and said so, then -- then that may be their finding, but I don't know that that occurred.

Q.   Okay.  All right.  But you're saying this paragraph, you had read it, it was part of your analysis in the opinions that you reached, right?  Regarding the training and everything being adequate.  You're saying you took this into account?  This was part of your analysis?

A.   Everything in our analysis, not everything, but it's to some degree, it's factored in.  Now, the

Page 129

weight that it's given, I -- I -- I don't know that it was given a huge amount of weight.

Q.   Okay.

A.   But -- but it -- it's a -- a recommendation and I think it's probably a recommendation that you could give to every police department.

Q.   That would be speculation though, wouldn't it?

A.   I -- I mean, as a -- as a chief, I'd recommend that every agency -- it's a high liability item that they would continually recommend their -- or review their use of force policies.

Q.   Okay.

A.   I'd say that you should do it on an annual basis.

Q.   Okay.  Are they doing that in Paulding County?

A.   I don't know that.

Q.   Okay.  But you would recommend that they do that?

A.   I -- I -- I think, like, it's a high liability issue.  It's not required, but if -- I think it's always good to take a -- a look at it.  It doesn't mean it needs to be changed, but if there's changes in case law or there are different tools that are available and, you know, the policy should reflect its use.

Q.   Best practices would dictate doing what you're

33 (Pages 126 to 129)



MAGNA
LEGAL SERVICES

Page 130

saying. Would you go so far as to say that?

A. I don't know that it's written anywhere, but I -- I -- it's just something that, personally, I choose to.

Q. Right. I didn't ask you whether it was written. Do you --

A. You said best practices that incorporates. And it's right.

Q. No. Do you believe that it is best practices? You could have a view about what's best practices and it doesn't have to be written or accepted by CALEA or anyone else. I take it that's what you were stating in your view, these are things that should be done, right?

A. I think that it should be continually reviewed.

MR. STARK: Okay. All right. Well, one -- couple -- couple other things here I -- I want to show you and then I -- I'm going to let you go. Plaintiff's Exhibit-14 and 15. I want to show you this. Well, let me start with 14.

- - -

(EXHIBIT-14, DOCUMENT ATTACHED TO COMPLAINT, WAS MARKED FOR IDENTIFICATION.)

- - -

Page 131

BY MR. STARK:

Q. Tell me -- that this was attached to the complaint. I -- I just want to make sure. Have you -- and the paragraph I want to focus you on is that last paragraph, where it says, "We stress to Deputy McMaster that we want him to do his job. We want him to be comfortable with the job requirements, but that he must learn to use the most reasonable amount of force necessary to control any situation in a safe way.

We further explained to Deputy McMaster that if he continues to demonstrate a pattern of inappropriate use of force, it could lead to further disciplinary action and/or termination." Did you read and consider that in your evaluation?

A. I don't -- I don't know if I had the document to review.

Q. You don't think you've ever seen this before?

A. I don't -- I don't recall it.

Q. Okay.

A. It could be in there, but I just don't remember

MR. STARK: All right. Take a look at Plaintiff's Exhibit Number 15. Tell me if you think you have ever --

Page 132

MR. BUCKLEY: Counsel, didn't you say these were attached to the complaint you filed?

MR. STARK: Yes.

MR. BUCKLEY: Okay. Tell me if you've ever seen that document.

- - -

(EXHIBIT-15, DOCUMENT ATTACHED TO COMPLAINT 79 OF 80, WAS MARKED FOR IDENTIFICATION.)

- - -

MR. BUCKLEY: And this is 15, did you say?

MR. STARK: Yes.

MR. BUCKLEY: Thank you.

THE WITNESS: Back on -- on 14, as I read the other sections that you reference -- I -- I remember the complaint, so I know that it was in there.

BY MR. STARK:

Q. You think you have seen it?

A. Yeah. I don't know that per se this letter or if it was -- the complaint was summarized in some other fashion using this, but I -- I remember the story.

Q. Okay. Here's -- here's my question.

A. Yeah.

Q. Have you seen either of those two documents before today, not whether you think you've heard about it or maybe read about it? Have you seen those two

Page 133

documents before today?

A. I -- I believe I am, but I have -- but I can't be sure.

Q. Okay. All right. That's fine. Take a look at this one. Take a look at Plaintiff's Exhibit Number 11. So the extent to which we know if you saw it, you would have used and relied on it, it would have been part of your review, right? Yes?

A. Yes.

Q. If you didn't see it, it couldn't have been, right?

A. Right.

Q. Okay. All right. That last document there, this is some of the termination stuff. I really want to ask you, you see the three-page -- you see the termination letter that's three pages. It starts really on the 3rd page. It's -- it's signed by --

A. Yes.

Q. -- Chad Hunten. Have you read all of that letter?

A. Yes.

Q. Okay. All right. And do you agree that part of what it's -- it's -- it's asserting here is that Deputy McMaster has a problem as it relates to not adequately or appropriately de-escalating situations or



Page 134

do you -- do you need to read it to familiarize yourself with it?

A.   I'd like to read it.

Q.   Okay.

A.   Okay.

Q.   Have you not read that before today?

A.   I have.

Q.   Okay.  Did you read it to prepare for today?

A.   I don't -- I don't know that I read the entire file.

Q.   Okay.  You don't cite it in your report, do you?

A.   I do not.

Q.   Nor do you cite either a Plaintiff's Exhibit-15 or 14, right?

A.   No.

MR. STARK:  That -- that's all I have for you, sir.  Thank you.  Jason, are you there?

MR. WAYMAYER:  No -- no questions.

MR. BUCKLEY:  None for me at this time.

MR. STARK:  Well, sir, in the interest of not going into that fourth hour.  I don't think I went into that fourth hour.  But let me give you my cell.  I want you to get your -- your -- your payment here and -- so you -- 404 -- you want -- can

Page 135

you take it because I -- I -- I don't want these folks to lose track.  I want you to get your -- 404-274-1178.  I don't think they mind if you call me about getting your money.  How much you gonna charge me for 3 hours, right?  Now I didn't go with --

THE REPORTER:  Mr. Stark, would you like a copy?

MR. STARK:  I didn't go into the 4th hour.

THE REPORTER:  Stand by, please.  I still have to --

MR. STARK:  Oh, sorry.

THE REPORTER:  Does counsel want to order the video at this time?

MR. STARK:  Not at this time.

THE VIDEOGRAPHER:  Okay.  This concludes today's testimony given by John Dale.  The time is 1:29.  We're off the record.

- - -

(Whereupon, the Witness was excused.)

- - -

(Whereupon, the deposition concluded at approximately 1:29 p.m.)

- - -

Page 136

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, KEITH RABINOWITZ, Court Reporter, Notary Public, State of Florida, certify that JOHN DALE, appeared before me on this 23rd day of May, 2025 and was duly sworn.

Signed this 23rd day of May 2025.

_____

KEITH RABINOWITZ, Court Reporter

Notary Public, State of Florida

My Commission No.: HH632937

Expiration:  02/02/2029

Page 137

REPORTER'S CERTIFICATE

STATE OF FLORIDA

COUNTY OF BROWARD

I, KEITH RABINOWITZ, do hereby certify that I was authorized to and did report the foregoing proceedings and that the transcript is a true and correct transcription of my notes of the proceedings.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or counsel connected with the action, nor am I financially interested in the action.

Signed this 23rd day of May 2025.

_____

KEITH RABINOWITZ, Court Reporter

Notary Public, State of Florida

My Commission No.: HH632937

Expiration:  02/02/2029



## ACKNOWLEDGMENT OF DEPONENT

I, JOHN DALE, do hereby certify that I have read the foregoing pages, 04 - 135, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____    7/11/25
JOHN DALE            DATE

Subscribed and sworn to before me this
11 day of JULY, 20 25.
My commission expires: 3/25/29

_____
Notary Public

KENDRA HOWE
Notary Public
State of Florida
Comm# HH656239
Expires 3/25/2029

## LAWYER'S NOTES

PAGE   LINE

ERRATA SHEET
IN RE : TYLER LEE CANARIS v. MICHAEL MCMASTER AND
        GARY GULLEDGE
DEPONENT: JOHN DALE
TAKEN : 05/23/2025
*********************************************************
DO NOT make any marks or changes on the transcript itself. Enter any changes here.

| Page/Line | Change | Reason for change |
|---|---|---|
| 35/21 | force in a manner not in accordance | Clarification |
| 119/20 | IA | Typographical Error |
| 133/2 | I believe I have | Clarification |



MAGNA
LEGAL SERVICES

**A**

**a.m**
1:17 4:7
**A4**
125:21
**able**
68:1,2 69:7 72:16
90:15 91:4 113:3
**Absent**
40:8
**absenteeism**
52:2
**Absolutely**
18:10 24:16
**academy**
109:17
**academy-type**
85:6
**acceptable**
66:25 68:1 106:11,12
**accepted**
35:21 39:19 64:6
104:24 123:25
130:11
**account**
104:13 128:22
**accountability**
29:21
**accreditation**
85:9,12,15,22 86:19
105:14
**accreditations**
85:10
**accredited**
74:8 85:20 86:17
**accurate**
71:10 72:1
**accurately**
27:9 30:16,19 71:24
**accusation**
27:15
**accuse**
89:14
**ACKNOWLEDG...**
138:1

**acted**
10:2 64:5 66:11
**action**
16:2 57:22 119:18,23
131:13 137:12,13
**actions**
42:19
**active**
45:18 57:4
**acts**
121:9
**actual**
20:23 21:5 22:10
69:16 70:25 73:22
**add**
55:25 74:8 79:4
82:13 84:20 128:4
**added**
11:17 97:19
**additional**
120:7,13,19,22
121:22
**additions**
31:9
**address**
48:5 70:18 104:20
120:18
**addressed**
111:18
**addresses**
26:10 53:13 85:12,18
**adequacy**
48:21
**adequate**
48:14 128:21
**adequately**
48:8 70:14 108:5,15
109:5 110:9 133:25
**adjoining**
7:8
**administrative**
15:21 21:16 22:17,20
38:7 62:20
**administratively**
16:8,10 36:7

**advanced**
127:11
**affairs**
15:4 22:2 25:13
37:15 38:5 39:9,23
42:18 45:12 46:4
50:22 54:9 55:3,24
56:15 68:5 86:10
105:15 106:23,24
107:5
**affect**
35:17
**afraid**
10:2
**agencies**
75:12,16 77:12 85:12
85:15 89:11 123:3
**agency**
7:12 18:20 19:3
62:16 74:6 75:19
89:15 115:12
127:19 129:9
**ago**
46:15 84:16
**agree**
5:16 15:16,22 18:7
21:7 121:18 123:1,5
133:22
**agreeable**
5:13,14
**agreement**
5:5 10:4,9 49:24,25
**ahead**
53:9 117:9
**Akhtar**
36:15
**Albuquerque**
49:9 50:3
**alert**
51:21,25 112:12
113:8,16
**alerts**
112:19
**allegations**
36:24 39:2,3 77:19

77:24
**alleged**
13:1
**allowances**
106:1
**allowed**
5:6 108:13
**alot**
60:4
**Amendment**
36:25 37:2,4,6,7
38:10
**amount**
57:20 129:2 131:8
**analysis**
19:15 20:22 21:4
22:10 23:10 24:23
25:14 63:12 69:16
74:3 78:10,13 81:17
83:19 84:16 96:22
98:18 99:13,16
101:12 118:6
122:17 124:5 127:4
128:19,23,24
**analyze**
19:20 64:2 71:11
**analyzed**
74:24
**and/or**
55:12 131:13
**anecdotally**
102:18
**annual**
129:13
**answer**
33:10 34:13 40:11
52:18,20,20 60:21
66:18,24 67:1,2
68:2 98:4 106:3
**answered**
102:10
**answering**
19:5 20:2 21:20
87:24
**answers**



MAGNA
LEGAL SERVICES

5:11 56:5 138:4
**Anthony**
41:22 46:10
**anybody**
65:11,14,19,21
112:15
**anybody's**
44:6
**APD**
113:14
**apologize**
78:7 93:6
**Apparently**
120:16
**appear**
104:12
**appearance**
4:14
**APPEARANCES**
2:1
**appeared**
136:7
**applications**
106:11
**applies**
104:2
**apply**
102:8 115:1
**appropriately**
120:2 133:25
**approval**
6:25 7:15 8:8
**approximately**
135:23
**April**
79:18
**arbitration**
36:9,12
**area**
7:10 30:12 101:14
105:4 110:21 122:8
**areas**
54:6 67:5
**arguing**
57:17

**argument**
110:8
**armed**
59:11
**arrest**
37:5 38:20,22 57:24
57:25 59:19 60:6
77:16
**arrests**
60:3
**articulable**
68:19 69:19 70:2,19
**aside**
80:18
**asked**
16:17 22:19 29:12,15
30:20 53:4,5,6,8,11
66:23 71:14 87:21
88:20 102:10 104:7
127:16
**asking**
17:15,16 18:2,2 19:6
19:8 25:2 31:1,3
34:6 65:3 70:16
76:19 100:4 108:8
**aspect**
21:22 102:1
**aspects**
102:23
**asserting**
133:23
**assets**
101:19
**assigned**
8:25 57:6,11 94:7
98:2 106:23 107:6
**assignment**
31:4 99:24
**assignments**
31:7
**assist**
49:21
**assistance**
7:10
**assistant**

6:11 8:15,18,19 9:3,4
9:14,20 50:18 54:6
56:21 57:10
**Association**
75:5
**assume**
24:19 99:6,7
**assuming**
56:22
**Atlanta**
2:2,4,9 113:14
**attached**
3:23,24 130:23 131:2
132:2,7 138:7
**attempt**
72:23 119:22 120:17
**attempted**
72:10
**attending**
100:25
**attorney**
12:4 25:22,24 43:17
137:11
**attorney's**
14:17 45:1
**attorneys**
14:15 43:21,22 63:19
73:10
**authored**
63:24
**authorization**
6:22
**authorized**
6:23 137:6
**available**
79:2 82:12 129:23
**avoid**
7:11
**aware**
85:24 86:2 106:15

_____

**B**

**B**
3:7 126:3
**back**

15:9 20:10 22:24
32:5 33:7 50:14
55:17 69:12 83:12
89:20 106:13
121:10 132:13
**background**
71:3,5 74:4,7 108:10
**backlog**
49:11 50:3
**backtrack**
100:6
**ballistics**
41:16
**based**
21:4 24:18 36:1 40:3
40:9,23 41:1,4,8,11
50:11 68:14 72:16
87:24 103:22 104:7
121:18
**basic**
58:7 75:18 108:21
**basically**
50:2 114:21
**basing**
103:12,20
**basis**
102:17,19 114:9
129:14
**Bates**
90:1 91:14,16,18
**Bay**
38:14
**Beach**
6:12 7:16 50:17
51:11,17 54:5 58:3
**bearing**
18:24 21:11,23 74:12
**begins**
4:3
**behalf**
2:2,7 4:17,19 5:14
7:24 43:25 44:11
**behavior**
122:5
**belief**



107:13 108:9
**believe**
6:6 7:14 9:13 14:18
15:14 27:12 28:9,11
28:12 30:18,21
32:22 42:17 46:15
46:19 70:13 72:13
73:1,2 75:8 81:12
83:8,8,10 86:19
91:2 92:13,25 93:15
93:25 95:19 104:24
105:4 108:7 109:24
115:9 130:9 133:2
**bell**
87:18
**belonged**
86:16
**benchmarks**
50:1
**benefit**
28:23 120:7
**best**
52:9 75:9 129:25
130:7,9,10
**better**
48:9 70:22 85:12
**beyond**
17:9 55:22 56:8,13
**big**
92:10
**bill**
26:5,5
**billed**
10:13
**bit**
5:23 50:13 67:16
**blanket**
8:8
**blue**
51:15,16 55:10 117:3
**board**
127:10 128:5
**body**
17:8 55:20 74:9 75:7
**body-worn**

75:17
**book**
107:10
**bottom**
46:24 60:13 91:14,16
94:22 119:4
**bound**
106:24
**box**
112:11
**Boynton**
6:12 7:16 50:17
51:11,17 54:5 58:2
58:4
**break**
10:24 24:13 50:14
53:21
**Brent**
65:10,11 87:13
**bring**
50:5 113:23
**brought**
14:25 15:11 50:7
128:13
**Broward**
58:4,18,24 62:12,16
86:18 105:12,21
136:3 137:3
**Broward's**
105:20
**bruises**
60:5
**Buckley**
2:7,8 4:17,17,21 5:14
10:10 11:23 20:7,9
20:11,14 23:22,24
24:1,4 26:18 31:15
46:16,23 47:3 52:17
52:21,24 53:2 56:3
56:10 63:19 79:10
81:19 83:15 90:6
96:13,16 102:10
107:18 116:15,17
116:20,25 117:3
118:18 125:25

126:2 132:1,4,10,12
134:20
**Buckner**
66:1 87:7
**budget**
73:20,22 74:10,11
**bullet**
54:7 56:15
**burden**
36:4 108:23
**Bureau**
73:22 74:11 88:2,8
88:19,22
**burglaries**
72:20

---
**C**

**C**
4:1
**CAD**
68:6
**CALEA**
85:7,8,13,13,20,20
85:24 86:2,8,9,11
86:17,18 130:12
**call**
9:6,7 49:24 85:11
124:22 135:3
**called**
31:19 51:6,15,22
53:15 84:10 100:11
100:14,16
**callers**
72:14
**calling**
116:20
**calls**
9:11 57:6 108:22
121:2
**cam**
55:20
**Camden**
46:11
**camera**
71:17 72:8,15,15

**cameras**
74:9 75:17
**Canaris**
1:4 4:4 69:8,23 72:9
72:17 80:14 87:9
119:7 121:13
122:25 139:2
**Canaris's**
72:4
**canine**
14:7,8
**capability**
113:2
**capable**
87:24
**capacity**
1:7,9 6:14 9:14 58:13
63:20
**captain**
55:2
**career**
59:14
**carefully**
88:10
**Carlos**
44:24
**Carmen**
44:24
**Carmichael**
46:11
**CASA**
49:24
**case**
7:1,4,6,18 9:17 10:1
10:10 12:10,14
13:25 14:5,6,20,21
15:11 16:8,12,15,16
16:19 17:18,21,23
17:24,24 18:4,15
19:9 21:3,8 24:21
25:10,15,16 29:15
32:2 33:4,8,14,25
34:11,22,23 35:15
35:18,19 36:15,20
36:21,24 37:20,22



37:24 38:17,19 39:1
40:5,16 41:2,5,23
41:25 43:3,11 44:15
45:1,4,18,23 46:14
46:19 47:17 62:2,14
63:21 64:3 65:4
66:10,13 67:12
68:12 70:1 73:6
74:13 85:6 103:4,24
108:4 110:7 119:12
127:5 129:22
**cases**
7:8,20,23 8:6 9:25,25
11:25 12:12,17,20
12:25 13:6,12,18
16:11,18 32:17
47:21,22 48:17,22
49:16 50:8 67:8
85:2 89:11 103:20
103:22 104:7
105:16 115:23
**casework**
10:19
**category**
80:15
**cause**
31:2 68:20 69:20
70:2,20
**cell**
100:11,12,16 105:8,9
134:24
**Census**
73:22 74:11
**center**
79:17 97:5,14 102:9
102:14
**certain**
17:9 110:21 111:5
123:19
**CERTIFICATE**
136:1 137:1
**certification**
108:13 110:6
**certified**
109:9

**certify**
136:6 137:5,10 138:2
**CFA**
85:11 86:2
**Chad**
87:3 133:19
**chain**
9:8
**chance**
62:22
**change**
8:15 35:25 39:25
44:18 82:13 91:23
91:25 122:5 139:9,9
**changed**
54:24 56:6,18 129:22
**changes**
127:8 129:22 138:6
139:7,8
**Chapter**
126:13
**charge**
8:20,21 105:13 135:5
**charged**
13:2,3 14:9 15:17
16:7,9,10 37:11
38:1 39:5 41:5
42:12 43:5 45:6
46:2 80:11
**charges**
14:10,11,25 15:10
26:6 33:9,11,16
**Charles**
37:18
**check**
10:21,24 14:14 32:21
49:5
**Chicago**
12:5
**chief**
6:11 8:15,18,19 9:3,4
9:14,20 50:18 54:6
56:22 57:10 129:8
**Chiefs**
75:5

**choose**
85:13 130:3
**CHRISTOPER**
2:7
**Christopher**
10:10 11:23 63:19
**circumstance**
57:20
**circumstances**
25:16 26:24 57:8
62:3 108:15 115:3
**citations**
94:19
**cite**
134:11,14
**cited**
73:21 75:24,25 93:25
127:22 128:1
**citizen**
126:17 128:5
**city**
6:11 46:11 48:12
49:9,25
**civil**
5:7 13:6,9 15:21 16:2
62:7
**Claimant's**
20:5
**claims**
47:23
**Clairmont**
2:8
**clarify**
26:22 52:25
**clarity**
26:18
**classes**
119:9 120:3 121:14
121:22
**clean**
79:9
**clear**
26:14 28:16 68:17
**cleared**
60:8 89:9

**Cleveland**
14:20
**cocaine**
60:3
**Cochran**
2:2 10:22
**code**
107:4
**coffee**
57:14
**collect**
89:13
**college**
59:9
**colonel**
58:24,24
**come**
8:16 20:10 67:17,21
68:5 75:18 105:16
119:13
**comes**
22:24 30:25 49:5
67:19 68:6 107:3,4
107:4 109:7 119:13
121:8
**comfortable**
34:21 131:7
**coming**
62:22
**command**
9:8 55:4 58:20,21
**commands**
126:6
**commenting**
105:5
**commission**
136:20 137:23
138:14
**commit**
36:13 41:9
**committees**
75:15
**communicates**
126:17
**communication**



114:15 120:3,8
122:23,24 126:16
**communications**
119:9 120:23 121:15
122:19
**compared**
76:13 83:24
**comparing**
78:14
**complaint**
3:23,24 130:23 131:3
132:2,7,15,19
**complaints**
51:4
**complete**
33:3 89:12
**completely**
66:24
**compliance**
49:22
**comply**
123:13
**complying**
123:9
**computer**
24:14
**computers**
27:20
**concerned**
109:4
**concerning**
26:11 29:17 67:5
96:8
**concert**
77:11
**concluded**
135:22
**concludes**
135:16
**conclusion**
38:9 39:24 70:8
**conclusions**
64:3
**conduct**
19:9 23:3 37:15

39:18 45:13 46:5
48:3 49:12 76:12,21
76:24 88:20 89:1
107:4 108:21 112:1
**conducted**
22:2 48:8 96:7
**conflict**
9:16,18,19
**conforms**
85:23
**connect**
109:16
**connected**
137:12
**Connor**
103:23 104:2
**Consensus**
3:17 77:12 84:5,11
**consent**
49:1,4,8,16 123:23
**consequences**
123:9
**consider**
17:13,15 19:4 48:18
66:11 82:16 102:2
118:6 127:4 131:13
**considered**
118:8 123:10,24
**consistent**
21:18 23:9 29:22
66:11
**Constitution**
16:7
**consultant**
6:20 49:1,3 67:5
**consultation**
108:3
**contain**
92:23
**content**
74:20 85:16 86:6
**contents**
25:6,8 26:14
**context**
25:23 29:21 69:4

89:1 92:18 100:18
119:3
**contexts**
12:21
**continually**
127:17 129:10
130:15
**continue**
109:15 127:8
**continues**
109:22 131:11
**control**
126:4,5,6 131:9
**conversation**
20:13 113:3
**copies**
23:20 78:25
**copy**
6:6 23:12,14 79:9
89:24 90:4,7 116:19
125:10 135:8
**core**
114:14 115:15
**correct**
6:7,8 11:11,21 12:11
14:4,22,23 15:1
17:3 18:4,13 19:10
19:11,18 21:6 23:23
24:21 25:17 26:15
26:16 27:1,2,16
28:21,24 31:25
38:11,12 40:7,18,19
40:25 41:3,10,21
44:13 47:19 50:20
50:24 51:13 54:7,10
54:11 56:8,23 61:9
61:15,20 71:22
73:14,15 74:17,18
80:16 82:1,2 85:19
91:25 92:5 94:14,18
95:7 96:24 103:19
110:16 114:16
120:18 121:10,16
137:7 138:4
**correctional**

98:19 101:18,18
**corrections**
138:5
**corrective**
119:17,22
**correctly**
22:9 35:14 99:12
**correspond**
90:12
**corresponds**
96:6
**cost**
86:20
**counsel**
4:13 59:2 132:1
135:13 137:11,12
**counseling**
111:1
**count**
99:2
**counted**
99:1
**counting**
92:5
**country**
51:10 75:17
**county**
1:8,10 3:22 19:17
22:3 29:18 30:2
37:18 48:13 64:4,14
72:24 73:19 74:5,11
76:15 78:12 81:13
81:24 83:21,25
101:21 102:5 103:2
103:5,13 106:14,15
107:13 109:12
111:25 112:22
113:4,11,15 119:21
120:1,5,21 121:19
125:1 126:13,25
128:11 129:15
136:3 137:3
**County's**
124:19
**couple**



MAGNA
LEGAL SERVICES

32:6,7 54:22 87:20
130:18,18
**course**
15:20 124:10
**court**
1:1,24 4:11,15 14:2
18:5 23:3 25:13,15
26:10,23 34:11 42:7
45:22 46:12 48:24
136:5,18 137:21
**court's**
23:2
**cover**
106:19 117:24
**crack**
60:3
**creating**
54:13
**creation**
127:10
**credentials**
5:24
**crime**
57:1,9
**criminal**
14:10,11,25 15:10,20
23:22 26:6 33:9,11
33:15 35:23 36:11
80:1 89:17
**criminally**
15:17 36:6 46:2
80:11
**criteria**
52:8 111:24 112:9,22
113:7,16,18,21
**cross**
111:2
**crosstalk**
96:25
**cup**
57:14
**current**
6:7 11:8 24:18 53:11
61:16 110:5 127:23
128:1

**currently**
6:9 7:23 8:20 31:4
50:25 109:25
**curriculums**
124:9,13
**custodial**
101:24
**custody**
100:17
**customs**
64:7
**cut**
95:20
**CV**
3:10 6:3,6 13:13,15
13:18 32:9,12,16,20
54:4 63:24

---
**D**

**D**
3:2 4:1
**Dale**
1:16 3:4 4:4,24 5:4
41:18 54:5 108:1
125:6 135:17 136:6
138:2,10 139:4
**Dale's**
90:13 125:12
**dancing**
40:13
**dash**
71:17
**data**
113:23
**date**
63:10 95:20 138:10
**day**
114:24 126:22 136:7
136:12 137:16
138:13
**days**
8:14
**de-escalate**
126:8
**de-escalated**

125:23
**de-escalating**
133:25
**de-escalation**
111:12 119:9 120:3,7
120:22 121:15
122:14,18,22 123:2
123:8,10,24 124:2,7
124:15,19 125:14
125:19 126:12,16
**deadly**
114:20
**deal**
101:5
**dealing**
26:23 122:4
**death**
14:5 37:24 38:17
41:25 43:3 45:4,23
**December**
126:22
**decide**
31:22
**decided**
18:5 22:14
**decides**
41:8
**deciding**
25:23
**decision**
21:21,23 22:1,1,5
23:2 34:14 36:22
39:9 42:19 71:12
114:3,19 115:12
**decisions**
25:13,14
**decree**
49:2,4,8,16 123:23
**deem**
80:2 89:17
**deemed**
95:22 99:17 108:20
109:9
**defendant**
2:7 7:21,23

**Defendants**
1:11
**Defendants'**
23:15,17 27:14
**defense**
12:8,21 32:24 43:14
43:15
**deficiencies**
127:23 128:10
**deficiency**
111:18
**deficient**
128:2,15
**define**
113:3 124:19
**defined**
124:14
**defines**
123:5,19
**defining**
112:22
**Defoe**
67:6,9 94:15,16 97:4
98:25 101:15 104:8
104:12
**Defoe's**
28:17 93:21 94:9
**degree**
51:20 118:8,13
119:21 128:25
**delineates**
24:20
**demonstrate**
131:11
**department**
6:24 7:17 8:2,12,22
15:19,25 47:23
48:13 49:4,6,7,8
50:17 51:1,11,18
53:12 54:5 58:3
61:16 62:4,14 75:15
86:4,17 108:12
111:8 113:20,21
119:14 122:17
129:6


MAGNA
LEGAL SERVICES

**department's**
48:21 50:22 54:9
55:24
**department-specific**
113:17
**departments**
51:9 52:7 75:10,13
109:11 110:18
**depend**
113:19
**depending**
35:16 99:24
**depiction**
71:10
**DEPONENT**
138:1 139:4
**deposed**
34:24 38:25 45:19,20
87:16
**deposition**
1:16 4:3,7 5:4,12
10:20,22 11:2,10,15
28:18,23 29:1,1,5,6
29:7 31:1 32:3 63:3
88:2,7 97:11 104:22
111:24 113:5
135:22
**depositions**
11:1 14:13 15:6
65:20 66:15 86:23
91:22
**deputies**
106:5 127:11
**deputy**
1:8 19:16 20:23 21:5
22:11 30:7 69:17
71:18 89:9 90:12
96:8,9 100:19,22
101:5 102:13,20,21
103:10 109:2 110:4
112:16 114:23
115:5 120:6,20
125:22 131:5,10
133:24
**derogatory**

122:25
**described**
30:15 75:8
**DESCRIPTION**
3:9
**designated**
13:21
**designed**
106:19
**detached**
17:13
**detention**
97:5,14 102:9,12,14
103:7 105:9
**determination**
89:19
**determine**
35:1 69:7 72:16 80:7
88:23 94:11
**determined**
48:7 72:9,12 108:4
120:6,21
**dictate**
129:25
**differed**
104:21
**difference**
15:21 100:1 101:15
104:8
**different**
8:19 15:15 19:5 20:4
36:3 39:24 60:15
61:3 68:14 69:25
70:16 76:2 98:20,20
101:22,25 102:12
106:4,6 107:6,8,9
107:10,14 109:1
110:13,22 113:15
114:5 124:8 129:23
**differently**
35:25 102:8 104:3
**direct**
18:23 59:1,1 62:19
74:12
**direction**

100:20
**directly**
20:2 59:4
**disagree**
16:4
**discharged**
59:14
**disciplinary**
131:12
**discipline**
47:24,25 55:5 99:21
110:20 122:6
**disciplined**
45:10 122:12
**disclosure**
47:14
**discourtesy**
116:1
**discretion**
7:14 57:20
**Discussion**
3:17 77:12 84:6,11
**dismiss**
3:13 23:15,18 27:15
**dispatch**
57:6
**dispositive**
15:17,24 17:6 18:17
**distinction**
102:19 105:22,25
106:9
**district**
1:1,2 14:2,16 45:22
**division**
1:3 95:23 96:23 98:2
**DLG**
50:10
**document**
3:21,23,24 24:20,25
27:10 28:13,15
79:17 100:21
117:21,21 118:17
130:23 131:15
132:5,7 133:13
**documentation**

72:25
**documents**
29:14 66:9 67:21
90:1,10 103:1
117:15 132:23
133:1
**doing**
6:19 18:5,8,11 32:6
40:17,20,23 54:25
56:23 57:18 72:20
82:22 83:22 108:2
129:15,25
**DOJ**
49:21,23,25 123:22
123:25
**dots**
109:16
**doubt**
17:10 61:14,19
**draw**
22:8
**drive**
92:4
**Dropbox**
10:6 78:21 90:25
91:7 92:3,14
**dropped**
62:2 86:19
**dual**
9:14
**due**
86:20
**duly**
4:24 136:8
**duties**
8:17 57:9 58:15

---
E
---
**E**
3:2,7 4:1,1
**earlier**
47:6 68:18 69:24
**early**
3:15 51:1,1,4,19,25
53:13 60:19,20



80:19,22 81:14,25
82:23 101:1 110:13
110:19,24 111:4,13
111:15 112:18,23
113:1,17
**easier**
113:20
**education**
40:24 41:11
**effect**
86:4
**efficient**
114:4
**egregious**
57:15
**EIP**
51:21 53:4 55:15
60:23 112:4 113:24
**either**
7:6 25:25 132:23
134:14
**elaborate**
18:1
**electronically**
91:7
**elicit**
123:14
**email**
9:10
**employed**
6:9
**employee**
64:18 66:7 77:19,24
80:5 137:11
**employees**
64:5,15,15,17,20,24
65:2 66:5,22 76:16
**employment**
6:22 7:17 33:5 36:10
46:20 62:14
**employment-law**
33:4 46:19
**enacted**
127:21
**encompass**

49:17 70:6
**encompassed**
62:19
**encompasses**
85:14 102:23 114:20
**encounter**
71:20 104:1 108:16
**encounters**
49:13
**ended**
49:9
**ends**
109:22 126:21,22
**enforcement**
10:2 29:22 35:22
66:12 79:16 94:8
103:22 123:3
**engaged**
39:21
**enhanced**
122:8,18
**enlisted**
59:10
**ensure**
39:21
**enter**
72:10 100:16 139:8
**entered**
112:5 113:7
**entire**
25:6,8 134:9
**entirely**
107:9
**entirety**
28:15 71:12
**entity**
32:25
**environment**
101:24
**environments**
98:21
**equally**
72:3
**Eric**
2:15 4:10

**Errata**
138:7 139:1
**escalated**
125:22
**ESQUIRE**
2:3,8
**essence**
112:7
**essentially**
18:2 63:11 74:16
81:14 85:21 86:12
**ethics**
114:12
**evaluate**
21:24,25
**evaluated**
41:19
**evaluation**
19:15 21:4 36:2
108:3 131:14
**events**
39:22
**eventually**
86:19
**evidence**
16:20 17:8,10 34:3
39:4 41:18 44:4
68:12 82:14
**exact**
91:9 112:6
**exactly**
75:12 92:14 95:25
**EXAMINATION**
5:18
**examine**
20:23 22:10 67:4
69:16
**examined**
4:25
**example**
85:11 110:14 111:5
**excessive**
13:1 16:7 21:15,17
21:22 22:6,15,25
35:2 38:19 99:21

119:15
**excused**
135:20
**Executive**
85:5
**exhibit**
20:6 23:14 26:12,25
27:3 32:13 79:6,8
80:18 81:18 82:23
82:25 84:3 89:25
91:3 92:2 124:23
125:11 131:24
133:5
**Exhibit-1**
3:10 6:1,3 32:15,16
47:5 54:4
**Exhibit-10**
3:19 116:10,12
**Exhibit-11**
3:20 117:7,13
**EXHIBIT-12**
3:21 117:15
**EXHIBIT-13**
3:22 125:1
**Exhibit-14**
3:23 130:20,23
**Exhibit-15**
3:24 132:7 134:15
**Exhibit-2**
3:11 47:6,8,22
**Exhibit-3**
3:12 20:16 24:19
27:11 61:23 63:6
**Exhibit-4**
3:13 23:17 24:6 25:6
25:9 73:14
**EXHIBIT-5**
3:14 79:12
**EXHIBIT-6**
3:15 80:22
**EXHIBIT-7**
3:16 83:2
**EXHIBIT-8**
3:17 84:5
**EXHIBIT-9**



3:18 90:19
**exhibited**
24:25
**exigent**
57:8
**exist**
50:25 86:14
**existed**
81:5
**existing**
128:4
**exists**
81:6
**expect**
97:6
**expected**
51:21
**expensive**
85:14
**experience**
40:24 41:12 89:11
  100:10 102:17
  105:3 108:2,11
**experienced**
102:18
**expert**
6:20 7:2,3,6,16,17
  8:9 9:15,22 11:15
  12:25 14:22 16:24
  17:17 18:6 24:9,22
  31:16 32:18 36:1
  40:17 41:16,16
  44:11 48:24 63:4,20
  67:9 115:14 128:13
**expert's**
28:12
**experts**
75:16
**Expiration**
136:21 137:24
**expires**
138:14
**explain**
37:3 62:3
**explained**

131:10
**explains**
56:5
**extent**
18:14,22 21:9 25:12
  26:9,22 28:17 29:5
  78:10 80:13 81:16
  83:19 89:6 90:5,23
  93:12 97:4 103:12
  114:4 123:2 133:6
**extra**
23:20
**extractions**
100:11
**extraordinary**
99:19
**eyes**
89:13 120:17

---
**F**
---

**facets**
126:19
**facility**
98:19 102:24 106:2
**fact**
17:4,7 36:13 44:17
  55:1 118:14 119:13
  119:19 122:17
**fact-finding**
89:2
**factored**
128:25
**factors**
114:23
**facts**
26:24 40:9 73:1,2,5,9
  89:14,15
**factual**
26:10 67:18
**failed**
39:18
**failing**
47:24
**failure**
47:25 48:2

**failures**
55:11
**fair**
18:24 68:15 71:9
  72:22 92:16 101:12
  101:13 103:15
  118:24 123:20
**fairly**
26:2 30:15,19 71:24
**fairness**
90:13
**fall**
30:12
**falling**
80:15
**falls**
29:23
**false**
38:20,22 39:2 52:11
**familiar**
87:17
**familiarize**
134:1
**far**
8:3 10:14,16 31:11
  31:13 109:4 130:1
**fashion**
132:20
**fault**
70:8
**February**
63:6,7
**federal**
5:6 13:9 42:6 46:12
**feed**
113:23
**feel**
20:1 22:4,7 34:20
  40:13 80:9 85:12
  99:15
**felt**
114:14 116:19
**field**
108:18
**field-training**

109:12,13,13
**figure**
102:16
**file**
10:7 23:8 24:13,19
  27:4,5,22 33:3 34:3
  66:16,25 73:10,25
  84:21 90:25 91:9
  92:3,3,10,23 93:9
  94:16 97:19,20
  118:22 134:10
**filed**
132:2
**files**
93:4 95:1 119:20,20
**final**
34:14
**financially**
137:13
**find**
22:6 23:11,21 45:12
  46:4 69:21 89:17
  101:11 119:5,16
  121:11 125:13
**finders**
55:1
**finding**
16:21 19:3 21:15
  22:24,25 35:20 55:3
  128:16
**findings**
15:3 17:11 26:11
  35:16 118:9,10
**fine**
20:11 34:19 52:23,23
  53:1,1,3,22 78:8
  82:21 90:15,16 97:9
  133:4
**finish**
52:17,19
**finished**
52:21,25
**firearm**
59:14 114:22
**firearms**



**114:16,18**

**fired**
42:21 45:10,25 115:5
115:21

**firm**
2:2 10:10,22 11:23
12:5,17 50:6,9

**first**
5:11 13:23,24 33:8
47:16,25 54:22
71:14 74:25 96:5,18
116:8 122:5 126:23

**fit**
80:7

**five**
117:22

**flag**
111:7 112:1

**flat**
10:25

**flawed**
69:9

**flees**
55:13

**flexible**
8:14

**Florida**
1:20,25 4:9 6:12 7:6
7:18,24 14:2 41:23
45:23 85:10 136:2,6
136:19 137:2,22

**fluent**
103:25

**focus**
131:4

**focused**
96:22

**folks**
135:2

**follow**
16:6

**following**
127:9

**follows**
4:25

**foot**
60:4

**footage**
70:25 72:8,12

**footnote**
63:23 94:23 96:6,20
97:2

**force**
3:16,17,18 13:1 14:6
15:18,24 16:8 19:10
19:16,20,22 20:23
21:5,10,12,15,17,22
21:24 22:6,11,12,16
22:25 33:5,22 34:1
35:2,21 36:20 37:1
37:5,22 38:11,19
42:1 43:1 46:8
47:19 48:15 49:11
49:13,17 50:22 51:4
51:25 52:1 55:13,18
55:25 56:16 59:19
61:11,17 62:20
68:25 69:1,2,6,17
70:14,25 71:6 77:4
77:5,13 82:25 83:2
84:6,11 86:5 88:24
90:1,10,19,24 92:6
92:21,24 93:2,14,22
94:3,6 95:1 96:8,19
97:14,23 98:5,13
99:8,14,20,21,23
100:19 101:4,22
102:6,20,21,22
103:24 104:3,4,14
105:5,15,23 106:1,4
106:11 107:4,15
108:6 109:5 110:5
111:6,10,11,16
112:12 114:10,11
114:12,14,20,24
115:2 118:15
119:16 123:8,24
124:19 125:15,22
127:1,10,11,18,20
128:11 129:11

131:8,12

**force-related**
18:18 116:4

**forces**
59:11

**foregoing**
137:6 138:3

**forget**
34:6

**forgot**
27:24

**form**
5:10 31:15 70:21
81:19 138:6

**formalized**
55:5

**former**
1:8 20:23 22:11
69:17

**forms**
114:9

**Fort**
1:20 4:8 59:25 60:11
60:16,18 62:5

**forth**
21:3 30:16,19 51:18
69:11 70:11,17
72:24 75:11 78:17
81:11 83:22 86:11
93:18

**Forum**
85:5

**forward**
128:12

**found**
16:2 21:17 22:15
36:12 49:10 93:25
99:20 119:15

**four**
47:15 117:22 124:24

**fourth**
36:25 37:2,4,6,7
38:10 134:22,23

**Friday**
4:6

**Fridays**
9:2

**front**
72:20 117:24

**FTO**
110:1

**full**
15:7 24:1 26:14
49:19 55:9

**full-time**
6:17 9:14,20

**fully**
6:22

**function**
113:22

**functioning**
58:12

**functions**
106:20 112:23

**further**
131:10,12 137:10

**future**
31:5 121:2,25 122:9
122:11

---

### G

**G**
4:1 87:16,17 88:7

**G-H-E-E**
87:16

**GAINESVILLE**
1:3

**gaps**
49:18

**Gary**
1:9 4:21 87:1 139:3

**GBI**
87:15,21 88:2,12
89:7,8

**general**
7:1,3 29:22 59:2
108:9 110:16 114:9
118:2,20

**generally**
35:21 85:22



generate
56:16
generated
56:2 112:19
George
4:5 42:23
Georgia
1:2 2:4,9 11:25 12:9
12:12,15 85:6 88:2
88:8,19,22
getting
135:4
Girardi
42:23
give
31:1,23 60:8 85:11
92:15 99:3,5 117:9
124:21 129:6
134:23
given
27:6,10 29:14 33:3
33:12 42:9 73:10
75:12 81:11 92:10
108:2,10 115:3
122:3,8 129:1,2
135:17 138:4
gives
126:3
go
14:11 15:9 18:15
19:23 24:14 32:5
33:7 35:9,15 36:14
39:7 41:22 42:14,16
45:8 53:9 55:17
56:20 58:11 61:21
61:22,22 63:5,5
66:8,16 70:23 73:7
73:18 74:15 83:12
86:9,21 89:20,20
96:4 106:13 107:18
109:10 117:9
118:17 123:20
126:20 130:1,19
135:5,9
goal

110:19
goals
122:1
goes
58:25 90:2
going
5:24 19:7 20:13
31:23 35:11 50:4,5
50:14 57:1 60:13
66:3,25 71:5 82:21
82:22 89:12,23
97:20 105:6 106:23
111:20 113:25
114:3 117:9 130:19
134:22
gonna
78:22 98:23 135:4
good
5:21,22 34:17 75:18
82:22 129:21
gotten
44:22
grabbing
57:14
Graham
103:23 104:2 114:20
grand
3:21 14:12 15:23
16:14 17:4,11,19,21
17:25 18:16,23,25
18:25 21:9,14,20
22:14,22,24 23:3
25:13,25 26:2 35:9
35:11,15,16 37:13
38:3 39:7 41:8
42:14,16 43:7,9,10
45:8 68:4 117:15,20
118:20 119:13
126:21,23,24
127:25 128:9
granting
23:15,17 27:14
Great
5:3
grouped

93:13
guess
7:5 12:24 17:16 50:6
60:14 62:22 71:3,14
72:4 92:19 104:25
118:25 122:2
guideline
51:18
guidelines
86:12 123:17
guides
85:6
guilty
16:2 26:4,4 36:12
Gulledge
1:9 4:5,21 65:20 87:1
88:19 90:2 139:3

─────────
**H**
─────────
H
3:7
half
9:24,25 51:9
hand
4:23 5:25 23:13 90:8
handle
9:9
HANSEL
2:7
happened
22:21
happens
9:10
Harbor
38:14
headed
12:2
hear
46:25
heard
132:24
hearing
19:3 99:12
held
60:15

help
65:9 113:23
helpful
89:24
helps
58:23 91:6
Hensel
63:19
Hertz
12:8
hey
50:2 57:18
HH632937
136:20 137:23
high
129:9,19
higher
54:25 97:6
highlight
125:14,16
highlighted
126:11
highlights
125:11,12
hire
17:17 95:20
hired
12:4 29:11 49:12
52:8 63:15 64:11
hold
45:1 52:24 61:22
76:15 79:7 103:12
117:7
holding
15:5
home
72:14
homes
72:20 73:8
hospital
59:20 60:7
hour
10:19,20 11:2,7,20
134:22,23 135:9
hourly



10:18
**hours**
 10:13,16 11:3,4,5,8
   11:12,16,20 53:21
   114:1 135:5
**house**
 94:8
**huge**
 129:2
**Hunten**
 65:22 133:19
**Hunton**
 87:3
**hypothetically**
 110:14

—————— **I** ——————
**IA**
 105:16
**IACP**
 75:2 76:12,18,19
   77:3,10,11,15,18,23
   79:12,16,19 83:24
   85:3,4 123:5,16,19
   123:20 124:1
**IACP's**
 78:14 83:20
**IAPro**
 51:7,12 55:10 112:17
   113:2
**identification**
 3:15 6:3 20:17 23:18
   47:9 79:13 80:19,22
   80:23 81:14,25
   82:24 83:3 84:7
   90:20 116:13
   117:14,16 125:2
   130:24 132:8
**identified**
 84:20 92:22 112:17
   119:17
**identify**
 92:6 110:15 119:22
**identifying**
 110:20,25

**IEP**
 124:18
**ignore**
 124:23
**III**
 125:21
**immediate**
 72:11
**impact**
 21:14
**implement**
 127:8
**impression**
 34:3 109:2 110:6
**improve**
 121:1
**inappropriate**
 131:11
**inappropriately**
 10:2
**inartful**
 40:15
**incarceration**
 55:20
**incident**
 19:10 26:11,24 36:2
   39:24 48:20 58:7,7
   59:23 64:19,20 65:5
   67:15,16 68:3,15
   69:14 70:25 71:17
   72:4,22 82:25 88:23
   89:7,9 90:1 92:6
   93:24 100:25
   102:20,21 114:9
   119:8,15 120:2,10
   121:13,20 127:9,22
**incidents**
 49:11 79:18,24 80:14
   92:6 93:2 95:1 96:8
   96:20,22 98:13
   99:23 104:14 111:6
   116:1
**include**
 8:24 11:9 55:10
   73:13 75:19 86:5

 91:10 93:1 97:16
   98:18
**included**
 68:11 74:7 81:23
   105:14 114:12,13
**includes**
 24:23
**including**
 55:20 97:5 127:10
**inclusive**
 81:17 94:9
**incorporates**
 130:7
**independent**
 17:6 18:5 40:4,6,17
   44:6 70:18 73:5
   88:20
**independently**
 75:13 118:15
**indicate**
 81:12 111:16
**indicated**
 113:6
**indict**
 17:5,5 21:9,21
**indicted**
 15:23 16:14 35:7
**indictment**
 17:11,19 18:16
**indirect**
 21:19
**individual**
 1:7,9 72:9 85:10
   91:22 115:23
**individually**
 111:16
**industry**
 123:5
**infer**
 120:9
**inference**
 22:8 119:25 122:10
   123:13
**influence**
 17:7

**influenced**
 118:13
**information**
 33:2 40:8 51:19
   57:13 73:20 74:8,11
**initiate**
 55:11,12 113:7
**initiated**
 100:19
**injuries**
 60:5
**inmate**
 100:12
**instance**
 85:19
**Institute**
 52:9
**intended**
 40:20
**intent**
 62:9 124:2
**interest**
 9:19 134:21
**interested**
 137:13
**internal**
 15:4 22:2 25:13
   37:15 38:5 39:9,23
   42:18 45:12 46:4
   48:3 50:22 54:9
   55:3,24 56:15 68:4
   70:4 86:10 105:15
   106:23,24 107:5
**internally**
 50:5
**International**
 75:5
**internet**
 73:20,23
**interpretation**
 128:7
**interrupt**
 53:2
**intersects**
 22:17



**intervene**
57:2
**intervention**
51:1,5,25 60:20
112:9 113:1,17
**investigate**
50:3 54:20
**investigated**
39:13,23 88:23
**investigating**
54:23 89:7
**investigation**
17:12,13 21:16,16
22:2,21,21 38:21
39:16,19 69:9 71:6
79:17 80:1 88:3,8
88:21,23
**investigation's**
36:21
**investigations**
55:1 68:10 77:19,24
88:20 108:21
**investigative**
36:22
**investigator**
87:15
**investigators**
88:19
**investigatory**
77:16
**invoice**
10:16
**involve**
7:24 47:23 48:11
54:13 56:22 57:11
99:13 104:14
**involved**
7:23 13:7 14:14,24
17:21 30:7 33:1,25
35:1 48:23 55:4
59:18 60:4 64:19,20
67:9 83:19 104:13
108:4
**involvement**
77:10

**involves**
36:24 50:21 103:24
114:10
**involving**
14:6,8 47:19 92:7
96:8 98:13 100:25
119:9 121:15
**Islands**
38:14
**issue**
8:3 76:7 93:21
100:15 129:20
**issues**
37:7 62:20
**issuing**
28:25
**item**
129:9
**items**
90:12
**iTrack**
112:4

---

**J**

**jail**
60:8 94:10 95:17
97:24 98:2,14,20
99:2,2,24,25 100:2
100:23 101:23
102:1,20,22 103:25
104:3 105:1,2,5,8,9
105:14,15,16,23
106:10,12 107:2,7
107:15
**jailers**
106:4
**James**
87:7
**Jason**
2:14 4:19 134:18
**Jersey**
46:12
**Jesus**
45:22
**job**

8:12 50:21 131:6,7
**John**
1:16 3:4 4:4,24 5:4
41:18 46:10 135:17
136:6 138:2,10
139:4
**Joshua**
34:21
**judge**
17:2 18:3,8 35:25
**judo**
122:21
**juror**
18:9
**jurors**
26:7
**jury**
3:21 14:12 15:23
16:14 17:4,11,19,21
17:25 18:16,23,25
18:25 21:9,14 22:14
22:22,24 23:3 25:13
25:25 26:2,4 35:9
35:11,16,24 37:13
38:3 39:7 41:8
42:14,16 43:7,9,10
44:18 45:8 68:4
117:15,20 118:20
119:13 126:21,23
126:24 127:25
128:9
**jury's**
21:21 35:16
**Justice**
49:8
**justifiable**
111:7,10
**justified**
21:1,1 115:11 118:15

---

**K**

**Karen**
87:5
**keep**
66:2 82:21,22 98:21

**Keith**
1:24 4:11 136:5,18
137:5,21
**Khan**
36:15,23
**killed**
59:16
**kind**
43:18 46:21 49:18
55:5 83:22 84:20
89:15 92:9 114:14
123:20
**knew**
112:3
**know**
8:3 10:15,15 15:2,10
15:12,13 17:9 24:8
25:22,22 26:4 27:20
28:2 30:25 31:5,11
31:13,22 35:11 36:4
39:13,19 42:16,22
43:20 45:18 46:18
49:6 50:12 53:16,17
55:15 56:18 58:23
58:24 60:23,24 61:3
61:7,8,11 62:8
66:16 67:11 72:15
75:13 81:5,6,7 82:4
88:25 89:1 91:18
93:20 94:18 96:1,2
97:18 98:12,16,17
99:4 100:3,7,7,24
101:4,8,25 103:8
104:5,23 106:7,7
107:16 112:5,8,8,10
112:10,11 113:6,9
115:4 116:3 117:24
119:3 121:5 122:23
122:24 123:6,21,23
124:12,14 128:16
129:1,16,24 130:2
131:15 132:15,18
133:6 134:9
**knowledge**
27:8,9 35:10 38:4



39:8 45:9,11,14 67:10 73:17 86:15

**known**
61:6

**L**

**L**
2:3
**lack**
48:8
**large**
52:6 57:20
**larger**
113:20
**lasers**
123:12
**Lauderdale**
1:20 4:8 59:25 60:11 60:16,18 62:5
**law**
10:1 21:11 23:3 26:10,23 29:22 33:5 33:20,22 35:22 36:5 36:6,6,10 46:20 62:14 63:19 66:12 79:16 94:8 103:4,22 123:3 129:22
**lawyer**
16:25 18:3,12,12 36:8 91:24 103:17
**lawyer's**
41:1 140:1
**lead**
131:12
**leading**
93:23
**learn**
131:8
**learned**
109:17,17
**leave**
70:22 100:12
**leaving**
101:1
**Lee**

1:4 4:4 139:2
**legal**
4:11,12 25:15 26:11 69:2,3 106:9 114:13
**legally**
108:12
**legitimate**
48:3
**Leicester**
45:22
**lengthy**
66:10
**let's**
5:23 13:17 18:15,21 19:23,23 32:5 36:14 46:21 50:13 53:20 61:21,22,22 63:5,5 63:17 76:1 78:20,20 82:21,21,22 84:1 89:22 96:4,4 104:23 106:13 116:5 117:19,20 118:16 124:21 126:20
**lethal**
111:11
**letter**
132:18 133:16,20
**level**
108:21 123:15
**levied**
26:6
**liability**
129:9,19
**likewise**
85:3 104:14
**limitations**
72:2
**limited**
56:14 90:5
**LINE**
140:3
**link**
10:6 78:21
**list**
3:11 47:8,22 94:19

**listed**
28:11 66:2,14 67:24
**Listen**
66:21
**listing**
75:1
**little**
5:23 6:15,15 10:17 50:13 66:9 67:15
**located**
50:12
**location**
74:5,10
**long**
6:13 110:1
**look**
13:12,14 16:18,21,24 17:8 21:12 24:15 28:5,5 29:20 31:23 32:9 34:10 36:3 50:8 52:14 55:17 65:8 69:5 73:8 80:6 81:1 82:15,17 85:16 86:9 89:13 90:14 91:10 95:18 96:3 111:15,17 115:21 115:22 124:20 129:21 131:23 133:4,5
**looked**
16:19 19:20 22:20 27:13 29:20 41:18 79:20 80:4 89:9 97:10 99:19 115:21 124:1,9
**looking**
10:1 35:22 48:19,20 78:13 83:20 94:3
**looks**
50:21 68:25
**lose**
135:2
**lost**
113:20
**lot**

52:2 57:13,13 58:23 85:9,11 91:13 103:22
**lower**
123:14
**Luigi**
38:13

**M**

**Machado**
45:22
**Magna**
4:10,12
**main**
64:16
**Major**
81:10 82:5 111:21,21 112:25
**majority**
54:21
**manages**
51:4
**manner**
118:23
**manual**
76:14,17
**Maosia**
38:13
**March**
96:11
**Marion**
37:18
**mark**
13:19 89:23
**marked**
5:25 6:3 20:16 23:18 47:8 79:13 80:23 83:2 84:6 90:19 116:12 117:13,15 125:2 130:24 132:8
**marker**
125:13
**marks**
139:7
**massaged**



89:14
**massive**
93:7
**match**
56:19
**material**
24:20 74:20 75:1
**materially**
101:12
**materials**
15:7 24:17 29:14
63:3 66:2 67:22,23
68:11 74:23 93:8
98:5
**matter**
4:4 20:24 22:12,12
22:14,17,18 30:11
30:17 31:7,11 34:14
35:23 39:15,17 48:8
80:14 105:2 114:17
115:1
**matters**
30:20
**maxes**
94:13
**McMaster**
1:7 4:5,20 20:24 21:5
21:22 22:11 65:13
65:14 69:17 71:18
86:23 89:9 90:12
92:7,21,24 93:14
96:9 98:13 100:22
101:5 104:14 109:3
110:4 112:17,20
114:6 115:5 119:6,8
120:7,21 121:12,14
131:5,10 133:24
139:2
**McMaster's**
19:16 23:3 88:24
93:22 114:24
**mean**
16:5,14,20 17:20
20:5 52:1,1,2 59:23
59:23 60:25 64:16

65:1,2,5 66:1,4,7,17
66:18 71:22 74:4
76:7 79:1 83:10
99:25 108:14 115:1
116:18 118:12
119:12 120:12
122:1,10 123:7,21
127:16 129:8,21
**meaningful**
48:3
**means**
109:4,8 112:7 121:6
**meant**
55:17 123:14
**mechanisms**
29:21 128:3
**mediated**
12:2
**medically**
60:7
**meet**
50:2
**Melchiorre**
41:23
**members**
62:14
**mentioned**
24:22 55:15
**met**
17:9
**methodologies**
67:24
**methodology**
74:16,19,22 84:15
98:21 99:13 118:7
127:5
**Michael**
1:7 4:5,20 14:20
20:23 21:5 22:11
33:24 69:17 86:23
139:2
**military**
59:5,8
**Miller**
65:10,11 87:13

**mind**
83:13 135:3
**mine**
125:12
**minimum**
11:3,4,7
**minute**
52:24
**mirrored**
22:2
**misconduct**
77:19,24 80:5
**misreading**
54:8
**missed**
78:6,6
**missing**
71:23 79:4 84:19
**misspoke**
95:24
**mixed**
92:1
**model**
75:8,12 76:12 77:3
77:15,18,23 78:15
83:20,24 85:23,24
123:16
**modeled**
85:21
**module**
51:15
**moment**
31:8 32:4 84:16
106:14 109:7
**momentarily**
23:21
**Monday**
8:13
**money**
135:4
**monitored**
50:1
**monitoring**
49:22
**monitors**

49:20,23 50:1,2
**moral**
81:7
**morning**
5:21,22 40:15
**motion**
3:13 23:15,17 27:14
**move**
67:1
**movements**
71:19
**municipality**
7:12
**mutual**
7:9

---

**N**

**N**
3:2 4:1
**N.W**
2:3
**nail**
52:7
**name**
50:9 53:17 64:24
65:3,6,7 66:6,15
67:11 87:16,17 91:9
93:9 103:24
**named**
62:13,18 88:7
**narcotics**
59:24
**narrative**
68:2,5
**National**
3:17 77:12 84:5,10
**Navy**
59:9
**NE**
2:8
**necessarily**
52:1 85:16
**necessary**
131:9
**need**



8:15 9:7 110:21
111:1 134:1
**needed**
58:17,18 120:22
**needs**
49:18 57:22 86:6
110:15 129:21
**neither**
72:6
**neutral**
17:12
**never**
13:1 25:20 26:14
27:1 59:10,16 86:14
109:22 124:9
**new**
46:11 54:13 55:25
56:2,16
**night**
8:16
**nomenclature**
32:12
**non-death**
42:1
**NORTHERN**
1:2
**Notary**
1:25 136:5,19 137:22
138:17
**noted**
26:20 31:17 56:11
71:16 138:6
**notes**
137:8 140:1
**notice**
5:5 122:8
**noticed**
91:12
**notified**
9:10
**November**
88:9
**nuances**
102:11 123:7
**number**

4:3 10:16 20:6 23:14
24:25 25:2,4 26:12
26:25 27:3 28:2
29:10 54:7 56:15
58:21 60:9 73:17
76:4,8 79:6,8 80:19
81:18 82:23,25 84:3
89:25 91:3,14,16
92:2 93:13 94:13,25
97:6,8,12 98:10,11
99:22,23 104:10,11
104:24,25 111:6
112:12 117:20
118:18 124:8,23
131:24 133:5
**numbered**
90:2 92:7 97:2
**numbers**
100:1 117:11
**numeral**
125:21

---

**O**

**O**
4:1
**OATH**
136:1
**Object**
31:15 81:19
**objection**
26:20 31:17 55:21
56:4 102:10
**objections**
5:9
**objective**
40:21 44:14 69:2,3
**objectively**
10:1 41:19 115:2
**obviously**
9:8
**occur**
28:19 39:22 127:20
**occurred**
120:11,15 128:17
**occurs**

89:16
**off-duty**
6:22,25
**offense**
36:11,13
**offer**
64:3
**offered**
69:22
**offering**
9:21 68:18 70:1
**office**
1:8 14:17 29:18 30:3
37:19 48:13 58:5,19
58:25 62:13,17 64:4
64:14 72:24 73:19
76:16 78:12 81:13
81:25 83:21 86:18
101:21 102:5 103:2
103:6,14 105:13,19
105:20,22 106:14
106:15,20 107:14
112:1 113:15 119:4
119:14 120:1,6,22
121:11,12,20
126:25 127:8
128:11
**Office's**
19:17 112:23 119:6
**officer**
6:10 7:18 13:1 14:24
15:16,23 16:13 17:5
17:18,22 21:21 33:1
33:3,20,25 35:1,7
36:25 37:11,16 38:1
38:6,10 39:2,5,10
41:9 42:12,19,21
43:5 45:6,10,25
46:8 57:5 59:14
80:10 94:4 105:10
108:5,11,15 109:10
109:25 110:8,15,25
111:5,7,9 126:17
**officer's**
45:13 46:5 112:1

**officer-involved**
3:14 79:12,17,23
**officers**
7:25 14:8,10,14,24
35:1 54:23,23 72:13
73:7 104:13 107:6
109:14,20 110:20
**official**
1:9 68:23 115:20
**Ogden**
65:15,17 87:11
**oh**
9:4 41:15 43:8 46:22
47:5 116:22 135:12
**okay**
4:22 5:3,21 6:13,24
7:5,13,22 8:2,8,17
8:24 9:5,12 10:4,6,9
10:21 11:8,17,22,25
12:7,9,14,17,19
13:17,23,24 14:11
14:19 15:3,15,22
16:4,11,22 18:11,14
18:21 19:7,12,23
20:3,9 21:2,8 22:23
23:2,6,24,25 24:10
24:18 25:8,12 27:4
27:13,17 28:4,8,10
28:14,16 29:9,19
30:8,11,14,19,22
31:10,14 32:1,5,23
32:25 33:7,15,24
34:9,17,25 35:4,7
35:14 36:8,14,20
37:9 38:9,22 39:5
39:15 40:2,5,10,12
40:14 41:22 42:9,12
42:18,23 43:10,22
44:2,17,24 45:15,19
45:21 46:20 47:3,16
47:21 48:4,17,25
49:3 50:13,25 51:8
51:14,22 52:16
53:15,17,20 54:4,13
54:16 55:7,14,19,21



56:20 57:3,8,23
58:2,6,10,15,18,22
59:3,7,10,13,18,22
60:10,18,22 61:5,10
61:16,21 62:6,11,15
62:21 63:5,15,17
64:13,24 65:8,11,14
65:19,21,23,25
66:14 67:3,8,11,14
67:25 68:7,9,13,17
69:18,18,24 70:10
70:22 71:8,13 72:7
72:19,21 73:4,16,18
73:23 74:2,15,19,25
75:20 76:7,10,21,23
76:23 77:2,5,7,14
77:17,22,25 78:3,5
78:8,17,20 79:8
80:2,6,13,17 81:9
81:16,23 82:8,17
83:12,18,18 84:1,15
84:19,25 86:8,16,21
87:15,19 88:6,18
89:3,6,20 91:2,20
92:11 93:5,17,20
94:2,5,9,13,15,24
95:2 97:1,4,9,18
98:7,11 99:5,17
100:4,9,21 101:2,8
101:14 102:4,8,16
103:11,17 104:6,17
104:19,22 105:6,21
106:13,22 107:11
107:17 108:1,8,25
109:23 110:12,24
111:4,20 112:7,14
112:21,25 113:13
113:25 114:2,22
115:4,7,10,19,24
116:2,5 117:6 118:1
118:16 119:2,24
120:9 121:18
122:16 123:11,16
123:19 124:1,4,7,17
125:24 126:7,9,11

126:15,20 127:7,14
128:18 129:3,12,15
129:17 130:17
131:20 132:4,21
133:4,13,22 134:4,5
134:8,11 135:16
**older**
46:16
**omitted**
27:18,19
**once**
62:1 109:19 125:21
**ones**
32:19 66:14 75:23
76:2 79:3,4 84:19
95:22 97:5 99:1,2
105:1 107:7
**ongoing**
108:23
**open**
31:6 66:8 92:25
128:6
**operation**
9:9
**operations**
8:23 86:10 106:20
**opinion**
16:17,19 17:14 19:21
21:1 25:10 29:15
33:21,22,24 34:5,7
34:22,25 35:4,13,17
36:18 37:9,19 38:23
39:20,25 40:3,4,5,7
40:9 41:19,20 42:2
42:24 44:7,14,19
46:7 48:4 56:7
68:23 69:10,13,18
69:21,22 70:17,21
76:4 82:13,13
101:15 103:12,20
104:8,21 115:13,16
115:20
**opinions**
18:24 21:2,4,11,23
30:16 31:1 33:19

55:2 63:12 64:3
67:4 68:19 69:11
70:1 71:8 74:12
81:11 116:7 119:11
128:20
**option**
122:11
**options**
125:15 126:4
**orange**
125:13
**order**
3:13 23:15,17 24:23
24:24 25:23 26:10
26:19,23 27:1,2,14
68:25 69:1 85:20
117:11 123:9
135:13
**outcome**
43:13 110:17
**outdoor**
72:15
**outlines**
124:10
**outside**
6:20 7:16 30:13
106:12
**outstanding**
30:23,23 31:7 49:13
**overall**
111:17
**overcome**
126:4,5
**oversight**
128:4

---

**P**

**P**
4:1 13:19
**p.m**
1:17 135:23
**P1**
32:16 50:14
**packed**
57:14

**page**
3:4,9 20:20 33:7
46:24 60:13,14
67:15,16 70:23
71:14 73:18 74:15
76:5,6,11,20 77:5,8
77:9,15,23 83:12,15
83:16,18 86:21
88:16,17,18 89:21
92:8 94:22 96:4,13
96:15 98:7,8,11
101:3 114:6,7
117:25 118:17,17
118:20 119:4
125:21,25 126:1,21
126:22 133:17
140:3
**Page/Line**
139:9
**pages**
32:8,16 90:24 91:10
93:17,18 99:8,10
117:22 133:16
138:3
**paid**
49:21 50:7
**paper**
3:17 54:19 56:2
77:13 84:6,11
**paragraph**
63:18 71:15 72:8
76:11 77:20,21
89:21,22 96:5,18
126:24 127:15
128:19 131:4,5
**paragraphs**
93:13
**parameters**
111:25 112:5,6,8
**part**
23:7 24:13,21 27:4,5
30:8 49:5,10,16
50:21 51:3 57:9,11
58:19 69:5 71:3
74:25 84:23 92:4



95:21 110:19,24
111:13,23 116:7
117:5,5,22 118:2,22
122:2 124:5,22
126:15 128:19,22
133:7,22
**part-time**
6:16
**particular**
33:25 48:8 75:21
85:18
**parties**
4:13 5:5 137:11
**parts**
24:11,24 25:3 28:12
128:14
**patrol**
8:25 56:23 57:12
58:16 94:10 95:23
96:9,23 98:2 101:23
102:9,21 106:5
107:3,7,15
**pattern**
15:6 111:17 131:11
**Paulding**
1:8,10 3:22 19:17
22:3 29:18 30:2
64:4,14 72:24 73:19
74:5 76:15 78:12
81:13,24 83:20,25
101:21 102:5 103:2
103:5,13 106:14,15
107:13 109:12
111:25 112:22
113:4,11,15 119:14
119:21,25 120:5,21
121:19 124:18
125:1 126:13,24
128:10 129:15
**payment**
134:25
**PCO**
76:14
**PCSO**
96:7

**PD**
59:25 60:11,16,18
**PDF**
92:10 93:7
**Peachtree**
2:3
**pen**
13:18
**Pendergast**
14:20 15:11 33:25
**pending**
11:25 12:9
**people**
26:8 36:5,10 54:22
54:25 57:17 58:23
60:5 73:6 101:23
106:23 113:20
123:7
**percent**
7:20,21,22,22 52:10
52:11
**Perez**
45:21
**PERF**
85:4
**performance**
121:2
**period**
49:15 61:8 94:7
109:6
**perishable**
108:23
**person**
55:12 72:17 99:23
100:17
**personally**
56:23 130:3
**personnel**
8:20,21
**perspective**
41:1,5
**pertain**
90:11
**pertains**
127:20

**pertinent**
99:16
**ph**
65:22
**phone**
9:11
**physical**
59:19 114:11
**physically**
50:12
**place**
52:6 81:13 127:9
128:2
**places**
76:2 78:9 87:20
88:12
**plain**
26:8
**plainly**
26:8 71:7
**plaintiff**
1:5 2:2 4:16 7:18,20
7:22,24 9:25 12:20
13:3,25 14:21 16:12
16:13,17 17:18 33:8
36:15 38:15 43:16
43:25 44:8,12,18
45:2 46:25
**plaintiff's**
5:25 12:25 23:14
24:6,19 25:6,8
26:12,25 27:10
32:13,15 43:17
44:15 47:5,6,22
54:4 61:23 63:6
67:4 73:14 79:6,8
80:18 81:18 82:23
82:24 84:3 89:25
91:3 116:9,21,23
117:6 124:23
130:20 131:24
133:5 134:14
**plaintiffs'**
13:5,8
**Plaintiffs**

32:16
**play**
75:11
**please**
4:23 135:10
**point**
15:8 33:12 54:7
56:15 61:6 62:2
69:8 71:18 72:5
91:11 100:15
102:25 108:20
128:10
**pointed**
128:14,14
**pointing**
123:12
**points**
72:6
**police**
6:9 7:1,3,15,16,18,24
8:12 9:15,20,22
12:21 14:22 16:23
17:17 18:6 21:18
32:18,25 33:13 36:1
40:16 44:19 48:12
49:4,6,6 50:17 51:9
51:11,17 52:6 53:11
54:5 56:22 57:5,10
57:21 58:3,7 59:14
63:20 68:4,8,24
75:6,10,13 85:4
86:4,17 94:4 108:3
109:10,11 115:14
119:14 123:3 129:6
**policies**
15:18 18:19 29:17,24
30:2,8 48:14,21
54:14,15,17 56:1,16
56:18 64:7,23 75:9
75:18 76:18,19
78:11 79:19 83:25
85:21 101:21
102:13 103:8
106:10,16,18,25
107:5 109:16


MAGNA
LEGAL SERVICES

123:22,23 126:25
127:18 129:11
**policy**
 3:14,17 6:21 15:25
   16:2,5 19:18 22:16
   22:16 30:12 39:10
   49:17,18 51:1,2,3
   51:17,22,23,24,25
   53:15,18 60:19
   61:11,17 70:15
   75:12,14 76:12,14
   76:16 77:3,3,12,15
   77:18,23 78:14
   79:13,17 81:7,24
   83:20,20,21,24 84:5
   84:11 85:16,17,22
   85:23,25 86:5,6,12
   101:22 102:6 103:1
   103:8,14 105:17
   106:25 107:10,14
   119:6 121:9,9,12,21
   121:24 122:9
   123:25 124:19
   127:21,23 128:1,4
   128:15 129:24
**population**
 74:6
**position**
 6:16,19 54:8 56:22
**positions**
 58:12 60:15
**positives**
 52:11
**possibility**
 27:18,21,23,25
**possible**
 34:4 110:17
**post**
 3:19 85:6 109:8,22
   110:6 116:9,12
   124:12
**post-approved**
 124:13
**post-certified**
 108:11,17 109:3,25

**post-force**
 122:24
**post-profile**
 124:9
**post-training**
 114:5
**practice**
 7:3 16:23
**practices**
 7:2,16 9:15,22 12:21
   14:22 17:17 18:6,19
   19:2 21:18 29:17,22
   29:24 30:2,9,12
   32:18 35:22 36:1,22
   39:20,21 40:17
   44:19 49:19 63:20
   64:6,8,23 66:12
   75:9 105:18 108:3
   115:14 123:4
   129:25 130:7,10,11
**pre-approval**
 8:6
**pre-force**
 122:23
**preparation**
 11:10,14
**prepare**
 11:13 63:1 134:8
**prepared**
 56:1 58:6 68:13
**preponderance**
 17:10
**present**
 2:13 4:13 50:18
   56:21 58:11 89:18
   118:20
**presented**
 17:19 25:9 73:3,9
   92:13 93:4,15
**presentment**
 118:3
**presents**
 44:3
**pretty**
 13:4 16:6,9 123:4

**prevent**
 121:24
**prevents**
 6:19
**previous**
 12:17 125:11
**previously**
 27:13
**principles**
 114:25
**print**
 73:25 78:21
**prior**
 28:25 38:7
**probable**
 68:20 69:20 70:2,20
**probably**
 12:24 57:25 96:2
   122:10 129:5
**probation**
 110:3
**probationary**
 109:20
**problem**
 7:11 10:1 91:5
   111:16 120:18
   122:4 133:24
**problems**
 7:7
**procedure**
 5:7 51:17 53:12
   76:14 78:14 81:24
   107:14
**procedures**
 3:22 15:18 48:14,22
   54:14,15,16 56:1,6
   56:17,19 63:20 64:8
   75:9 76:17 78:11
   79:19 101:22
   106:16,19 107:5
   125:2 127:1,18
**proceed**
 5:2
**proceeding**
 23:22 26:2

**proceedings**
 25:25 137:7,8
**process**
 50:23 55:9 57:9
   100:13 110:1
**produced**
 24:7,12
**product**
 77:10
**professional**
 41:11 64:6 105:13
   119:5 121:11
**professionalism**
 114:13
**profile**
 3:19 116:9,12
**program**
 51:4,5,6 60:23
   109:12,13 112:4,11
   113:7
**programs**
 52:5 124:11
**progressively**
 122:4
**project**
 75:14
**pronounce**
 87:16
**proof**
 36:4
**proper**
 39:18
**propose**
 5:8
**proposition**
 108:10
**propounded**
 138:5
**prosecutor**
 33:18 89:18
**prosecutor's**
 41:4
**provided**
 32:20 67:18 68:3
   82:6 83:8 96:7


**MAGNA**
**LEGAL SERVICES**

97:15
**provides**
76:16
**provisions**
103:9
**prowling**
72:18
**Public**
1:25 136:6,19 137:22
138:17
**publically**
79:2
**publications**
63:24
**publish**
73:22
**pull**
57:17
**pulled**
73:23
**purely**
18:18 55:1 89:2
**purpose**
89:4,5 124:2
**purposes**
5:6 19:21 20:25 71:4
114:8 115:15,17,18
**pursuant**
5:4 7:15
**pursuit**
50:23 55:12
**pursuits**
55:11 60:4
**put**
11:12 13:19 27:22,24
50:6 55:21 73:25
75:11 78:23 80:17
116:23 127:9
**putting**
48:9 75:14 93:9
123:12

---
**Q**

**qualifications**
5:24 63:24

**qualified**
128:10
**question**
7:13 19:5 20:2 21:20
24:12 25:1,5,5
29:11 40:11 52:15
52:20 53:13 55:22
55:23 56:9,13,14
66:20,21 67:1 70:12
70:16,17 72:21
80:10 81:19 87:23
87:23 88:13,21 92:1
92:22 98:4,25 102:3
106:5 108:2,9
110:13 112:14
132:21
**questioned**
98:24
**questions**
5:10 66:18 90:5
134:19 138:5
**quite**
33:10
**quotations**
24:23
**quote**
24:11

---
**R**

**R**
4:1
**Rabinowitz**
1:24 4:12 136:5,18
137:5,21
**radio**
56:25 68:10
**raise**
4:23
**RAND**
52:9
**rank**
54:25
**rarely**
17:24
**rate**

10:18,25
**reached**
34:6,14 39:24 74:13
128:20
**reaching**
119:10
**read**
16:6 22:9 25:20,21
26:14 27:1,3 28:6
29:6 62:24 98:17
103:1 104:11
112:15,21 115:7
118:4,12,13,22
120:23 121:7
128:19 131:13
132:13,25 133:19
134:1,3,6,8,9 138:3
**reader**
74:5
**reading**
63:25 72:23 88:1
109:2 120:5,20
**reads**
121:16,19
**real-life**
109:18
**really**
33:14 55:5 60:14
74:19 79:24 80:7
88:9 90:16 93:9
100:18 106:5
133:14,16
**reason**
69:7 139:9
**reasonable**
17:10 38:11 68:19
69:4,19,23 70:2,6,8
70:19 88:24 115:3
131:8
**reasonably**
64:5
**reasoning**
115:22
**recall**
42:20 54:18 60:22,25

61:4 65:7 88:1,4
91:15,17 92:9 93:20
93:23 101:10
111:21,23 112:25
124:3 131:19
**receipt**
15:7
**receive**
98:12
**received**
10:21 27:21 32:21
74:21
**recess**
53:25 107:22
**recognize**
109:11 122:22
**recollection**
11:18 86:8 112:2,3
**recommend**
127:7 129:8,10,17
**recommendation**
129:4,5
**recommendations**
19:1,1 26:7 55:4
118:12,14 126:23
**recommended**
127:17
**recommending**
128:3
**recommends**
126:24
**record**
4:2 5:3 26:13,22
28:16 53:23 54:2
84:23 88:6 92:2,4
107:18,20,24
111:23 124:18,22
125:10,20 135:18
**recorded**
71:17,19
**records**
30:6
**refer**
75:2 79:25 87:20
88:11,12 100:21



114:5
**reference**
18:22 63:21 76:2,18
81:10 89:7 91:11
93:22 96:1 124:8
132:14
**referenced**
24:9 28:18 29:3
68:14 83:10,14
84:12 90:23
**references**
29:10
**referencing**
92:21
**referred**
91:16 111:22
**referring**
28:17 64:15 67:6
76:8 89:11
**refers**
63:23
**reflect**
94:16 129:24
**reflected**
26:12,12,24 27:15
**refrained**
105:4
**regard**
70:13
**regarding**
18:19 25:16 30:16
31:7 33:21,22 36:22
38:11 46:8 48:14
51:19 56:15 60:3,19
69:13,19 78:11
81:25 92:24 115:7
115:13 127:1
128:20
**regardless**
17:25 18:4
**regimented**
100:13
**regularly**
127:19
**Reincon**

44:24,25
**relate**
90:10 114:16
**related**
8:23 29:14 65:2
106:1
**relates**
8:12 21:2 25:25
55:23 64:7 66:12
100:22 101:2 108:5
109:5 123:3 125:19
126:12,16 133:24
**relating**
32:2 48:12 93:14
99:8
**relative**
99:24 137:10,12
**relevant**
23:4,10 25:14,17
74:3 80:3 95:22
99:17,18 101:12
114:8
**reliance**
15:7 24:17 63:2 66:2
67:21,23 68:11
93:21
**relied**
76:3,4 83:7 85:3,4
118:23 119:1 133:7
**rely**
75:20 85:5,7 119:3
119:10 127:14
**relying**
89:8
**remedy**
121:1
**remember**
28:7,9 61:2 63:15
73:13 95:21,25
103:21,23 104:15
131:22 132:14,20
**render**
29:15 39:20 41:17
44:6,14 55:3 71:12
**rendered**

22:1 25:9 34:22
35:17 36:18,22 37:9
37:19 38:23 40:6
42:2,24 46:7
**rendering**
19:21 20:25 55:2
69:13
**rent-a-car**
12:8
**repeated**
116:1
**rephrase**
19:7
**report**
3:12,20 14:15 18:22
19:12 20:5,16,20
21:3 22:10 26:13,15
26:19,25 27:11,15
27:24 28:12,19,25
28:25 29:2,3 30:13
30:14,24 31:9 32:7
33:13 35:5 40:10
42:4,6,6,10 45:15
58:7,8 61:22 62:23
63:13 65:8 67:25
68:4,4,5,6,8,22,24
69:11,21 70:11,18
70:20,24 72:13
81:12 83:23 87:20
88:11 90:13 92:5,22
94:20 96:1,3 97:10
101:3 109:2 110:7
117:13 118:3,4,12
118:20 119:19
125:5,8 126:21
128:11 134:11
137:6
**reported**
1:23 59:4 72:10
**reporter**
1:24 4:11,15,22 5:2
135:7,10,13 136:5
136:18 137:21
**REPORTER'S**
137:1

**reporting**
3:16 77:4,5 82:25
83:2
**reports**
3:18 41:17 59:1,2
67:19,20 90:1,11,19
90:24 91:15 92:12
92:21,24 93:1,14,22
96:7 97:14,23 98:5
98:18 99:9,14,20
101:5 115:7
**represent**
4:14 16:11,13
**representing**
14:21
**request**
6:25 7:4,9 88:18
**require**
30:24
**required**
57:19 59:20 70:15
108:13 119:8
121:14 129:20
**requirements**
131:7
**requiring**
120:2
**Research**
85:5
**reserving**
5:9
**resigned**
38:7
**resistance**
123:15
**resisting**
126:5
**resolved**
39:1
**resources**
50:5 74:7
**respect**
44:14
**respects**
106:24



**respond**
57:5 108:22
**responding**
120:1
**response**
48:21 100:8,10,14,16
101:1,6
**responsibilities**
8:18 57:10 58:16
**Responsibility**
54:6
**responsible**
105:17
**responsive**
56:7
**responsiveness**
5:11
**result**
105:18
**resulted**
99:21
**results**
39:16
**resume**
6:7 50:15
**retained**
13:11,16,24 27:7
28:20 32:17,22,23
33:8 36:15 38:14
43:17,21,23 44:8,25
45:2 46:25 49:7
63:18 73:11
**retainer**
10:4,9
**retraining**
110:16,21
**returned**
17:20 18:16 21:14
**revealed**
21:17
**review**
11:14 14:16 17:6,7
18:4,5,8,11,17,18
19:8,10 23:8 24:19
29:13,23 30:2,6,8

30:12,20,23 34:15
37:15 38:8 40:16,17
40:20,23 42:18 48:3
48:7,12 49:10,19
50:23,23 54:20
55:13,18,25 56:16
62:23 63:11 64:19
64:21,22 65:5,5
66:22 69:6 70:4,5,5
70:6,18 71:5 72:16
73:5 80:12 82:12,16
96:7 102:13 114:10
117:23 118:2
119:20 120:6
126:25 127:10,17
127:17 129:10
131:16 133:8
**reviewed**
24:1,21,24 25:2,3,6
28:12 39:18 49:15
62:25 63:3 65:4,20
66:15 70:5,14 72:11
72:14 74:17 76:13
81:20 86:23 87:25
93:8 99:15 102:6
103:7 109:21
118:25 119:15
130:16
**reviewing**
28:24 34:2 68:24
72:8 99:13 105:17
**reviews**
29:20 49:12
**revise**
31:2
**RFP**
50:6,7
**right**
4:23 6:6 7:7,19 8:5
8:13 9:19 10:11
11:7 12:1,22 13:5
13:13,23 14:2,3
15:9,11,15 16:25
17:4 19:13 20:6,14
20:20 21:8,12 23:6

23:24 24:18 25:12
25:19 26:1,17 27:15
27:23 28:1,4,20
29:9,23,24 30:3,9
30:22 31:3,6,8,10
31:11,20 32:5,12,15
33:7 34:12,13,17,25
35:15,24 36:8,14,16
37:4 38:22 40:5,21
40:24 41:2,4,6,9,12
41:20,22 42:7,23
43:18 44:2,4,9,12
44:17,24 45:1 46:12
46:21 47:4,16,18
49:20 50:19,23
51:11,16 53:20
55:16 56:20 58:10
58:18 59:5,7,13
60:10 61:10,12,17
61:21 62:21 63:8,25
64:8,11,13 65:11
67:3,6,15 69:25
70:22 71:1,4,8,13
72:3,7 73:4,5,13,18
74:2,25 76:6 77:6
77:14,17,22,25 78:1
78:17,18 80:17
81:14 82:3,17,22
83:12,18,23 84:1,2
84:12,13,15,17,23
85:19 86:16 87:19
88:6,21 89:6 91:2
91:12,15,16 93:18
95:17 96:9,20,24
97:1,18 98:3,9,11
99:7,10,14 100:4
101:2,4,8,9,14,16
102:6 103:11,17,18
104:6 106:16,20,22
106:25 107:17
108:19 110:2,18,21
110:24 111:2,13
113:18,25 114:2,11
115:4,5 116:5,25
117:1,2,7,8,9,19,20

118:18 119:2
120:20 121:3,4,22
121:25 122:14,16
122:19 123:5,17
124:4,5,11,14,17
126:15,18,20
128:18,20 130:5,8
130:14,17 131:23
133:4,8,11,12,13,22
134:15 135:5
**rights**
13:6,9 16:2 36:25
37:2
**ring**
72:15 87:18
**Ritch**
65:24 82:5 87:5
111:21 113:1
**Ritch's**
81:10 111:21
**road**
2:8 56:24 102:13
**road-patrol**
103:10
**role**
17:16 62:20 66:10
89:10
**roles**
8:19
**Roman**
125:21
**roughly**
11:17 13:5 99:10
**rule**
17:8 35:4 38:5 41:17
42:4,9 45:15 48:4
**ruled**
36:12 43:14,15,18,21
43:22 44:18 118:14
**Rules**
5:6
**ruling**
25:15
**rulings**
25:13 99:21


MAGNA
LEGAL SERVICES

run
66:19

**S**

s
1:8 3:7 4:1
S.E
1:19
Saeed
36:14
safe
131:9
Sam
4:16
SAMUEL
2:3
sat
75:17
Saturdays
9:2
saw
71:9 72:17 82:14
112:16 115:22,25
116:6 133:6
saying
22:9 23:9 26:4 30:1
34:16,21 41:17
65:17 69:24 80:8
94:15,16,17 95:22
102:19 106:10
110:10,11 114:22
120:4 121:20
128:18,21 130:1
says
16:6 46:24 54:7 64:2
64:13 67:3 69:12
72:8 76:17 79:24
85:17 88:18 96:7,19
97:4 100:22 112:12
116:17 120:15,16
121:7,10 122:25
124:1 125:21 127:7
131:5
Scarborough
34:21 46:25 47:17

48:1
scenario
109:25
scenarios
109:18
scene
62:1 73:7
schedule
8:15
scholarship
59:9
scope
22:18 29:12 30:1,20
55:22 56:9,13 64:10
116:7
Scott
28:17 67:6,9 93:21
94:9,15,16 97:4
98:25 101:15 104:8
104:12
scratches
60:5
se
132:18
Search
37:4
second
12:14 71:16 76:11
117:2 118:19
126:20
section
96:2 126:3
sections
132:14
security
72:8 102:1,23 106:2
see
13:24 14:15 24:17
27:14 52:14 57:1,5
57:15,21 63:21 70:7
70:7 71:20 77:22
82:11,14 84:1 86:22
86:23 92:20,21 93:1
95:18 97:11,13
103:21 111:24

112:15,19,21 116:5
117:10 127:1,12
133:10,15,15
seen
17:24 24:6 71:19
86:14 131:17 132:5
132:17,23,25
seizure
37:4
send
97:18,19
sends
41:2
sense
36:7 70:5
sentence
20:22 71:16 96:18
127:2
separate
35:23 89:13 103:8,9
separated
95:17
September
96:11
sergeant
62:9 65:4
sergeants
54:24
serious
79:18,24 80:14
serve
7:17 59:8
served
6:13 59:5 62:16
service
108:22
services
4:11,12 9:21
serving
6:19 9:13
set
21:3 30:16,19 54:19
69:10 70:10,17
75:15 78:17 81:11
83:22 86:11 89:13

93:18 111:5 113:14
sets
51:18 74:4
setting
72:24 101:18 102:12
122:7
settlement
12:3
Sheet
138:7 139:1
sheriff
1:8,9 4:18 5:15 58:25
59:1,4 64:16 87:1
88:19
sheriff's
19:17 29:18 30:3
37:19 48:13 58:5,19
58:25 62:13,17 64:4
64:14 72:24 73:19
76:16 78:12 81:13
81:25 83:21 86:18
101:21 102:5 103:2
103:6,14 105:12,20
105:21 106:14,15
106:20 107:14
112:1,22 113:15
119:6,14 120:1,6,21
121:12,19 125:1
126:25 127:8
128:11
SHERRIF'S
3:22
shooting
3:14 79:12,23
shootings
79:18
short
127:22
shot
59:16
show
13:23 23:7 71:24
72:4 79:1,3 80:18
82:24 88:11 89:12
94:21 97:20 109:15



116:8 123:7,24
128:1 130:19,20
**showing**
91:3
**shows**
71:25 72:25 119:21
119:25
**side**
7:6 12:7,21 13:6,8
32:23 43:15,19 44:3
44:6 94:8
**sides**
44:3
**signed**
133:17 136:12
137:16
**silos**
113:23
**simultaneously**
9:21
**single**
24:20
**sir**
5:21 96:16 116:15
134:18,21
**sit**
28:4 30:14 31:3,6,10
60:6 75:16 109:20
**situation**
126:8 131:9
**situations**
133:25
**size**
74:6
**skills**
108:23 126:6
**skimmed**
63:2
**skipped**
20:8 47:6
**small**
113:21
**solution**
120:25
**somebody**

103:13
**someone's**
36:25
**something's**
56:5
**somewhat**
85:4
**sorry**
4:21 32:10 43:9 45:1
46:22 47:5 61:21
65:6 76:15 116:24
125:25 135:12
**sort**
32:6 63:18 71:15,24
72:23 78:13,14,18
111:12,22 113:1
**Sosinovich**
46:10
**sound**
87:17
**sounds**
15:10 58:10,16
101:11 106:8
118:23 122:16
**source**
67:17
**Southeast**
4:8
**speak**
8:11 73:6
**speaking**
110:15
**special**
100:7,10,14 101:1,5
**specific**
7:1 8:6 66:17,20
103:24 109:1 121:8
122:21
**specifically**
55:23 62:25 75:20
114:11 119:3
**speculation**
129:7
**spend**
9:23

**spent**
98:1
**spoke**
19:2 119:7 121:13
**sstarks@cochranfi...**
2:5
**staff**
55:4
**stage**
122:7
**stamped**
91:19
**Stand**
135:10
**standard**
5:9 10:19,25 21:18
46:8 85:17 86:13
101:25 105:23
106:4,6,8
**standards**
38:10 64:6 76:12,21
76:24 86:3,3,10
105:13 108:12
119:5 121:11
**standpoint**
22:13 48:19 68:24
**Stark**
2:3 3:5 4:16,16 5:3
5:20,23 6:5 19:23
20:1,4,8,10,12,19
23:6,20,23,25 24:3
24:5 26:20,21 31:17
31:18 46:20 47:2,4
47:11 52:19,23 53:1
53:3,5,8,10,20 54:3
56:8,11,12 79:6,15
80:17,25 81:22
82:20 83:5,17 84:1
84:9 89:20 90:9,22
96:15,17 102:15
107:19,25 116:5,16
116:18,22 117:1,6
117:18 118:19,21
124:21 125:4,10,16
125:18,24 126:7,9

126:10 130:17
131:1,23 132:3,11
132:16 134:17,21
135:7,9,12,15
**start**
5:23 117:19,20
130:21
**starting**
60:13 89:21 92:7
**starts**
133:16
**state**
1:25 4:13 19:12
37:18 45:21 85:13
109:9 136:2,6,19
137:2,22
**statement**
71:20 112:16
**statements**
81:12
**states**
1:1 85:9
**stating**
130:13
**status**
109:20
**stay**
113:25
**staying**
56:21
**step**
122:4
**sticker**
117:4
**stipulated**
49:24
**stipulation**
5:9
**stop**
55:11,12 57:1 68:20
69:8,20,23 70:3,7
70:20
**stops**
77:16
**story**



132:20
**straightforward**
26:3
**Strawn**
12:5
**street**
1:19 2:3 4:8 59:24
104:4 105:24
108:14
**stress**
131:5
**strike**
29:10
**structured**
55:9
**study**
52:8
**stuff**
91:24 109:21 133:14
**subject**
5:8 30:11 31:19
66:22 126:5
**subject-matter**
75:16
**submit**
6:21 7:4
**submitted**
6:25 37:13 38:3 43:7
63:7
**subpoena**
5:5
**Subscribed**
138:12
**substance**
111:20 138:6
**sue**
62:9
**sued**
61:25 62:2
**sufficient**
108:21
**suggesting**
89:8 98:24
**suit**
62:7,9,13

**Suite**
1:19 2:4,9 4:8
**suits**
62:18
**summarize**
91:8
**summarized**
132:19
**summary**
67:14,16,17,18 68:3
68:15 72:22 88:15
**Sundays**
9:2
**supervised**
101:18 109:21
**supervision**
22:13
**supervisor**
47:23 48:12 51:20
62:1 100:15,20
**supervisory**
58:13
**supplement**
30:24
**supportive**
8:4
**supports**
22:5 103:2
**suppose**
31:20
**sure**
13:14 16:9 19:25
24:3 39:23 44:8
51:3,23 52:19 71:6
78:8 79:7,9 84:22
85:1 87:23 97:15
101:25 104:18
105:1 106:3 111:8,9
125:17,20 131:3
133:3
**suspect**
59:16,19,20 126:17
**suspicion**
68:20 69:5,20,23
70:2,7,9,19

**sustain**
38:5 60:5
**swear**
4:15
**sworn**
4:24 136:8 138:12
**system**
51:19 52:10 53:7,13
81:14 82:1 110:14
110:24 111:4,13,15
112:4,18,23 113:1
113:13,14,14
**systems**
3:15 80:19,22 82:24
110:19

———————
T
———————
**T**
3:7
**tabulated**
10:15
**tactics**
109:17 127:11
**take**
6:18 7:8 8:5,24 9:12
9:17 10:9 11:9
12:19 13:14 16:16
16:18 17:23,24
24:13 25:15 34:11
38:9 41:14 46:7
50:14 53:20 57:22
61:10 62:6 63:10,17
67:5 70:24 75:7
76:1 85:2 88:1,13
98:12 100:17 103:5
104:12 119:8,22
120:3 121:14,21
124:17 129:21
130:12 131:23
133:4,5 135:1
**taken**
4:7 5:4 29:7 53:25
57:22 88:9 107:22
139:5
**talk**

41:15 73:7 98:23
104:17 116:6
**talked**
78:1 84:16 113:1
**talking**
47:17 64:17
**tap**
40:13
**tape**
33:13
**taser**
47:20 114:23 123:12
123:13,14
**tasked**
64:2,10 80:12
**taught**
124:10
**tbuckley@bchlaw...**
2:10
**team**
49:12 50:6 51:15,16
55:10 100:8,13,14
100:16 101:6
**teams**
100:10
**technically**
57:1
**telephone**
2:14
**tell**
10:24 23:7,8 24:14
33:14 34:2 35:14
41:15 47:12 52:4
59:22 62:10,17 66:7
67:25 68:2 76:24
79:7 86:6 89:22
90:7 91:4 95:19
96:13 101:3 113:5
119:2 123:21 131:2
131:24 132:4
**telling**
25:3 123:8
**tells**
74:6
**tend**



122:5
**Teriano**
13:25 14:19
**term**
122:18,22
**terminated**
36:11
**termination**
3:20 115:8,10 117:13
131:13 133:14,16
**terms**
14:15 16:21 49:25
106:8 113:16
123:16 128:4
**test**
114:21 115:2
**testified**
4:25 112:15
**testify**
43:23
**testimony**
3:4,11 10:20 19:4
39:4 42:5 43:8 47:8
47:14 56:4 68:11,12
81:10 82:5 103:1
111:21 135:17
**text**
9:10
**Thank**
79:10,16 96:16
116:15 126:2
132:12 134:18
**theirs**
40:4 113:10
**theoretically**
110:16
**theory**
106:19
**thing**
104:20 111:19 121:3
121:5
**things**
9:9 28:19,22 29:6
32:7 52:2 68:14
74:9,16 78:21,22

93:7 110:13 111:12
114:13 122:25
130:13,18
**think**
10:13 11:12,14,15
12:2,6 13:4,11,12
14:13 17:22 23:5,11
24:8 27:17 28:5
32:5 33:15 34:18
36:19 44:21 47:17
57:21 60:2 65:15
69:13 71:15 75:1
81:9,10 83:15 84:10
84:12 87:17 88:8
94:19 96:5 104:2,11
104:21 105:4 107:7
109:24 111:14
114:4,6 115:10
116:6 120:14
122:21 124:4 125:5
125:19 127:21
128:9 129:5,19,20
130:15 131:17,24
132:17,24 134:22
135:3
**third**
72:7 96:18 118:17,17
**Thomas**
87:11
**thought**
47:2 69:11,24 95:21
**three**
6:15 11:3,4,5,7 52:6
53:21 59:1 133:16
**three-page**
133:15
**threshold**
17:9
**thumb**
92:4 117:21
**Thursday**
8:14
**Tim**
2:8 4:17
**time**

4:6 5:12 32:19 35:12
40:9 57:23,25 58:6
58:9 62:10,17 63:18
88:5 93:23 94:7
95:19 96:23 97:23
98:1,13 100:15
114:18 127:22
134:20 135:14,15
135:17
**times**
36:5 78:18 124:8
**title**
28:7,9,11
**titled**
79:25
**today**
4:6 10:22 11:10
13:12 30:14 32:1,3
62:22 63:1 97:20
116:21 132:24
133:1 134:6,8
**today's**
135:17
**tool**
115:1 123:8
**tools**
111:9 129:23
**top**
60:14
**topic**
85:18
**topics**
86:5 110:23
**total**
10:16 11:14 96:19
**totality**
115:3
**touch**
114:14
**touched**
68:18
**Town**
38:14
**Townsend**
37:18

**track**
135:2
**traffic**
57:16
**train**
47:24 109:15
**trained**
108:5,15,18,20 109:5
110:9
**training**
22:13 30:6 40:24
41:12 48:14 49:17
64:7 85:6 96:2
101:1 103:21,22
108:10,24 109:8,9
111:19 114:8,16,19
114:22,23 120:8,10
120:12,13,16,19,22
120:23 122:3,6,8,10
122:11,14,19
127:11 128:21
**transcript**
105:7 111:23 137:7
139:7
**transcription**
137:8 138:4
**transform**
54:9 55:24
**transforming**
50:22
**transmissions**
68:10
**transparency**
89:12
**transparent**
93:8 128:5
**transpired**
71:10
**treatment**
59:20
**tri-county**
7:10
**trial**
5:12 10:20 31:15,19
35:25 43:8,11 44:3



45:17
**triggers**
 113:24
**true**
 20:24,24 26:5,5 72:3
   137:7
**try**
 15:15 18:21 20:4
   52:7 91:8,22 108:25
   109:23 121:1
**trying**
 40:11 90:17 95:25
   102:16 106:9
   111:14
**turned**
 56:25
**two**
 44:3 59:1,24 114:1
   116:16,18,19 119:4
   132:23,25
**two-year**
 49:15
**Tyler**
 1:4 4:4 87:9 139:2
**type**
 6:23 33:4 41:16
   51:25
**types**
 39:22
**typically**
 7:8 8:13 100:11

––––––––– U –––––––––

**U.S**
 44:25 45:22
**uh**
 92:3
**Uh-huh**
 49:14 60:1
**Ulai**
 45:21
**unable**
 66:24
**uncommon**
 60:4

**underlying**
 48:20
**underneath**
 117:4
**undersheriff**
 59:2
**understand**
 11:1 12:19 15:21
   19:9 22:7 25:24
   26:5,9 33:10,19
   34:12 44:2,5 52:3
   52:12 56:3 78:9
   79:3 81:9 93:5,12
   98:1,23 101:20
   102:25 106:3
**understanding**
 16:12 25:25 86:11
   88:22 89:8,16 90:7
   90:9 106:8 107:3
**understood**
 35:14 93:10
**uniform**
 56:25
**uniformed**
 8:20,21
**unit**
 59:24 60:2 100:24
**UNITED**
 1:1
**unlawfully**
 72:10
**unprofessionalism**
 116:1
**unreasonable**
 33:23 34:1 35:2,20
**unsupported**
 39:3
**updates**
 114:13
**use**
 3:16,17,18 5:11 14:6
   15:18,24 16:8 19:10
   19:16,20,21 20:23
   21:5,10,12,22,24
   22:10,12 33:5,22

 36:20 37:1,5,22
 42:1 43:1 46:8
 47:19 48:14 49:11
 49:17 51:24 52:1
 55:9 59:19 61:11,17
 62:20 68:25 69:1,2
 69:6,16 70:14,25
 71:6 75:20,24 77:4
 77:5,13 82:25 83:2
 84:6,11 86:4 88:24
 90:1,10,19,23 91:23
 92:6,21,23 93:2,14
 93:21,22 94:3,6,25
 96:8 97:13,23 98:5
 98:12 99:8,14,20,23
 101:4,22 102:5,20
 102:21,22 104:3,3
 104:13 105:15,23
 106:4 107:3,15
 108:5 109:5 111:6
 111:10 112:12
 114:10,12,14,19,24
 119:10 122:18
 123:14 124:19
 125:11 127:1,10,11
 127:14,18,20
 128:11 129:10,24
 131:8,12
**uses**
 51:12 55:13,18
**usually**
 7:10 55:17 122:3
**utilized**
 125:22

––––––––– V –––––––––

**v**
 1:6 14:20 104:2
   139:2
**valid**
 69:1
**validates**
 22:5
**vantage**
 71:18 72:5,6

**various**
 126:4
**vast**
 99:25
**vastly**
 98:20
**vehicles**
 72:10
**verbal**
 122:21 126:6,6
**verdict**
 26:3
**versus**
 4:4 37:18 38:13
   46:11 102:20
   103:23 104:3
   105:24 107:7,15
**vicinity**
 72:11
**video**
 33:12 68:8 70:25
   71:9,11,17,23,24
   72:11,14 73:8
   135:14
**videographer**
 2:15 4:2,10 53:23
   54:2 107:20,24
   135:16
**Videotape**
 4:3
**VIDEOTAPED**
 1:16
**view**
 9:15 36:1 44:19
   80:14 123:7 130:10
   130:13
**views**
 35:25 71:9
**violate**
 36:5,5,6
**violated**
 15:18,24 16:1 33:20
   36:25 38:10 46:8
   119:6 121:12,21
   122:9



**violating**
39:10 121:24
**violation**
16:3 19:17 21:10
22:16 41:9 46:4
57:16 120:17 121:1
**violations**
38:6 45:12 119:16,22
**virtue**
9:20 20:12 121:20

**W**

**wait**
117:1
**want**
18:1 32:6 34:5,18,19
62:2 66:2,8,18,18
66:19,20 78:23 79:9
82:14,17,19 86:22
87:22,23 88:10,10
93:7 100:12 111:7,8
113:16 119:3
120:17 121:21
130:18,20 131:3,4,6
131:6 133:14
134:24,25 135:1,2
135:13
**wanted**
82:11 98:21
**warning**
51:1,19 53:13 60:19
110:14,19,24 111:4
111:13,15 112:18
112:23
**warnings**
100:15
**wasn't**
35:12 55:5 59:23
60:4 61:1 79:23
80:10,12 122:3,3
**watch**
70:24
**way**
7:14 13:17 15:16
18:21 19:24 20:12

22:4 47:13 48:9
54:19 55:6 66:11
74:23 75:8 79:25
89:15,23 92:14
97:17 104:25 109:1
109:24 112:14
113:13 118:16
119:7,10 120:24
121:13,19 123:19
126:16 127:15
128:2 131:9
**WAYMAYER**
4:19 5:16 134:19
**Waymire**
2:14 4:19
**ways**
20:5 78:12
**we'll**
23:12 47:13 50:14,14
58:11 74:8 92:2
124:22
**we're**
14:15 46:21 50:4,5
68:17 72:23 82:21
89:12 98:23 135:18
**we've**
55:9
**weekend**
9:11
**weight**
129:1,2
**well-defined**
123:4
**went**
43:8,11 55:2 72:14
134:22
**weren't**
16:8 56:6 69:7
122:20,20
**widely**
64:6
**Williams**
2:15 4:10
**willing**
34:10

**Wilson**
87:17 88:7
**Winston**
12:5
**withdraw**
16:15
**witness**
4:15,23 5:1 19:25
20:3 43:23 44:11
46:17 53:4,6,9
62:16 81:20 83:16
102:11 125:15,17
125:20 126:1,3,8
128:12 132:13
135:20
**witnessing**
57:9
**won**
50:7
**words**
14:19 18:14 23:2
**work**
6:20,23,25 8:9,13
11:22 30:1 31:11,16
54:13 56:14 57:21
100:2 109:21 113:3
**worked**
52:6 54:9 59:24
62:12 98:19 99:25
101:17 105:8,9
**working**
32:2 55:24 75:14
101:25 123:22
**works**
56:2 113:9
**wouldn't**
9:17 16:20 21:18
40:3 82:10 97:6
120:15 129:7
**wow**
56:10,11
**write**
26:8
**writing**
51:18 56:2 82:10

105:22 112:16
**written**
26:7 42:6 48:4 51:16
53:12 54:14,15,16
54:16 56:1,5,7,16
60:19,21,24 61:11
61:17 63:6,12 78:11
78:13 81:24 103:14
106:16,18 107:5
119:8 121:14 130:2
130:6,11
**wrong**
15:4 17:22 44:22
85:20 111:1,2
**wrote**
22:9 28:19 35:12

**X**

**X**
3:2,7 112:12

**Y**

**yeah**
11:6 13:10,15,22
15:14,20 20:25
21:13 24:4 32:11
33:6,12 43:20 44:5
46:18 52:4 61:22
62:24 64:22 65:3
66:6,17 68:21 73:21
79:5 80:9 87:18
90:9 92:9 93:11
94:21,21 98:4,4
99:22 107:12
110:22,23 111:14
112:10 113:19
114:18,25 116:22
117:24 118:11
119:12 122:13,15
122:20 124:21
125:9 126:14
132:18,22
**year**
49:9 60:3 92:12 93:2
93:14 94:19,25 97:2



105:10,11
**years**
6:15 47:15 59:24
  93:3 95:16,25 105:8
  110:4

---
**Z**
---

---
**0**
---
**000378**
90:2
**000733**
90:3
**02/02/2029**
136:21 137:24
**04**
3:5 138:3
**05/23/2025**
139:5
**06**
3:10

---
**1**
---
**1**
4:3 20:20 32:14
  92:20 95:2
**1:29**
1:17 135:18,23
**10**
92:20 116:21,23
  117:2,8
**10-hour**
8:14
**10:04**
1:17 4:7
**100**
2:3
**11**
76:6,11,20 92:20
  95:4 117:2,6,8
  133:6
**11:02**
53:23
**11:16**
54:2
**110**

1:19 4:7
**116**
3:19
**117**
3:20,21
**12**
77:1,5 83:15,15,16
  83:18 92:20 96:6,20
  97:2 117:9,10,10,20
  118:18,19
**12:29**
107:20
**12:50**
107:24
**124**
3:22
**12th**
88:9
**13**
58:1 77:8,9,15,18
  92:20 116:17
  124:23 126:1
**13-page**
26:13,25
**130**
3:24
**132**
3:25
**135**
138:3
**14**
92:21,21 98:5 130:21
  132:13 134:15
**15**
98:6 130:20 131:24
  132:10
**15,000**
10:17,18
**1500**
60:2
**15k**
11:9,18
**16**
94:22 96:4,15
**17**

95:8
**17,000**
75:13
**18**
77:23
**1800**
60:3
**19**
13:12
**1970**
4:8
**1980**
1:19
**1990**
60:10

---
**2**
---
**2**
20:8 58:21 60:13
  67:15 76:4,8 92:20
  95:14 125:21 126:1
**20**
3:12 99:10 138:13
**2012**
58:1
**2013**
58:19 60:10
**2014**
99:10
**2015**
99:9,10
**2016**
95:14 96:11
**2017**
95:12
**2018**
95:10
**2019**
58:19 79:18 95:8
**2020**
50:18 80:20 93:18
  95:6
**2021**
93:1,17 95:4
**2022**

6:14 56:21 58:11
  95:2 96:12
**2023**
126:23
**2024**
88:9
**2025**
1:16 4:6 63:7 136:7
  136:12 137:16
**20th**
126:22
**22**
70:23 71:14 73:19
  74:15 86:21 89:21
  96:5,15 99:8 101:3
  114:6,7
**222-9922**
2:5
**23**
1:16 3:13 99:9
**23rd**
4:6 136:7,12 137:16
**24/7**
9:9
**24th**
96:11
**26**
35:4 41:17 42:4,9
  45:15 48:4 93:17
**2600**
2:4
**28**
93:17
**2970**
2:8

---
**3**
---
**3**
20:6,7,8 67:15 70:23
  71:14 88:17,18
  92:20 135:5
**30303**
2:4
**30329**
2:9



**33301**
 1:20
**350**
 10:19 11:20
**3rd**
 133:17

---
**4**

**4**
 23:14 24:25 25:2,4
  26:13,25 27:3 60:15
  67:16 73:17,18
  74:15 92:20
**404**
 2:5,10 134:25
**404-274-1178**
 135:3
**41**
 89:21 90:12 92:8
  93:13
**450**
 10:20 11:2,7
**47**
 3:11
**4th**
 63:7,7 96:11 135:9

---
**5**

**5**
 79:6,8 86:21 89:21
  92:8,20
**5/2020**
 3:15 80:23
**5:00**
 8:11
**50**
 7:19,20,22,22
**51**
 98:10,11 101:2
**52**
 98:10,11 101:2
**54**
 89:22 90:13 92:8
  93:13
**55**

93:25 94:13 96:19,22
 97:6 99:1,5 104:22
 104:23

---
**6**

**6**
 32:8,16 33:7 46:24
  80:19 81:18 82:23
  92:20 98:8,11 101:3
**60**
 52:10
**62**
 49:15
**633-9230**
 2:10
**650**
 2:9
**6th**
 1:19 4:8

---
**7**

**7**
 32:8,16 82:25 92:20
  95:10
**70**
 52:11 93:25 94:9,12
  94:16,16 97:5 98:25
  99:3
**700**
 49:11
**78**
 104:23
**79**
 3:14,25 132:7

---
**8**

**8**
 84:3 92:20 95:6
  114:6 126:13
**8.8**
 11:15,20
**80**
 3:15,23,23,25 132:8
**83**
 3:16
**87**

3:17

---
**9**

**9**
 89:25 91:3 92:2,20
  95:12 114:7
**9:00**
 8:11
**90**
 3:18

